**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 1:07-cv-01267 (JR) |
| | ) | |
| U.S. NATIONAL ARCHIVES AND | ) | |
| RECORDS ADMINISTRATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S
APPLICATION FOR INJUNCTIVE RELIEF**

Plaintiff Judicial Watch, Inc. requests nothing in its emergency application for injunctive relief that is different than the ordinary relief it ultimately seeks in its verified complaint from defendant United States National Archives and Records Administration ("NARA"). Plaintiff does not claim that any records are being destroyed; does not seek to preserve the status quo; does not identify any specific exigency; and does not even identify a desired date for receipt of the records at issue. Indeed, plaintiff identifies no factor found significant by courts in disputes meriting preliminary relief. Instead, all plaintiff requests in its application is "that the Court enjoin Defendant from continuing to withhold records responsive to Judicial Watch's April 5, 2006 FOIA request by requiring Defendant to search for and produce all non-exempt responsive records by a date certain and by requiring Defendant to produce a Vaughn index of any and all responsive records subject to any claim of exemption." Appl. at 6 (emphasis added); see also Proposed Or. at 1-2. That plaintiff seeks nothing more than the substantive relief requested in its complaint, rather than any emergency relief designed to preserve the status quo, is reason alone

to deny the request for preliminary relief.  See Verified Compl. ¶ 12; see also Electronic Privacy

Info. Ctr. v. United States Dep't of Justice, No. 03-2078, Or. at 1 (D.D.C. Oct. 20, 2003)

(Robertson, J.) vacated as moot 2004 WL 2713119 (D.C. Cir. 2004) (denying sua sponte a

request for preliminary injunction "enjoining defendant Department of Justice from continuing to

deny plaintiff expedited processing of plaintiff's Freedom of Information Act request" because

such relief "would effectively grant all the relief plaintiff seeks").

　　　The touchstone for granting preliminary relief is irreparable harm.  Plaintiff identifies no

harm meriting emergency relief.  In invoking the court's extraordinary powers, plaintiff

advances rather ordinary justifications, claiming simply that it is entitled to documents requested

in April 2006 (as any other FOIA litigant would) and that the subject of the records requested –

former First Lady Hillary Clinton's calendar and related records – are somehow more significant

than the other Presidential records requested from NARA.  Pl's Appl. for Inj. Relief ("Appl.") at

6.  Moreover, plaintiff identifies only a generic harm in support of its application – purported

prejudice from the denial of its "clear, statutory right to receive all non-exempt responsive

records" and a Vaughn index[1] – that is common to all plaintiffs raising FOIA claims and typical

in most, if not all, FOIA disputes.  Appl. at 5.  As evidenced by the many opinions of this court

denying preliminary relief to FOIA litigants, such claims of statutory entitlement are inadequate

to justify emergency relief.

　　　Nor can plaintiff show a likelihood of success on the merits as required for preliminary

injunctive relief.  Through this litigation, plaintiff seeks to upend the orderly procedures for

releasing presidential records that are detailed in the Presidential Records Act of 1978, the

---

[1] As described further below, plaintiff is not entitled to a Vaughn index for withholdings of
restricted records under the Presidential Records Act, 44 U.S.C. § 2204(b)(3).

Freedom of Information Act and by Executive Order, and unilaterally to jump to the front of

NARA's processing queues.  Through its application for emergency relief, plaintiff goes further,

as it seeks to bypass the orderly procedures for litigating disputes by jumping to the front of the

court's docket and unilaterally requesting an expedited litigation schedule of its own liking.  It is

plain that plaintiff seeks to use the preliminary injunction provisions of Federal Rule of Civil

Procedure 65, which are intended to provide a shield against imminent injury while a court

considers the merits of a dispute, to artificially accelerate the proceedings in this case.  This is

nothing more than a litigation tactic, and it should not be indulged.  As this Court explained to

plaintiff before, "cases finding 'emergency' conditions in a FOIA context have been few" and

"focused" and plaintiff does not meet the standard.  Judicial Watch, Inc. v. United States Dep't

of Justice, No. 00-1396, Or. at 2 (June 27, 2000) (Robertson, J.).

        At base, the relief plaintiff seeks is inconsistent with the processing provisions of the

Presidential Records Act of 1978, 44 U.S.C. § 2201, et seq. ("PRA"), FOIA, and Executive

Order 13233.  The PRA not only requires NARA carefully to review Presidential records for

restrictions from disclosure, but grants both the incumbent and former Presidents a consultative

right to review any responsive records before release.  Any decision to restrict a record under

one of six enumerated categories under the PRA is not judicially reviewable.  44 U.S.C.

§ 2204(b)(3).  Executive Order 13233 further explains the procedure required for administering

Presidential records, granting an additional 90 days for a former President to review the

documents and make withholding decisions and then time for the incumbent President to concur

with those decisions.  By requesting "emergency" relief, plaintiff seeks to bypass statutory

processing requirements.  Plaintiff cannot by application request what is not permitted by law.

Plaintiff's application for preliminary injunction must be denied.

## BACKGROUND

### 1.    Statutory and Regulatory Framework

The PRA sets forth a scheme for the preservation and disclosure of Presidential and Vice-Presidential records.  44 U.S.C. §§ 2201, 2207.  "Presidential records" covered by the PRA include "documentary materials, or any reasonably segregable portion thereof, created or received by the President, his immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President."  44 U.S.C. § 2201(2).  Included among "Presidential records" are documentary materials created or received by the Office of the First Lady, an advisor to the President and a component of the Executive Office of the President, when those materials meet the definition of "Presidential records" set forth in the PRA.  See, e.g., Executive Office of the President available at http://www.whitehouse.gov/government/eop.html (last visited Aug. 2, 2007); H.R. Rep. No. 95-1487, at 12 (1978), reprinted at 1978 U.S.C.C.A.N. 5732, 5743 ("When the President's spouse or other family member or associate serves as a de facto member of the President's staff, the documents which reflect such service are included in the ambit of presidential records[.]"); cf. Ass'n of Am. Phys. & Surgeons, Inc. v. Clinton, 997 F.2d 898, 904 (D.C. Cir. 1993) ("Congress itself has recognized that the President's spouse acts as the functional equivalent of an assistant to the President.").

Documentary materials deemed Presidential records become the property of the United States, 44 U.S.C. § 2202, and may be disclosed to the public under limitations imposed by the PRA.  Id. § 2204.  The PRA imposes upon the Archivist of the United States ("Archivist") "an affirmative duty to make [Presidential] records available to the public as rapidly and completely as possible consistent" with limitations under the PRA.  Id. § 2203(f)(1).  However, there is no public access to Presidential records under FOIA for a period of five years after the President leaves office.  Id. § 2204(b)(2).  In addition, the President may, before leaving office, "specify durations, not to exceed 12 years, for which access shall be restricted with respect to information" within one of six enumerated categories:  (1) classified or secret information designated by Executive order; (2) documents relating to appointments to Federal office;  (3) documents specifically exempted from disclosure by statute other than FOIA; (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential; (5) confidential communications requesting or submitting advice, between the President and his advisers, or between such advisers; or (6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.  See 44 U.S.C. §§ 2204(a)(1) – (a)(6).  Thus Presidential records falling into one of the six categories must be withheld for up to 12 years, even if the record is the subject of a FOIA request.  The PRA provides that the Archivist's decision to categorize a record as falling under one of the six mandatory, restricted categories, and then to withhold the record within the 12 year period, "shall not be subject to judicial review."  Id. § 2204(b)(3); see also H.R. Rep. No. 95-1487, at 4, 16 ("The subsection also provides that when a presidential restriction is in effect, a determination

by the archivist regarding access it not subject to judicial review . . ..."); Armstrong v. Executive Office of the President, 1 F.3d 1274, 1294 (D.C. Cir. 1993).

The Archivist may withhold documents not subject to restriction under the PRA under FOIA exemptions from disclosure. The PRA incorporates the provisions of the FOIA, including the enumerated exemptions from public access contained in 5 U.S.C. § 552(b), except the (b)(5) exemption covering "privileged" records. See 44 U.S.C. § 2204(c)(1). Applicable FOIA exemptions -- including but not limited to Exemption 2 for certain internal administrative records, and Exemption 7, for law enforcement records, 5 U.S.C. 552(b)(2) & (b)(7), respectively -- may apply to records not otherwise covered by one of the PRA restrictions, and to Presidential records first processed beyond the 12-year PRA restriction period. See 44 U.S.C. § 2204(c)(1). The PRA further provides that none of its provisions "shall be construed to confirm, limit or expand any constitutionally based privilege which may be available to an incumbent or former President." Id. § 2204(c)(2).

Executive Order 13233 provides that the former and incumbent Presidents be afforded an opportunity to review all Presidential records, not otherwise restricted by operation of section 2204 of the PRA, prior to their public disclosure for purposes of determining whether to invoke any constitutionally-based privileges. Executive Order 13233 provides that NARA must provide notice of a FOIA request for Presidential records to the former and incumbent President as soon as practicable and provide a copy of any records requested by the President. Once the Presidential Library intends to disclose Presidential records, NARA must notify the incumbent and former Presidents, through their designated representatives, in order to provide them an opportunity to review the records for any constitutionally-based privileges that may apply.

Executive Order 13233, § 3.  The former President has up to 90 days to review requests that are not unduly burdensome, id. § 3.b, followed by an undetermined time period for the incumbent President to review the records as well.  Id. § 3.d.

The legislative history of the PRA explains the rationale behind the delayed disclosure of restricted Presidential records and the mechanisms for ensuring Presidential review.  In passing the bill that became the PRA, Congress recognized that "premature disclosure" of Presidential records could have a "chilling effect on presidents and the frankness of advice they could expect from their staffs."  H.R. Rep. No. 95-1487, at 8.  It was felt, in fact, that the failure to recognize that potential "might eventually diminish the completeness of the written record created and left by chief executives."  Id.  Congress acknowledged, in passing the PRA, the need to consider the "expectation of confidentiality of executive communications to avoid the prospect of a constitutional infirmity."  Id.  Thus, the PRA sought to balance these considerations against the desire for "ready availability" of Presidential records.  Id.; see also id. at 15 (Congress sought to balance "the objectives of assuring availability with the concern that the premature disclosure of sensitive presidential records will eventually result in less candid advice being place on paper and a depleted historical record").

Consistent with FOIA, NARA may expedite certain record requests "to the head of [its] FOIA queue."  36 C.F.R. § 1520.28; see also 5 U.S.C. § 552(a)(6)(E)(v) (regarding expedited FOIA requests).  In light of the provisions of the Executive Orders, however, including the requirement of a Presidential notification period, NARA's regulations provide that the agency "cannot expedite requests for Presidential records."  36 C.F.R. § 1250.28(b).

NARA received legal custody of Presidential records of former President William J. Clinton, including records from the Office of the First Lady, on January 20, 2001.  See Decl. of Emily Robison in Supp. of Def's Opp'n to Pl.'s Mot. for Inj. Relief ¶ 11 ("Robison Decl."). NARA deposited the records in the Clinton Presidential Library when it opened in November 2004.  The Clinton Presidential Library is a component of NARA and, therefore, all staff members of the Clinton Presidential Library are also NARA staff members.  Id. ¶ 2.  NARA regulations direct that FOIA requests for Presidential records of the Clinton Administration be directed to the Director of the Clinton Presidential Library for processing.  See 36 C.F.R. §§ 1250.22.  Pursuant to 44 U.S.C. § 2204(a), President Clinton asserted his right to apply the six enumerated restrictions in the PRA for the full 12 year period to all Presidential records.  See Robison Decl. ¶ 7.  Any documents covered by one of the six restrictions on disclosure are therefore not releasable until after January 22, 2013, at which time those records not also subject to a FOIA exemption may be proposed for release.  See id. ¶ 11.  The five-year moratorium on disclosure mandated by the PRA expired on January 20, 2006, and the Clinton Presidential Library began to receive FOIA requests for documents upon that date.  Id.  The Library currently has 266 pending FOIA requests, estimated to require the processing of over 10 million pages of Presidential records.  Id.  The Clinton Presidential Library has no more than six archivists available to process its pending FOIA requests for textual and electronic records.  Id. ¶ 21.

      2.    **Factual Background**

By letter dated April 5, 2006, plaintiff submitted a FOIA request to the FOIA Coordinator of the Clinton Presidential Library, seeking access to "Clinton Presidential records," specifically "First Lady Hillary Rodham Clinton's calendar, to include but not limited to her

daily office diary, schedule, day planner, telephone log book, and chronological file." <u>See</u> Robison Decl., Ex. 1 at 1.  Plaintiff identified the time period as spanning eight years between January 1, 1993 and January 20, 2001, and requested a waiver of search and duplication fees.  As justification for its fee waiver request, plaintiff advanced that "the subject-matter of the request concerns the operations and activities of government, namely daily operations, duties and activities of the former First Lady." <u>Id.</u>, Ex. 1 at 4.  Plaintiff further contended that "the American public deserves full disclosure of the schedule and details of duties of the former First Lady of the United States . . . particularly . . . given Mrs. Clinton's position as a 'special government employee' and her subsequent employment as a U.S. Senator . . . [and] because relatively little is known chronologically about the daily events and meetings, diplomatic and otherwise, in which the First Lady was involved throughout the first and second terms of the Clinton administration." <u>Id.</u>, Ex. 1 at 5.  Plaintiff did not request expedited processing of its request.  <u>Id.</u>

The Supervisory Archivist for the Clinton Presidential Library replied by letter dated April 13, 2006, noting that a preliminary search of the First Lady's calendar revealed approximately 62,600 pages of textual records and 125,732 pages of electronic records.[2]  <u>Id.</u>, Ex. 3.  The Supervisory Archivist also noted that the page total "is an estimate and that all pages

_____

[2] The initial, rough estimate of 62,600 pages of textual records has now been determined, after a physical search, to consist of approximately 30,000 pages, of which approximately 10,000 pages are daily schedules for First Lady Hillary Rodham Clinton, and the remaining approximately 20,000 pages consist of telephone log books for the Office of the First Lady, which contain as a subset an as-yet undetermined number of message slips for Mrs. Clinton.  <u>See.</u> Robison Decl. ¶ 15.  No responsive records corresponding to a "daily office diary," a "day planner," or a "chronological file" belonging to First Lady Hillary Rodham Clinton were found.  <u>Id.</u>  The 125,732 pages of electronic records, which entirely consist of e-mail records of two of the First Lady's appointed schedulers on staff, have since been determined not to be responsive to plaintiff's request.  Accordingly, there are a maximum of 30,000 pages of textual records that

processed might not be relevant to your specific topic." Id. She explained the review process,

outlining how the Library processed FOIA requests for records, like the First Lady's, covered by

the PRA and placed the requests in one of 16 FOIA processing queues:

> The staff of the Clinton Library is currently processing and reviewing FOIA
> requests that precede your request. To treat everyone equitably, we have placed
> your request in our complex electronic unclassified processing queue by the date
> it was received in our office. FOIA requests received by the Clinton Library
> are processed and reviewed for access under provisions of the PRA and FOIA and are
> subject to Executive Order 13233, which requires that we notify the
> representatives of the former President and the incumbent President prior to the
> release of any Presidential records.

Id.; see also Robison Decl. ¶ 18. On July 25, 2006, plaintiff responded, acknowledging "the

processing and review procedures . . . under the provisions of FOIA, the [PRA], and Executive

Order 13233," and requesting an estimated completion date. Id., Ex. 4 at 1. The Supervisory

Archivist responded on August 9, 2006, identifying 156 FOIA requests pending before plaintiff's

request and at least 2,000,000 pages of records to process before plaintiff's request would reach

the front of its queue. Id., Ex. 5. She further explained that she could not estimate a completion

date, in part because the Clinton Presidential Library had begun processing FOIA requests only

seven months prior to receiving the plaintiff's request, upon the expiration of the five-year

restriction period provided under the PRA. Id.

Plaintiff again requested a status update and an estimated completion date by letter dated

January 16, 2007. Id., Ex. 6. The Supervisory Archivist responded on February 9, 2007 that the

FOIA request had moved up in its processing queue, but that it had not yet reached the front of

the queue. Id., Ex. 7. Explaining the time-consuming task of processing all the requests before

it, the Supervisory Archivist explained that she "must complete a page-by-page review of all

---

may be responsive to plaintiff's request. Id. ¶ 17.

records to determine if this material can be released or if it requires withholding under one of the six [PRA] restrictive categories and/or the eight applicable FOIA exemptions that apply to Clinton Presidential records." Id.

Without further communication, plaintiff filed the instant suit and application for preliminary injunctive relief. NARA's search revealed approximately 30,000 pages of potentially responsive records queued for processing. See Robison Decl. ¶ 17. Because the Clinton Presidential Library received other FOIA requests involving records relating to Mrs. Clinton's schedule prior to receipt of the original request from plaintiff Judicial Watch, and subsequently received two or more additional requests for similar records, it made a determination earlier in 2007 to initiate processing of a portion of plaintiff's request – constituting an estimated 10,000 pages – as part of its "multi-request queue." See id. ¶ 20. As a result, the Clinton Presidential Library had begun to process those 10,000 records as of June 14, 2007. See id. The remainder of plaintiff's request (which constitutes an as-yet undetermined number of messages from the approximately 20,000 pages of telephone log books from the Office of First Lady) is still pending in the multi-request queue, behind what currently consists of five FOIA requests received prior to plaintiff's request.[3] See id.

The Clinton Presidential Library has no more than six archivists available to process all of its pending FOIA requests for textual and electronic records. See Robison Decl. ¶ 21. Processing Presidential records requires a page-by-page, line-by-line review to ensure that all exempt information is properly identified and redacted. See id. It is estimated that it will take

---

[3] Note, however, that under the matrix process of review utilized by the Clinton Presidential Library, in which each of the 16 FOIA queues are rotated after the next in line FOIA request is selected, there are approximately 80 FOIA requests pending ahead of the telephone log books portion of plaintiff's FOIA request. Decl. ¶ 19.

one archivist approximately six months to process the 10,000 pages of daily schedule records currently being processed in the multi-request queue. Id. The remaining 20,000 pages of telephone log book records will remain in the multi-request queue. Id. ¶ 20. At the conclusion of processing, NARA will notify the representatives of the former and incumbent Presidents of the proposed release and provide any requested records to the former and incumbent Presidents for their review, consistent with the PRA and Executive Order 13233. Id. ¶ 22. Of course, if plaintiff is interested in receiving documents faster, it can work with NARA to narrow the scope of its broad request spanning eight years.

## ARGUMENT

Preliminary injunctive relief such as that demanded by plaintiff is "an extraordinary measure, and . . . the power to issue such exceptional relief 'should be sparingly exercised.'" Experience Works, Inc. v. Chao, 267 F. Supp. 2d 93, 96 (D.D.C. 2003) (quoting Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1969)) (internal quotes omitted); accord Boivin v. US Airways, Inc., 297 F. Supp. 2d 110, 116 (D.D.C. 2003) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion") (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) ( per curiam)) (emphasis in original). "[I]n considering a plaintiff's request for a preliminary injunction a court must weigh four factors: (1) whether the plaintiff has a substantial likelihood of success on the merits; (2) whether the plaintiff would suffer irreparable injury were an injunction not granted; (3) whether an injunction would substantially injure other interested parties; and (4) whether the grant of an injunction would

12

further the public interest." Al-Fayed, 254 F.3d at 303; accord Serono Labs., Inc. v. Shalala, 158

F.3d 1313, 1317-18 (D.C. Cir. 1998).

## I.    PRELIMINARY INJUNCTIONS ARE GENERALLY INAPPROPRIATE IN FOIA CASES.

Plaintiff's request for a preliminary injunction is even more extraordinary than in the

usual case because plaintiff seeks such relief in a FOIA case where, for a variety of reasons, such

motions are generally inappropriate.[4]  First, absent truly dire emergencies, use of the preliminary

injunction mechanism should not be encouraged because it unnecessarily adds an additional

layer of procedure to FOIA litigation when available existing procedural mechanisms are

entirely adequate for managing that process.  Ideally for the Court and the parties, the parties can

agree among themselves on a reasonable production schedule.  If the parties fail to agree, the

Court can enter an order setting a production schedule at an initial conference.  There is no

legitimate reason for complicating these straightforward procedures by resorting to the more

drastic preliminary injunction remedy.

---

[4]  Indeed, courts in this district routinely deny requests for such relief.  See, e.g., Long v. Dep't f
Homeland Security, 436 F. Supp. 2d 38, 42-45 (D.D.C. 2006) (Friedman, J.) (denying
preliminary injunction request for expedited processing of FOIA request); Electronic Privacy
Info. Center v. U.S. Dept. of Justice, slip op., No. 03-2078 (D.D.C., Oct. 20., 2003) (Robertson,
J.) (denying, sua sponte, a request for preliminary injunction "'enjoining defendant Department
of Justice from continuing to deny plaintiff expedited processing of plaintiff's Freedom of
Information Act request'" because such relief "would effectively grant all the relief plaintiff
seeks" and was in the nature of a request for mandamus); Al-Fayed v. CIA, 2000 WL 34342564,
*6 (D.D.C. 2000) (Kollar-Kotelly, J.) (finding that "upon consideration of the parties'
arguments, the statutory and regulatory context, and the applicable case law," emergency relief
was not warranted despite the agency's delay in responding to FOIA requests); Judicial Watch v.
U.S. Dept. of Justice, slip op., No. 00-1396  (D.D.C., June 27, 2000) (Robertson, J.) (denying
plaintiff's "emergency motion for expedited treatment" to "compel defendant to respond to
plaintiff's Freedom of Information Act request"); Assassination Archives and Research Ctr., Inc.
v. CIA, No. 88-2600, 1988 U.S. Dist. LEXIS 18606, *1 (D.D.C., Sept. 29, 1988) (Revercomb,
J.) (rejecting motion for preliminary injunction asking the Court to order expedited processing of
a FOIA request).

*Second*, FOIA plaintiffs will seldom meet the standard for irreparable harm.  As discussed infra, it is the plaintiff's burden to make a "clear showing" that denial of the requested relief will result in harm that is "certain and great" rather than "speculative."  In cases where a plaintiff purports to be seeking documents to contribute to a public debate, that plaintiff frequently (if not by definition) does not know whether the request will produce responsive, non-exempt documents that will significantly contribute to a public debate.  And this is particularly true where, as here, plaintiffs fail to "identify an imminent action indicating that the requested information will 'not retain its value if procured through the normal FOIA channels.'"  Long, 436 F. Supp. 2d at 43.  Significantly, plaintiff has not even alleged such urgency.  Accordingly, the preliminary injunction procedure is generally incompatible with FOIA lawsuits.

*Third*, it is generally inappropriate to seek, purportedly by way of a "preliminary" remedy, the relief which it will ultimately seek on the merits, i.e., the grant of plaintiff's request for the disclosure of non-exempt documents.  See Univ. of Texas v. Camenisch, 451 U.S. 390, 397 (1981) ("[I]t is generally inappropriate for a federal court at the preliminary injunction stage to give a final judgment on the merits").  Unlike other plaintiffs who have requested extraordinary relief in order to secure expedited processing – which has been found in certain, unique circumstances to justify preliminary relief – plaintiff does not even offer an urgent need for documents in the near future.

There is also no indication in this case of significant delay in the processing of plaintiff's request.  To the contrary, NARA has timely begun its work of gathering, reviewing, and processing potentially responsive documents despite the fact that it continues to work on the other requests that pre-dated plaintiff's request.  See Robison Decl. ¶¶ 15-21.  Indeed, NARA

has begun its review and processing of at least the approximately 10,000 pages of records of the First Lady's schedules, as it diligently works to review records for other pending FOIA requests in an orderly manner as well.  Id. ¶ 20.  Had plaintiff met and conferred with defendant, as required by Local Rule 7(m), prior to filing its Motion for Injunctive Relief, the parties could potentially have agreed (and still may be able to agree) upon a schedule for completing the processing of the request.  Indeed, if plaintiff had conferred with defendant, plaintiff would have learned that the archivists had just begun processing part of its request when plaintiff filed the instant suit.  Use of the preliminary injunction procedure accomplishes nothing that could not be achieved through the standard procedures that generally apply in FOIA cases.

## II.   PLAINTIFF FAILS TO DEMONSTRATE LIKELIHOOD OF SUCCESS ON THE MERITS UNDER THE PRA AND FOIA.

Plaintiff contends that it will prevail on the merits because it has a "clear statutory right to have the Library search for and produce all non-exempt records responsive to its April 5, 2006 FOIA request within the time frame required by statute," and to have NARA produce a Vaughn index of withheld records.  Appl. at 4.  Plaintiff ignores the plain language of FOIA and the PRA, and instead, implies a time certain by which records must be reviewed, processed and produced.  Section 552(a)(6)(i) of FOIA provides that an agency shall "determine within twenty working days (except Saturdays, Sundays, and legal public holidays) after the receipt of the request whether to comply with such request."  That provision, while requiring a response within 20 days, does not require processing to be completed within 20 days.  See American Civil Liberties Union v. DOD, 339 F. Supp. 2d 501, 503 (S.D.N.Y. 2004) ("While it would appear that expedited processing would necessarily require compliance in fewer than 20 days, Congress provided that the executive was to 'process as soon as practicable' any expedited request.");

Long, 436 F. Supp. 2d at 43 (finding that the failure to meet statutory deadlines did not support a likelihood of success on a FOIA claim).  Given Executive Order 13233 requirements for a 90-day period of consultation by a former President and an additional review by the incumbent President, a 20-day response period for completion of processing is unlikely in most FOIA requests for presidential records.

Indeed, as plaintiff is well aware, courts have found that the 20-working day response time is not itself a rigid requirement, and have routinely allowed agencies to process FOIA requests under the "first in, first out" rule.  See Judicial Watch v. Rossotti, 285 F. Supp. 2d 17, 26 (D.D.C. 2003) (Collyer, J.) ("Certainly, it took longer than twenty days to respond to Judicial Watch's FOIA requests, but that is explained by the nature of these requests, the many offices to which they were directed, the number of FOIA requests [the agencies] regularly receive, and the treatment of FOIA requests on a first in/first out basis."); see also id. ("there are often instances where an agency will not be able to meet [the twenty-day] deadline").  Thus, under FOIA, a court may grant an extension to allow the agency to finish its search and processing where the agency has been unable to meet the deadline because of exceptional circumstances.  See 5 U.S.C. § 552(a)(6)(c); see also Open America v. Watergate Special Prosecution Force, 547 F. 2d 605, 615 (D.C. Cir. 1976).[5]  Such circumstances make the 20-day deadline "not mandatory but directory."  Id. at 616.  Even where expedited processing is requested – which plaintiff has not – release of documents must be "as soon as practicable," not within a time certain.  See 5 U.S.C. § 552(a)(6)(E)(iii).

---

[5]  As the Court of Appeals explained in Ogelsby v. United States Dep't of Army, 920 F.2d 57 (D.C. Cir. 1990), "[f]requently if the agency is working diligently, but exceptional circumstances have prevented it from responding on time, the court will refrain from ruling on the request itself and allow the agency to complete its determination."  Id. at 64.

Instead, what is reasonable on a first-in, first-out processing basis will vary depending on the size, scope, and detail of the request, other agencies or components which must be consulted or to which documents might have to be referred for additional review, and exemption issues. As explained in detail to plaintiff, there were over 156 first-in requests that required processing – constituting an estimated two million pages of records requiring review for withholdings or redactions in six categories of PRA disclosure restrictions, eight FOIA exemptions, and for presidential privilege – before NARA could begin processing even part of the instant request. See Robison Decl. ¶ 18.  Plaintiff's request will require painstaking review of approximately 30,000 pages of records spanning an eight-year time period.  Id. ¶ 17.  NARA has begun processing the approximately 10,000 pages of records comprised of the former First Lady's daily schedules.  Id. ¶ 20.  That review by itself will likely take up to six months, at the conclusion of which NARA must provide an opportunity for presidential consultation.  Id. ¶¶ 21, 22.

In addition, plaintiff suggests that it is absolutely entitled to a Vaughn index for all withheld documents.  Under the PRA, however, plaintiff is not entitled to a Vaughn index for documents withheld under one of the six mandatory restrictions; indeed, plaintiff is not entitled to judicial review of such withholdings and is instead limited to an administrative appeal.  44 U.S.C. § 2204(b)(3).  Having only just begun to process the records, NARA is unable to determine at this time what records, if any, will be withheld under the PRA, FOIA or for privilege.  But even if NARA would be obligated to provide a Vaughn index at some point for some withholdings, courts generally do not require Vaughn indices until dispositive motions are

17

filed.[6]  Plaintiff does not even attempt to explain why it has an immediate right to obtain a

Vaughn index now.

    Plaintiff offers no reason to believe that the agency is not processing the request with due

diligence or that plaintiff has an entitlement to a Vaughn index, and thus fails to meet its burden

of demonstrating, "by a clear showing," Mazurek, 520 U.S. at 972, that relief of any kind is

warranted at this juncture.  Preliminary injunctive relief should be denied.

## III.    PLAINTIFF FAILS TO IDENTIFY ANY IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION.

     "The basis of injunctive relief in the federal courts has always been irreparable harm."

CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir.1995) (citing

Sampson v. Murray, 415 U.S. 61, 88 (1974)).  In order for a plaintiff to meet its burden of

demonstrating irreparable harm sufficient to warrant the entry of preliminary injunctive relief,

the injury complained of must be both certain and great; it must be actual and not theoretical.

Injunctive relief "will not be granted against something merely feared as liable to occur at some

indefinite time."  Wisc. Gas. Co. v. Federal Energy Regulatory Comm'n, 758 F.2d 669, 764

(D.C. Cir. 1985) (citation omitted).  Instead, the party seeking injunctive relief must show that

"[t]he injury complained of [is] of such imminence that there is a 'clear and present' need for

---

[6]  See, e.g., Miscavige v. IRS, 2 F.3d 366, 369 (11th Cir. 1993) (The "early attempt in litigation of this kind to obtain a Vaughn index . . . is inappropriate until the government has first had the chance to provide the court with the information necessary to make a decision on the applicable exemptions."); United States Committee on Refugees v. Dep't of State, No. 91-3303, 1992 WL 35089, *1 (D.D.C. Feb. 7, 1992) ("the preparation of a Vaughn index is unwarranted before the filing of dispositive motions in FOIA actions because the filing of a dispositive motion, along with detailed affidavits, may obviate the need for indexing the withheld documents") (internal quotation marks and citation omitted); Stimac v. U.S. Dep't of Justice, 620 F. Supp. 212, 213 (D.D.C. 1985) ("the preparation of a Vaughn Index would be premature before the filing of dispositive motions").

equitable relief to prevent irreparable harm." Id. (citations and internal quotations omitted).  It is a "well known and indisputable principle[]" that a vague or speculative harm cannot constitute "irreparable harm" sufficient to justify injunctive relief.  Id.  A plaintiff's failure to meet its burden of establishing irreparable harm is sufficient, in itself, to deny emergency relief.  CityFed Fin. Corp., 58 F.3d at 747.

Plaintiff's only claim of irreparable harm is that it has a "clear statutory right to receive all non-exempt responsive records to its April 5, 2006 FOIA request and an index of responsive records subject to any claims of exemption."  Appl. at 5.  That is the same claim of harm that any FOIA litigant may raise.  Of course, courts routinely reject applications for preliminary injunction raised by litigants seeking even expedited processing of their requests.  It certainly cannot be that a statutory right to records is adequate to justify extraordinary relief.  Even construing plaintiff's claim as harm stemming from NARA's purported failure to abide by FOIA deadlines, "the failure to meet . . . deadlines – all too common, unfortunately, in view of the number of FOIA requests made to agencies and the limited resources available to deal with them – nevertheless does not constitute a 'compelling need' under" FOIA for even expedited processing.  Long, 436 F. Supp. 2d at 43.  Indeed, this Court will be just as capable of ordering production of any documents it might find to be improperly withheld later as it is now.  Because plaintiff has failed to establish irreparable harm stemming from denial of the preliminary injunction that it seeks, its motion should be denied.

## IV.    THE REQUESTED PRELIMINARY INJUNCTION WILL HARM THE PUBLIC INTEREST.

Plaintiff's failure to show that it would be irreparably harmed if the requested injunction is not granted is by itself sufficient to defeat their motion for preliminary injunction.  CityFed

Fin. Corp., 58 F.3d at 747. There is further reason, however, not to grant the injunction. In addition to any harm that may befall plaintiff in the absence of the requested injunction, the court must consider whether an injunction of the sort demanded by plaintiff would be in the public interest. See Al-Fayed, 254 F.3d at 303; accord Serono Labs., Inc., 158 F.3d at 1317-18. Although plaintiff claims that it seeks merely to have NARA adhere to its own statutory mandate, it in fact seeks much more. As already described, FOIA merely requires that requests be processed on a first-in, first-out process. Plaintiff's effort to impose an artificial time frame on NARA does not take account of the realities attendant to processing a request like plaintiff's, including the necessity to identify responsive materials, get those materials prepared for processing, review a significant volume of potentially restricted materials under the PRA, review the responsive materials for applicable PRA and FOIA exemptions, make the necessary redactions, and notify the former and incumbent Presidents prior to releasing any non-exempt, responsive documents. That process simply cannot be completed in any limited time frame plaintiff suggests is required.

Plaintiff's request for the proposed preliminary injunction ignores these realities, and, as a result, threatens to compromise the delicate balancing of the public interest that Congress undertook in enacting FOIA and the PRA, between the general interest in disclosure of government information and the necessity of ensuring that certain types of documents, the disclosure of which would cause harm, would not be disclosed. The restrictions listed in § 2204(b) and the exemptions listed in § 552(b) embody a judgment by Congress that the public interest would best be served by protecting some presidential records from disclosure. As noted above, Congress sought specifically in the PRA to balance the benefits of disclosure of

Presidential records with the "chilling effect on presidents and the frankness of advice they could expect from their staffs" if complete disclosure were required shortly after the end of a President's term.  H.R. Rep. No. 95-1487, at 8.  Ordering NARA to disclose documents on an artificially accelerated timetable causes significant harm to this delicate balancing of these competing public interests and may violate directives granting Presidential review periods.

Plaintiff suggests also that the public interest will be advanced through a preliminary injunction because the former First Lady's calendar will somehow impact "Mrs. Clinton's current status as a presidential candidate[.]"  Notably, however, plaintiff does not suggest that any records released through orderly PRA processing will fail to contribute to a public debate.  Plaintiff "has failed to identify an imminent action indicating that the requested information will 'not retain its value if procured through the normal FOIA channels.'"  Long, 436 F. Supp. 2d at 43.  Indeed, plaintiff cannot know whether its request will lead to the disclosure of information that will significantly contribute to a public debate.  Thus, even assuming that the inability to use certain records in a public debate constitutes public harm, plaintiff generally only speculates as to whether public interests will be harmed because the plaintiff does not know whether there will be responsive, non-exempt information and whether, if so, the response will contribute in any meaningful way to the public debate.  See The Nation Magazine v. Dep't of State, 805 F. Supp. 68, 74 (D.D.C. 1992) (finding no irreparable harm because even if the Court "were to direct the speed up of the *processing* of their requests," plaintiffs had not shown that they were "entitled to *release* of the documents they" were seeking) (emphasis in original).  Plaintiff's request for injunctive relief seeks to vault its interests over the public's interest in orderly records disclosure and must therefore be denied.

21

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiff's motion for injunctive relief should be denied.

Dated: August 6, 2007                    Respectfully submitted,

                                         PETER D. KEISLER
                                         Assistant Attorney General

                                         JEFFREY A. TAYLOR
                                         United States Attorney

                                         JOHN R. TYLER
                                         Senior Trial Counsel


                                         */s/ Helen H. Hong*
                                         HELEN H. HONG (CA SBN 235635)
                                         Trial Attorney
                                         U.S. Department of Justice, Civil Division
                                         P.O. Box 883, 20 Massachusetts Ave., NW
                                         Washington, D.C.  20044
                                         Telephone: (202) 514-5838
                                         Fax: (202) 616-8460
                                         helen.hong@usdoj.gov

                                         Counsel for Defendant

### CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2007, a true and correct copy of the foregoing

Defendant's Opposition to Plaintiff's Application for Injunctive Relief was served electronically

by the U.S. District Court for the District of Columbia Electronic Document Filing System

(ECF) and that the document is available on the ECF system.


/s/ Helen H. Hong
HELEN H. HONG

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 1:07-cv-01267 (JR) |
| | ) | |
| U.S. NATIONAL ARCHIVES AND | ) | |
| RECORDS ADMINISTRATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DECLARATION OF EMILY ROBISON IN SUPPORT OF DEFENDANT'S
OPPOSITION TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF**

I, Emily Robison, declare as follows:

1.    I am the Acting Director and the Deputy Director of the William J. Clinton

Presidential Library, having served in the position of Acting Director since May 2007.  My

background, training, and experience is as an archivist, having been continuously employed at

the Clinton Presidential Library in the capacity of Supervisory Archivist from February 2002 to

August 2004, and Deputy Director from September 2004 to May 2007.  In my current capacity, I

supervise the staff of the Clinton Presidential Library, which include: one Supervisory Archivist

who supervises eight archivists, one archives specialist, one archives technician, and a part-time

student; one Curator who supervises 2.6 FTE museum staff, one education specialist, 5.3 FTE

audiovisual museum staff, and 3.1 FTE admissions clerks; one IT contractor; and five

administrative staff members of the Library.

2.    Pursuant to Title 44 of the U.S. Code, Chapter 21, the Clinton Presidential Library is a component of the National Archives and Records Administration (NARA), and, therefore, all staff of the Clinton Presidential Library are also NARA staff members.

3.    Due to the nature of my official duties, I am familiar with the procedures followed by the Clinton Presidential Library in responding to requests for Presidential records from its files pursuant to the provisions of the Presidential Records Act of 1978, 44 U.S.C. § 2201, et seq. ("PRA"), the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), and Executive Order 13233.  NARA regulations direct that FOIA requests for Presidential records of the Clinton Administration be directed to the Director of the Clinton Presidential Library for processing. See 36 C.F.R. §§ 1250.22.

4.    Specifically, I am familiar with the treatment which has been afforded the April 5, 2006 FOIA request submitted by Judicial Watch, Inc., seeking "First Lady Hillary Rodham Clinton's calendar, to include but not limited to her daily office diary, schedule, day planner, telephone log book, and chronological file" for an eight-year time period between January 1, 1993 and January 20, 2001.  Attached as Exhibit 1 is a true and correct copy of the request.  That April 5, 2006 FOIA request was assigned FOIA case number 2006-0886-F.

## PRESIDENTIAL RECORDS ACT OF 1978

5.    The PRA sets forth a scheme for the preservation and disclosure of Presidential and Vice-Presidential records.  See 44 U.S.C. §§ 2201, 2207.  "Presidential records" covered by the PRA include "documentary materials, or any reasonably segregable portion thereof, created or received by the President, his immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting

activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). Included among "Presidential records" are documentary materials created or received by the Office of the First Lady, when those materials meet the above definition.

6. Documentary materials deemed Presidential records become the property of the United States, 44 U.S.C. § 2202, and may be disclosed to the public under limitations imposed by the PRA. Id. § 2204. The PRA imposes upon the Archivist of the United States ("Archivist") "an affirmative duty to make [Presidential] records available to the public as rapidly and completely as possible consistent" with limitations under the PRA. Id. § 2203(f)(1). However, there is no public access to Presidential records under FOIA for a period of five years after the President leaves office. In addition, the President may, before leaving office, "specify durations, not to exceed 12 years, for which access shall be restricted with respect to information" within one of six enumerated categories: (1) classified or secret information designated by Executive order; (2) documents relating to appointments to Federal office; (3) documents specifically exempted from disclosure by statute other than FOIA; (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential; (5) confidential communications requesting or submitting advice, between the President and his advisers, or between such advisers; or (6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. See 44 U.S.C. §§ 2204(a)(1) – (a)(6). Thus Presidential records falling into one of the six categories must be withheld for up to 12 years, even if the record is the subject of a FOIA request. The PRA provides that the Archivist's decision to withhold a record within the 12 year period under one of

the six enumerated, mandatory restrictions of the PRA "shall not be subject to judicial review."

Id. § 2204(b)(3).

7.   During his time in office, President William J. Clinton asserted his right to apply the

six enumerated restrictions in 44 U.S.C. § 2204(a)(1) – (a)(6) for the full 12 year period.

8.   In addition, the PRA incorporates the provisions of the FOIA, including the

enumerated exemptions from public access contained in 5 U.S.C. § 552(b)(5), subject to the

exception that the (b)(5) exemption, 5 U.S.C. 552(b)(5), is unavailable.  See 44 U.S.C.

§ 2204(c)(1).  Applicable FOIA exemptions, including but not limited to Exemption 2 for certain

internal administrative records, and Exemption 7, for law enforcement records, 5 U.S.C.

§§ 552(b)(2) & (b)(7), respectively, may apply to records not otherwise covered by one of the

PRA restrictions.  Such FOIA exemptions may also be applied to Presidential records first

processed beyond the 12 year PRA restriction period.  See 44 U.S.C. § 2204(c)(1).  The

Archivist may therefore withhold documents from disclosure under FOIA exemptions even when

they are not subject to restriction under the PRA.

9.   Once a Presidential Library intends to disclose Presidential records, NARA must

notify the incumbent and former Presidents, through their designated representatives, in order to

provide them an opportunity to review the records for any constitutionally-based privileges that

may apply.  Executive Order 13233, § 3.  The former President has up to 90 days to review

requests that are not unduly burdensome, id., § 3.b, followed by an undetermined time period of

review for the incumbent President.  Id., § 3.d.

10.  In light of the provisions of Presidential Executive Order 13233, including the

requirement of a Presidential notification period, NARA's regulations provide that the agency

"cannot expedite requests for Presidential records." 36 C.F.R. § 1250.28(b).[1] Plaintiff did not

request that NARA expedite this FOIA request.

11.  NARA received legal custody of the Presidential records of former President

Clinton, including records from the Office of the First Lady, on January 20, 2001.  The five-year

moratorium on disclosure mandated by the PRA expired on January 20, 2006, and the Clinton

Presidential Library began to receive FOIA requests for documents on that date.  We currently

have 266 pending FOIA requests, which we estimate involves the processing of over 10 million

pages of Presidential records.  Any documents covered by one of the six restrictions on

disclosure are not releasable until January 22, 2013, at which time those records not also subject

to a FOIA exemption will be proposed for release.

## <u>EXECUTIVE ORDER 13233</u>

12.  Executive Order 13233 provides that the former and incumbent Presidents be

afforded an opportunity to review all Presidential records, not otherwise restricted by operation

of section 2204 of the PRA, prior to their public disclosure for purposes of determining whether

to invoke any constitutionally-based privileges.  Executive Order 13233 further provides that the

Archivist must provide notice of a FOIA request for Presidential records to the former and

incumbent President as soon as practicable and provide a copy of any records requested by the

President.  As noted above, the former President has up to 90 days, for requests that are not

unduly burdensome, followed by an undetermined time period for the incumbent President.

Attached as Exhibit 2 is a true and correct copy of Executive Order 13233.

---

[1] NARA's regulations at § 1250.28(b) reflect the provisions of prior Executive Order 12667, which Executive Order 13233 superseded.

13. The Clinton Presidential Library has been following the requirements of Executive Order 13233 by notifying the representatives of the former and incumbent Presidents for review of responsive records.

**FOIA CASE LOG NUMBER 2006-0886-F**

14. After receiving Judicial Watch's April 5, 2006 FOIA request ("Request"), archivists at the Clinton Presidential Library conducted what we term a "preliminary search" to determine the approximate volume of records that could be responsive, in order to place the request in the appropriate FOIA queue. The preliminary search for relevant calendar records to Judicial Watch's request consisted of searching a series of databases in the nature of "finding aids," which collectively provide a rough index to the holdings of the Clinton Administration at the Clinton Presidential Library, as supplemented by the institutional knowledge of our Clinton Presidential Library staff archivists. One of the applications searched is a database known as CDSS (the Clinton Document Search System), which allows Clinton Presidential Library archivists to search the description of  Clinton Presidential records retired and filed in the White House Office of Records Management (WHORM) Subject Files, or folder titles of Staff Member Office Files entered into the WHORM system. This database serves as a finding aid to millions of pages of textual Clinton Presidential records. Additionally, a search was conducted of an MS Access database created by the Clinton Presidential Library staff, consisting of folder title lists as originally supplied to NARA by WHORM, constituting a less than fully comprehensive set of White House Box Inventory Lists. Finally, the preliminary search also included a search of e-mails captured by the Automated Records Management System (known as "ARMS") for potentially responsive e-mail records.

15.   The Clinton Presidential Library conducted a preliminary search of its electronic finding aids and databases for First Lady Hillary Rodham Clinton's calendar records for the time period between January 1, 1993 and January 20, 2001.  This database search suggested that there were roughly 62,600 pages of potentially responsive textual records.  This figure included daily schedules for First Lady Hillary Rodham Clinton and telephone log books for the Office of the First Lady that contain, as a subset, an as-yet-undetermined number of message slips for Mrs. Clinton.  In conducting the electronic search, we located no responsive records corresponding to a "daily office diary," a "day planner," or a "chronological file" belonging to First Lady Hillary Rodham Clinton.

16.   By letter dated April 13, 2006, the Clinton Presidential Library's Supervisory Archivist notified Judicial Watch that its Request had been received and assigned case number 2006-0886-F.  A true and correct copy is attached as Exhibit 3.  As indicated above, our initial letter provided Judicial Watch with notice that a preliminary search had found 62,600 pages of textual records.  The letter also indicated that an additional 125,732 pages of electronic records could be responsive to the Request; however, our letter also indicated that the "page total is an estimate and that all pages processed might not be relevant to [the] specific topic."

17.   Since then, the Clinton Presidential Library determined that the 125,732 pages of electronic records -- which consist entirely of e-mail records not of the First Lady, but rather of two of the First Lady's appointed schedulers on staff -- are not responsive to Judicial Watch's Request.  In addition, we have since conducted a more accurate physical search of the potentially responsive textual records and determined that these documents total approximately 30,000 pages, not 62,600 pages.  The approximately 30,000 pages of textual records include 10,000

pages of daily schedules and 20,000 pages of telephone log books for the Office of First Lady. Accordingly, as set out above, we believe there to be a maximum of approximately 30,000 pages of textual records that may be responsive to the Request.

18.  We further corresponded with Judicial Watch in letters dated July 25, 2006, August 9, 2006, January 16, 2007 and February 9, 2007.  A true and correct copy of the letters is attached as Exhibits 4 through 7 respectively.  In the correspondence, Judicial Watch requested an estimated completion date for the Request.  The Supervisory Archivist responded that the Request had been placed into a processing queue and that approximately 156 requests preceded the Request, requiring processing and review of over 2,000,000 pages of records pursuant to the PRA, FOIA and Executive Order 13233.  She also noted that "[b]ecause the Clinton Library has only been processing records in response to FOIA requests for less than seven months, we do not yet have a sense of how long it will take us to process the [pending requests] . . . nor how long it will take us to process [the Request] once they reach the front of our queue."  See August 9, 2006 letter (Ex. 5).  Upon receipt of further inquiries, similar responses from the Clinton Presidential Library were provided in subsequent correspondence.  See Exs. 6 & 7.

19.  The Clinton Presidential Library has 17 separate access queues, 16 for FOIA and one for mandatory review of classified documents.  The queues are divided by the type of records requested (e.g., textual, electronic, audio-visual); whether the requests are deemed complex, simple, or capable of immediate processing (which correspond to our preliminary search resulting in an estimate of the request being over 5000 pages, 501-5000 pages, or under 501 pages, respectively).  Within each queue, the FOIA cases are organized by date received.  A matrix format is used to rotate through each of the queues; as the next-in-line FOIA request is

selected from each queue, the queue from which the FOIA request is selected for processing will then go to the end of the queue line. The Clinton Presidential Library queue structure has been evolving since we began FOIA processing. In an attempt to better serve our requestors, we have added additional queues and adjusted queue requirements. Our current queue structure is the result of experience gained by processing many FOIA request searches as well as discussions between staff at the Clinton Presidential Library, the Office of General Counsel, and the Presidential Materials Staff in Washington, D.C.

20. We have recently added an additional queue for records that are the subject of multiple FOIA requests. Because we received requests involving records relating to Mrs. Clinton's schedule prior to receipt of the original request from plaintiff Judicial Watch, and because we subsequently received two or more additional requests for similar records, we made a determination earlier in 2007 to initiate processing of a portion of the instant Request – constituting an estimated 10,000 pages – as part of our "multi-request" queue, and had thus begun to process these records as of June 14, 2007, shortly before the filing of the Complaint in this action. The remainder of the present Request (constituting the telephone log books from the Office of First Lady) is still pending in the multi-request queue. There are currently five FOIA requests in this multi-request queue ahead of this portion of the Judicial Watch Request. Under the matrix process described in paragraph 19, in which we rotate through each of the 16 queues, however, there are approximately 80 FOIA requests ahead of the remainder portion of the Request.

21. The Clinton Presidential Library has no more than six archivists available to process all of its pending FOIA requests for textual and electronic records. Each archivist is assigned an

501 244 2883

individual case for processing. Processing Presidential records requires a page-by-page, line-by-line review to ensure that all exempt information is properly identified and redacted. We estimate that it will take approximately five to six months to process these 10,000 pages of records.

22.    Once processing of this portion of the Request is completed, pursuant to the terms of the PRA and Executive Order 13233, NARA will notify the representatives of the former and incumbent President of the Clinton Presidential Library's proposed release of these records under Executive Order 13233. We will process the remainder portion as it arises under the matrix system, and once our review of those records is complete, we will follow the notification procedures set forth above. We are not in a position to expedite the privilege review by the former and incumbent Presidents under the terms of PRA and Executive Order 13233. Once the review process has been completed, NARA will inform Judicial Watch of the Clinton Presidential records that are available and whether any records are being withheld.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of August, 2007.

_Emily Robison_
EMILY ROBISON
Acting Director
Clinton Presidential Library

**EXHIBIT 1**



**Judicial Watch** ™
*Because no one is above the law!*

<u>**VIA FACSIMILE AND CERTIFIED U.S. MAIL**</u>

April 5, 2006

FOIA Coordinator
CLINTON PRESIDENTIAL LIBRARY
1200 President Clinton Avenue
Little Rock, AR 72201
(Fax. No.: 501-244-2881)
(Art. No.: 7005 0390 0004 0892 3059)

Re: <u>**Freedom of Information Act Request**</u>

Dear Mr. Sir/Madam:

Pursuant to the provisions of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, Judicial Watch, Inc. hereby requests request access to the following Clinton Presidential records from the Clinton Presidential Library (hereafter "Clinton Library"):

- First Lady Hillary Rodham Clinton's calendar, to include but not limited to her daily office diary, schedule, day planner, telephone log book, and chronological file.

Time-frame for the dates of these requested records is January 1, 1993 to January 20, 2001.

For purpose of this request, the term "record" shall mean: (1) any written, printed, or typed material of any kind, including without limitation all correspondence, memoranda, notes, messages, letters, cards, telegrams, teletypes, facsimiles, papers, forms, records, telephone messages, diaries, schedules, calendars, chronological data, minutes, books, reports, charts, lists, ledgers, invoices, worksheets, receipts, returns, computer printouts, printed matter, prospectuses, statements, checks, statistics, surveys, affidavits, contracts, agreements, transcripts, magazine or newspaper articles, or press releases; (2) any electronically, magnetically, or mechanically stored material of any kind, including without limitation all electronic mail or e-mail, meaning any electronically transmitted text or graphic communication created upon and transmitted or received by any computer or other electronic device, and all materials stored on compact disk,

CLINTON LIBRARY PHOTOCOPY

Judicial Watch, Inc. FOIA Request
April 5, 2006
Page 2

computer disk, diskette, hard drive, server, or tape; (3) any audio, aural, visual, or video records, recordings, or representations of any kind, including without limitation all cassette tapes, compact disks, digital video disks, microfiche, microfilm, motion pictures, pictures, photographs, or videotapes; (4) any graphic materials and data compilations from which information can be obtained; (5) any materials using other means of preserving thought or expression; and (6) any tangible things from which data or information can be obtained, processed, recorded, or transcribed. The term "record" also shall mean any drafts, alterations, amendments, changes, or modifications of or to any of the foregoing.

**If you do not understand this request or any portion thereof, or if you feel you require clarification of this request or any portion thereof, please contact us immediately at 202-646-5172.**

If any responsive record or portion thereof is claimed to be exempt from production under FOIA, please provide sufficient identifying information with respect to each allegedly exempt record or portion thereof to allow us to assess the propriety of the claimed exemption. *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974). In addition, any reasonably segregable portion of a responsive record must be provided, after redaction of any allegedly exempt material. 5 U.S.C. § 552(b).

**Judicial Watch also hereby requests a waiver of both search and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 5 U.S.C. § 552(a)(4)(A)(iii).**

Judicial Watch is entitled to a waiver of search fees under 5 U.S.C. § 552(a)(4)(A)(ii)(II) because it is a member of the news media. Judicial Watch, Inc. regularly obtains information about the operations and activities of government through FOIA and other means, uses its editorial skills to turn this information into distinct works, and publishes and disseminates these works to the public. It intends to do likewise with the records it receives in response to this request.

As a member of the news media, Judicial Watch uses the following means, among others, to publish and disseminate its distinctive work to the public:

(1)    Judicial Watch maintains an Internet site, www.JudicialWatch.org, where the public can review records obtained through FOIA and read editorial works prepared by Judicial Watch, Inc., including news releases, based on FOIA materials. This website is viewed by over 20,000 people per day on average, and on several occasions, has logged up to 1,000,000 visitors in a single day.

(2)    Judicial Watch also publishes a monthly newsletter in which it publishes its own editorial works and presents, analyzes, and explains information it obtains through FOIA.

Judicial Watch, Inc. FOIA Request
April 5, 2006
Page 3

Judicial Watch, Inc.'s newsletter is sent to approximately 140,000 individuals each month. The organization also utilizes an e-mail Infonet service that sends out updates of Judicial Watch's activities over the Internet to almost 14,00 persons.

(3)     Judicial Watch also periodically publishes and disseminates its own distinct works in the form of books and reports. For example, in September 1998 Judicial Watch, Inc. published the *Interim Report on Crimes and Other Offenses Committed by President Bill Clinton Warranting His Impeachment and Removal from Elected Office*. This 145-page report was accompanied by nearly 4,000 pages of supporting documentation and was crafted, in part, from the raw materials obtained by Judicial Watch through FOIA requests, among other regular means. In August 1999, Judicial Watch published *Filegate Status Report*, which is 136 pages long and is supported by nearly 1000 pages of documentation. In March 2001, Judicial Watch, Inc. published *The Judicial Watch Florida Recount*, an independent, non-partisan analysis of the results of Florida's hotly contested 2000 Presidential election based upon an sampling of ballots reviewed by Judicial Watch pursuant to Florida's version of FOIA. In February 2002, Judicial Watch published *The Judicial Watch 2002 "State of the Union" Report, Bush Administration Ethics Enforcement: "A Failure of Leadership."* In September 2002, Judicial Watch, Inc. published *Fatal Neglect: The U.S. Government's Continuing Failure to Protect American Citizens from Terrorists*. Most recently on November 21, 2003, Judicial Watch produced *Analysis of GAO Testimony: US Postal Service – Clear Communication With Employees Needed Before Reopening of Brentwood Facility*. (GAO-04-2057T/October 23, 2003). Comptroller General of the United States David M. Walker, in a reply to Judicial Watch's *Analysis of GAO Testimony*, wrote on December 17, 2003, "We view Judicial Watch as an important accountability organization in Washington, D.C." On February 16, 2005 Judicial Watch was rated by the highly respected capitol newspaper *The Hill* as being one of the nation's top ten "watchdogs." Most recently, on June 29, 2005, Judicial Watch produced a special report "US Border Patrol Survey Analysis," a report of an analysis of documents produced under FOIA.

Judicial Watch also publishes and disseminates its distinctive work by participating in public conferences and seminars, including its own "Ethics in Government" conferences held in Pasadena, California (1999), Washington, DC (2000), and Miami, FL (2001). Judicial Watch hold quarterly education panels at the National Press Club in Washington DC that have been televised by C-SPAN. Past panel discussions have been: "A Discussion of Ethics in Washington," "The Case for Open Government," "Conservative Perspectives on the Alito Nomination," and "The Role of Grassroots Groups in the Supreme Court Nominating Process." Judicial Watch also works with other media organizations to publish and disseminate distinctive work to the public, and representatives of Judicial Watch appear frequently on nationally broadcast television and radio programs. Judicial Watch has been granted press credentials at a number of national conventions and other events.

**CLINTON LIBRARY PHOTOCOPY**

Judicial Watch, Inc. FOIA Request
April 5, 2006
Page 4

Consequently, Judicial Watch qualifies for a waiver of search fees as a member of the news media. *See National Security Archive v. U.S. Department of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989). In fact, Judicial Watch has been recognized as a member of the news media in other FOIA litigation. *See Judicial Watch, Inc. v. U.S. Department of Justice*, 133 F. Supp.2d 52 (D.D.C. 2000).

Judicial Watch also is entitled to a complete waiver of both search fees and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). Under this provision, records:

> shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of government and is not primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii).

Judicial Watch is a 501(c)(3), not-for-profit, educational organization, and, by definition, it has no commercial purpose. Judicial Watch exists to educate the public about the operations and activities of government, as well as to increase public understanding about the importance of ethics and the rule of law in government. The particular records requested herein are sought as part of Judicial Watch ongoing efforts document the operations and activities of the federal government and to educate the public about these operations and activities. Judicial Watch is studying the schedule of former First Lady Hillary Rodham Clinton as a project of its Transparency Program.

Courts applying the "public interest" fee waiver provision of FOIA typically take into account four factors in determining whether to grant a waiver: (1) whether the subject of the requested records concerns the operations or activities of government; (2) whether disclosure of the requested records is likely to contribute to an understanding of government operations or activities; (3) whether disclosure of the requested records will contribute to a "reasonably broad" audience and whether the requestor has the "ability and intention" to disseminate the information to the public; and (4) whether disclosure of the requested record will contribute "significantly" to the public understanding. *See D.C. Technical Assistance Org. v. HUD*, 85 F. Supp.2d 46, 48-49 (D.D.C. 2000); 28 C.F.R. § 16.11(k)(2)(i)-(iv). Request for "public interest" waivers are to be judged on a case-by-case basis." *Larson v. CIA*, 843 F.2d 1481, 1483 (D.C. Cir. 1988).

Without question, the subject-matter of the request concerns the operations and activities of government, namely daily operations, duties and activities of the former First Lady.

Disclosure of the requested records is likely to contribute to an understanding of government operations and activities and will appeal to a "reasonably broad" audience, as a reasonably broad audience is obviously interested in the role of the First Lady in public life.

---

501 School Street, SW   Suite 500   Washington, DC 20024   Tel: (202) 646-5172   (888) JW-ETHIC
Fax: (202) 646-5199   email: info@judicialwatch.org   Web Site. www.JudicialWatch.org

CLINTON LIBRARY PHOTOCOPY

Judicial Watch, Inc. FOIA Request
April 5, 2006
Page 5

Indeed, the American public deserves full disclosure of the schedule and details of duties of the former First Lady of the United States. This is particularly true given Mrs. Clinton's position as a "special government employee" and her subsequent employment as a U. S. Senator. As a historical figure, the daily operations and activities of Mrs. Clinton should be a matter of public record for the American public to see and understand. Especially in light of the changing roles that the First Lady plays in public life.[1]

Once Judicial Watch obtains the requested records, it intends to analyze them and disseminate the results of its analysis, as well as the records themselves, as a special written report. Judicial Watch will also educate the public via radio programs, Judicial Watch's website, and/or newsletter, among other outlets. It also will make the records available to other members of the media or researchers upon request. Judicial Watch has a proven ability to disseminate information obtained through FOIA to the public, as demonstrated by its long-standing and continuing public outreach efforts, including radio and television programs, website, newsletter, periodic published reports, public appearances, and other educational undertakings.

Finally, disclosure of the requested records will contribute significantly to the public's understanding because relatively little is known chronologically about the daily events and meetings, diplomatic and otherwise, in which the First Lady was involved throughout the first and second terms of the Clinton administration. The records requested by Judicial Watch undoubtedly will shed additional light on this important matter.

Given these compelling circumstances, Judicial Watch is entitled to a public interest fee waiver of both search costs and duplication costs. Nonetheless, in the event our request for a waiver of search and/or duplication costs is denied, Judicial Watch is willing to pay up to $350.00 in search and/or duplication costs. Judicial Watch requests that it be contacted before any such costs are incurred, in order to prioritize search and duplication efforts.

We look forward to receiving the requested documents and a waiver of both search and duplication costs within twenty (20) business days.

Sincerely,

JUDICIAL WATCH, INC.

Christopher J. Farrell

CJF/mac

---

[1] Milton, Joyce. *The First Partner: Hillary Rodham Clinton.* New York: William and Morrow Co., Inc., 1999.

---

CLINTON LIBRARY PHOTOCOPY

# EXHIBIT 2





THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH

For Immediate Release
Office of the Press Secretary
November 1, 2001

# Presidential Records Act Executive Order

Further Implementation of the Presidential Records Act Executive Order

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to establish policies and procedures implementing section 2204 of title 44 of the United States Code with respect to constitutionally based privileges, including those that apply to Presidential records reflecting military, diplomatic, or national security secrets, Presidential communications, legal advice, legal work, or the deliberative processes of the President and the President's advisors, and to do so in a manner consistent with the Supreme Court's decisions in Nixon v. Administrator of General Services, 433 U.S. 425 (1977), and other cases, it is hereby ordered as follows:

Section 1. Definitions.

For purposes of this order:

(a) "Archivist" refers to the Archivist of the United States or his designee.

(b) "Presidential records" refers to those documentary materials maintained by the National Archives and Records Administration pursuant to the Presidential Records Act, 44 U.S.C. 2201-2207.

(c) "Former President" refers to the former President during whose term or terms of office particular Presidential records were created.

Sec. 2. Constitutional and Legal Background.

(a) For a period not to exceed 12 years after the conclusion of a Presidency, the Archivist administers records in accordance with the limitations on access imposed by section 2204 of title 44. After expiration of that period, section 2204(c) of title 44 directs that the Archivist administer Presidential records in accordance with section 552 of title 5, the Freedom of Information Act, including by withholding, as appropriate, records subject to exemptions (b)(1), (b)(2), (b)(3), (b)(4), (b)(5), (b)(6), (b)(7), (b)(8), and (b)(9) of section 552. Section 2204(c)(1) of title 44 provides that exemption (b)(5) of section 552 is not available to the Archivist as a basis for withholding records, but section 2204(c)(2) recognizes that the former President or the incumbent President may assert any constitutionally based privileges, including those ordinarily encompassed within exemption (b)(5) of section 552. The President's constitu-tionally based privileges subsume privileges for records that reflect: military, diplomatic, or national security secrets (the state secrets privilege); communications of the President or his advisors (the presidential communications privilege); legal advice or legal work (the attorney-client or attorney work product privileges); and the deliberative processes of the President or his advisors (the deliberative process privilege).

(b) In Nixon v. Administrator of General Services, the Supreme Court set forth the constitutional basis for the President's privileges for confidential communications: "Unless [the President] can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." 433 U.S. at 448-49. The Court cited the precedent of the Constitutional Convention, the records of which were "sealed for more than 30 years after the Convention." Id. at 447 n.11. Based on those precedents and principles, the Court ruled that constitutionally based privileges available to a President "survive[] the individual President's tenure." Id. at 449. The Court also held that a former President, although no longer a Government official, may assert constitutionally based privileges with respect to his Administration's Presidential records, and

expressly rejected the argument that "only an incumbent President can assert the privilege of the Presidency." Id. at 448.

(c) The Supreme Court has held that a party seeking to overcome the constitutionally based privileges that apply to Presidential records must establish at least a "demonstrated, specific need" for particular records, a standard that turns on the nature of the proceeding and the importance of the information to that proceeding. See United States v. Nixon, 418 U.S. 683, 713 (1974). Notwithstanding the constitutionally based privileges that apply to Presidential records, many former Presidents have authorized access, after what they considered an appropriate period of repose, to those records or categories of records (including otherwise privileged records) to which the former Presidents or their representatives in their discretion decided to authorize access. See Nixon v. Administrator of General Services, 433 U.S. at 450-51.

Sec. 3. Procedure for Administering Privileged Presidential Records.

Consistent with the requirements of the Constitution and the Presidential Records Act, the Archivist shall administer Presidential records under section 2204(c) of title 44 in the following manner:

(a) At an appropriate time after the Archivist receives a request for access to Presidential records under section 2204(c)(1), the Archivist shall provide notice to the former President and the incumbent President and, as soon as practicable, shall provide the former President and the incumbent President copies of any records that the former President and the incumbent President request to review.

(b) After receiving the records he requests, the former President shall review those records as expeditiously as possible, and for no longer than 90 days for requests that are not unduly burdensome. The Archivist shall not permit access to the records by a requester during this period of review or when requested by the former President to extend the time for review.

(c) After review of the records in question, or of any other potentially privileged records reviewed by the former President, the former President shall indicate to the Archivist whether the former President requests withholding of or authorizes access to any privileged records.

(d) Concurrent with or after the former President's review of the records, the incumbent President or his designee may also review the records in question, or may utilize whatever other procedures the incumbent President deems appropriate to decide whether to concur in the former President's decision to request withholding of or authorize access to the records.

(1) When the former President has requested withholding of the records:

(i) If under the standard set forth in section 4 below, the incumbent President concurs in the former President's decision to request withholding of records as privileged, the incumbent President shall so inform the former President and the Archivist. The Archivist shall not permit access to those records by a requester unless and until the incumbent President advises the Archivist that the former President and the incumbent President agree to authorize access to the records or until so ordered by a final and nonappealable court order.

(ii) If under the standard set forth in section 4 below, the incumbent President does not concur in the former President's decision to request withholding of the records as privileged, the incumbent President shall so inform the former President and the Archivist. Because the former President independently retains the right to assert constitutionally based privileges, the Archivist shall not permit access to the records by a requester unless and until the incumbent President advises the Archivist that the former President and the incumbent President agree to authorize access to the records or until so ordered by a final and nonappealable court order.

(2) When the former President has authorized access to the records:

(i) If under the standard set forth in section 4 below, the incumbent President concurs in the former

President's decision to authorize access to the records, the Archivist shall permit access to the records by the requester.

(ii) If under the standard set forth in section 4 below, the incumbent President does not concur in the former President's decision to authorize access to the records, the incumbent President may independently order the Archivist to withhold privileged records. In that instance, the Archivist shall not permit access to the records by a requester unless and until the incumbent President advises the Archivist that the former President and the incumbent President agree to authorize access to the records or until so ordered by a final and nonappealable court order.

Sec. 4. Concurrence by Incumbent President.

Absent compelling circumstances, the incumbent President will concur in the privilege decision of the former President in response to a request for access under section 2204(c)(1). When the incumbent President concurs in the decision of the former President to request withholding of records within the scope of a constitutionally based privilege, the incumbent President will support that privilege claim in any forum in which the privilege claim is challenged.

Sec. 5. Incumbent President's Right to Obtain Access.

This order does not expand or limit the incumbent President's right to obtain access to the records of a former President pursuant to section 2205(2)(B).

Sec. 6. Right of Congress and Courts to Obtain Access.

This order does not expand or limit the rights of a court, House of Congress, or authorized committee or subcommittee of Congress to obtain access to the records of a former President pursuant to section 2205(2)(A) or section 2205(2)(C). With respect to such requests, the former President shall review the records in question and, within 21 days of receiving notice from the Archivist, indicate to the Archivist his decision with respect to any privilege. The incumbent President shall indicate his decision with respect to any privilege within 21 days after the former President has indicated his decision. Those periods may be extended by the former President or the incumbent President for requests that are burdensome. The Archivist shall not permit access to the records unless and until the incumbent President advises the Archivist that the former President and the incumbent President agree to authorize access to the records or until so ordered by a final and nonappealable court order.

Sec. 7. No Effect on Right to Withhold Records.

This order does not limit the former President's or the incumbent President's right to withhold records on any ground supplied by the Constitution, statute, or regulation.

Sec. 8. Withholding of Privileged Records During 12-Year Period.

In the period not to exceed 12 years after the conclusion of a Presidency during which section 2204(a) and section 2204(b) of title 44 apply, a former President or the incumbent President may request withholding of any privileged records not already protected from disclosure under section 2204. If the former President or the incumbent President so requests, the Archivist shall not permit access to any such privileged records unless and until the incumbent President advises the Archivist that the former President and the incumbent President agree to authorize access to the records or until so ordered by a final and nonappealable court order.

Sec. 9. Establishment of Procedures.

This order is not intended to indicate whether and under what circumstances a former President should assert or waive any privilege. The order is intended to establish procedures for former and incumbent Presidents to make privilege determinations.

Sec. 10. Designation of Representative.

The former President may designate a represen-tative (or series or group of alternative representatives, as the former President in his discretion may determine) to act on his behalf for purposes of the Presidential Records Act and this order. Upon the death or disability of a former President, the former President's designated representative shall act on his behalf for purposes of the Act and this order, including with respect to the assertion of constitutionally based privileges. In the absence of any designated representative after the former President's death or disability, the family of the former President may designate a representative (or series or group of alternative representatives, as they in their discre-tion may determine) to act on the former President's behalf for purposes of the Act and this order, including with respect to the assertion of constitutionally based privileges.

Sec. 11. Vice Presidential Records.

(a) Pursuant to section 2207 of title 44 of the United States Code, the Presidential Records Act applies to the executive records of the Vice President. Subject to subsections (b) and (c), this order shall also apply with respect to any such records that are subject to any constitutionally based privilege that the former Vice President may be entitled to invoke, but in the administration of this order with respect to such records, references in this order to a former President shall be deemed also to be references to the relevant former Vice President.

(b) Subsection (a) shall not be deemed to authorize a Vice President or former Vice President to invoke any constitutional privilege of a President or former President except as authorized by that President or former President.

(c) Nothing in this section shall be construed to grant, limit, or otherwise affect any privilege of a President, Vice President, former President, or former Vice President.

Sec. 12. Judicial Review.

This order is intended to improve the internal management of the executive branch and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party, other than a former President or his designated representative, against the United States, its agencies, its officers, or any person.

Sec. 13. Revocation.

Executive Order 12667 of January 18, 1989, is revoked.

GEORGE W. BUSH
THE WHITE HOUSE,
November 1, 2001.

### #

Return to this article at:
http://www.whitehouse.gov/news/releases/2001/11/20011101-12.html

CLICK HERE TO PRINT

# EXHIBIT 3



# *Clinton Presidential Library*

*1200 President Clinton Avenue*
*Little Rock, AR 72201*

April 13, 2006

Christopher J. Farrell
Judicial Watch, Inc.
501 School Street, SW Suite 500
Washington, D.C. 20024

**FOIA Case: 2006-0886-F**

Dear Mr. Farrell:

This letter is in response to your request dated April 5, 2006 for Clinton Presidential records under the Freedom of Information Act (FOIA) (5 U.S.C. § 552) and Presidential Records Act (PRA) (44 U.S.C. §§ 2201-2207). Your request was received by the Clinton Library on April 5, 2006.

We have performed an initial search of our "textual and electronic" Presidential records involving First Lady Hillary Rodham Clinton's calendar (1/1/93 – 1/20/01), to include but not limited to her daily office diary, schedule, day planner, telephone log book, and chronological file. Approximately 62,600 pages of textual records, 125,732 pages of electronic records must be processed in order to respond to your request. Please keep in mind that the page total is an estimate and that all pages processed might not be relevant to your specific topic.

The staff of the Clinton Library is currently processing and reviewing FOIA requests that precede your request. To treat everyone equitably, we have placed your request in our complex electronic unclassified processing queue by the date it was received in our office. FOIA requests received by the Clinton Library are processed and reviewed for access under provisions of the PRA and FOIA and are subject to Executive Order 13233, which requires that we notify the representatives of the former President and the incumbent President prior to the release of any Presidential records. Also, it should be noted that many of the documents processed in response to your request may be closed in whole or part in compliance with PRA restrictions and FOIA exemptions.

When processing is completed and the notification period has passed, we will inform you of the availability of the requested records. The Clinton Library does not charge search fees. However, reproduction fees apply if you request material copied. You can request that we copy these records at the current reproduction fee of $.50 per page, or you can choose to view these documents in the research room of the Clinton Library where a self-service copier is available for the current price of $.15 a page. You may also bring certain scanners into our research room at no charge.

If you have any questions regarding your FOIA request, please contact our staff at (501) 244-2877. Your case log number is **2006-0886-F**. Please have this number accessible for reference during any future contact concerning this FOIA request.

Sincerely,

Melissa Walker
Supervisory Archivist
William J. Clinton Presidential Library

MW: dms

CLINTON LIBRARY PHOTOCOPY

# EXHIBIT 4



# Judicial Watch

*Because no one is above the law!*

July 25, 2006

**BY FAX (501-244-2881)**
Ms. Melissa Walker
Supervisory Archivist
William J. Clinton Presidential Library
1200 President Clinton Boulevard
Little Rock, AR 72201

### Re: Status Updates for Freedom of Information Act Requests

Dear Ms. Walker:

First, on behalf of Judicial Watch and my research colleagues, please accept our sincere thanks and appreciation to you and your staff for the courtesy and professionalism extended to us during our research visits to the Clinton Library.

As you know, Judicial Watch has several Freedom of Information Act (FOIA) requests pending with your office. This letter serves as our formal request for a FOIA case status update for each of our requests. The following requests are pending:

| FOIA Case No. | Date Received | Subject |
|---|---|---|
| 2006-0885-F | April 4, 2006 | Task Force on National Health Care Reform |
| 2006-0886-F | April 5, 2006 | First Lady's Calendar |
| 2006-0946-F | April 7, 2006 | White House Travel Office |
| 2006-1066-F | April 19, 2006 | White House Security Office & Vetting |
| 2006-1067-F | April 19, 2006 | Judicial Nominees |
| 2006-1080-F | April 21, 2006 | Death of Vincent W. Foster, Jr., Esq. |

We understand the processing and review procedures you follow under the provisions of FOIA, the Presidential Records Act (PRA) and Executive Order 13233; and we appreciate the enormous volume of textual and electronic records, as well as other archival materials, in your custody. Your FOIA receipt acknowledgement letters are clear and straightforward.

Kindly provide us with an estimated date of completion or some other quantifiable benchmark to objectively judge when we can reasonably expect to receive records responsive to our requests. Undoubtedly, your office maintains some means of

---

Ms. Melissa Walker
William J. Clinton Presidential Library
Re:  Status Updates for FOIA Requests
July 25, 2006
Page 2

tracking work progress, and a business process that allows managers such as yourself to
assess the productivity and performance of your archivist team.  Arriving at a "good faith
estimate" for completion of each request is consistent with both the FOIA law and the
guidance in Executive Order 13392.  The National Archives and Records Administration
(NARA) is an extremely sophisticated FOIA processor with unparalleled experience in
reviewing and clearing records for release to the American public.

I look forward to receiving your status update for each of our pending FOIA
requests.  Thanks for your cooperation.

Sincerely,

JUDICIAL WATCH, INC.

Christopher J. Farrell
Director of Investigations & Research

# EXHIBIT 5



# Clinton Presidential Library

1200 President Clinton Avenue
Little Rock, AR 72201

August 9, 2006

Christopher J. Farrell
Judicial Watch, Inc.
501 School Street, SW Suite 500
Washington, D.C. 20024

**FOIA Cases: 2006-0885-F; 2006-0886-F; 2006-0946-F; 2006-1066-F;
2006-1067-F; 2006-1080-F**

Dear Mr. Farrell:

This letter is in response to your correspondence dated July 25, 2006 requesting additional information regarding the Freedom of Information Act (FOIA) requests filed by Judicial Watch. Your letter was received by the Clinton Library on July 25, 2006. I hope the following response addresses any concerns you have regarding these FOIA cases.

As we explained in our initial search letters, the Clinton Library has placed each FOIA request in our processing queues. None of the six (6) FOIA requests made by Judicial Watch have reached the front of the queue; therefore, processing has not yet begun. There are currently 155 FOIA requests pending before FOIA case 2006-0885-F; 156 pending before 2006-0886-F; 157 pending before 2006-0946-F; 190 pending before 2006-1066-F; 191 pending before 2006-1067-F; and 192 pending before 2006-1080-F.

Many of the FOIA requests that precede those filed by Judicial Watch require that we review a large volume of records and will take a significant amount of time to process. Because the Clinton Library has only been processing records in response to FOIA requests for less than seven months, we do not yet have a sense of how long it will take us to process the 155 cases pending prior to the first FOIA request about which you inquire nor how long it will take us to process each of the FOIA requests listed in your letter once they reach the front of our queue. However, to respond to the 155 FOIA cases preceding yours will require that we process more than 2,000,000 pages of records before your first FOIA request reaches the front of the queue.

Please be aware that we fully understand the desire of Judicial Watch to gain access to records responsive to these requests at the earliest possible convenience. The primary mission of the National Archives and Records Administration, which operates the Clinton Library, is to ensure that the American public has access to the records in our legal custody. We welcome requests from all those interested in gaining access to our holdings and work to make those records available as soon as possible.

I hope this information addresses any concerns you have regarding the abovementioned FOIA cases. If you have any additional questions regarding your FOIA request, please contact our staff at (501) 244-2877. If you cannot resolve your concerns with the staff at the Clinton Library you may refer your inquiries to our FOIA Public Liaison, John Laster at (202) 357-5144.

Sincerely,

Melissa Walker
Supervisory Archivist
William J. Clinton Presidential Library

MW: dms

CLINTON LIBRARY PHOTOCOPY

**EXHIBIT 6**



# Judicial Watch

*Because no one is above the law!*

January 16, 2007

**BY FAX (501-244-2881)**
Ms. Melissa Walker
Supervisory Archivist
William J. Clinton Presidential Library
1200 President Clinton Boulevard
Little Rock, AR 72201

### Re:  Status Updates for Freedom of Information Act Requests

Dear Ms. Walker:

As you know, Judicial Watch has several Freedom of Information Act (FOIA) requests pending with your office. This letter serves as our formal request for a FOIA case status update for each of our requests. The following requests are pending:

| FOIA Case No. | Date Received | Subject |
|---|---|---|
| 2006-0885-F | April 4, 2006 | Task Force on National Health Care Reform |
| 2006-0886-F | April 5, 2006 | First Lady's Calendar |
| 2006-0946-F | April 7, 2006 | White House Travel Office |
| 2006-1066-F | April 19, 2006 | White House Security Office & Vetting |
| 2006-1067-F | April 19, 2006 | Judicial Nominees |
| 2006-1080-F | April 21, 2006 | Death of Vincent W. Foster, Jr., Esq. |

We understand you process and review records under the provisions of the FOIA, the Presidential Records Act and Executive Orders 13233 and 13392.

Kindly provide us with an estimated date of completion or some other quantifiable benchmark to objectively judge when we can reasonably expect to receive records responsive to our requests. Arriving at a "good faith estimate" for completion of each request is consistent with both the FOIA law and the guidance in Executive Order 13392. Thanks for your cooperation.

Sincerely,

Christopher J. Farrell
Director of Investigations & Research

---

501 School Street, SW     Suite 725     Washington, DC 20024     Tel: (202) 646-5172     Fax. (202) 646-5199

**CLINTON LIBRARY PHOTOCOPY**

# EXHIBIT 7



# *Clinton Presidential Library*

*1200 President Clinton Avenue*
*Little Rock, AR 72201*

February 9, 2007

Christopher J. Farrell
Judicial Watch, Inc.
501 School Street, SW Suite 500
Washington, D.C. 20024

**FOIA Cases: 2006-0885-F; 2006-0886-F; 2006-0946-F; 2006-1066-F;
2006-1067-F; 2006-1080-F**

Dear Mr. Farrell:

This letter is in response to your correspondence dated January 16, 2007 requesting the status of the Freedom of Information Act (FOIA) requests filed by Judicial Watch. Your letter was received by the Clinton Library on January 16, 2007. I hope the following response addresses any concerns you have regarding these FOIA cases.

Since our previous correspondence in August 2006, each of the six (6) FOIA requests noted above has moved up within their respective processing queues. However, none of these requests has reached the front of their queue. Unfortunately, while we can not provide an estimated date that processing of your FOIA requests will begin, as we explained in our previous correspondence, the archival staff must process approximately 2,000,000 pages of records before processing can begin on any of the abovementioned FOIA cases.

As you may be aware, processing Presidential records is time-consuming. Archivists must complete a page-by-page review of all records to determine if this material can be released or if it requires withholding under one of the six Presidential Records Act (PRA) Presidential restrictive categories and/or the eight applicable FOIA exemptions that apply to Clinton Presidential records.

We fully understand the desire of each FOIA requestor to gain access to records at the earliest possible convenience. The primary mission of the National Archives and Records Administration, which operates the Clinton Library, is to ensure that the American public has access to the records in our legal custody. We are working diligently to make these records available as soon as possible.

I hope this information addresses any concerns you have regarding the abovementioned FOIA cases. If you have any additional questions regarding your FOIA request, please contact our staff at (501) 244-2877. If you cannot resolve your concerns with the staff at the Clinton Library you may refer your inquiries to our FOIA Public Liaison, John Laster at (202) 357-5144.

Sincerely,

Melissa Walker
Supervisory Archivist
William J. Clinton Presidential Library

MW: dms

**CLINTON LIBRARY PHOTOCOPY**

*NARA's web site is http //www archives gov*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 1:07-cv-01267 (JR) |
| | ) | |
| U.S. NATIONAL ARCHIVES AND | ) | |
| RECORDS ADMINISTRATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**[PROPOSED] ORDER DENYING PLAINTIFF'S
APPLICATION FOR INJUNCTIVE RELIEF**

Upon consideration of Plaintiff's Application for Injunctive Relief, Defendant's

Opposition and the arguments made therein, it is hereby

ORDERED that Plaintiff's Application for Injunctive Relief be, and hereby is, DENIED.

Signed this _____ day of _____, 2007.


_____
JUDGE JAMES ROBERTSON
United States District Judge