## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 1:07-cv-01267 (JR) |
| | ) | |
| U.S. NATIONAL ARCHIVES AND | ) | |
| RECORDS ADMINISTRATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DEFENDANT'S STATUS REPORT AND PROCESSING SCHEDULE

Pursuant to this Court's August 30, 2007 Order [9] and consistent with the Presidential Records Act of 1978, 44 U.S.C. § 2201, et seq. ("PRA"), the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), and the constitutional privileges recognized in Executive Order 13233 and NARA's regulations, defendant United States National Archives and Records Administration ("NARA") submits the following schedule to process, in two groups, plaintiff's April 5, 2006 records request ("the request"):

1. NARA estimates that it will complete processing approximately 10,000 pages of daily schedule records potentially responsive to the request by the end of January 2008 to provide to Presidential representatives for their review. (See Supplemental Decl. of Emily Robison in Support of Def.'s Status Report & Processing Sch. ("Suppl. Decl.") ¶¶ 22, 23.)

2. NARA also represents that it intends to process the approximately 20,000 pages of telephone log books potentially responsive to the request as it arises under the current FOIA queue matrix system. Given the volume of records in the FOIA queues and the uncertainty about receiving the funding for additional requested resources that may be appropriated for the Library for FOIA processing, NARA cannot provide a date certain by which it will complete processing this portion of the request. NARA is exercising due diligence in processing the requests that preceded plaintiff's request, as detailed below, and will continue to process the requests in the orderly process for fair and efficient processing established by the Library. (See Suppl. Decl. ¶¶ 22, 23.)

Plaintiff submitted on April 5, 2006 its request for "First Lady Hillary Rodham Clinton's calendar, to include but not limited to her daily office diary, schedule, day planner, telephone log book, and chronological file."  (See Suppl. Decl. ¶ 4.)  At that time, 211 FOIA requests for Presidential records from the Clinton Presidential Library ("Library") were pending.  (See id. ¶ 12.)  Since the end of the document disclosure moratorium provided by the PRA, the six archivists at the Library available to review Presidential records, exercising due diligence in responding to then-pending requests, have processed 57 requests comprised of 188,304 records (not pages).  (Id.)  The requested records required exacting review for, among other things, information exempted from disclosure under the PRA and FOIA.

In June 2007, the Library reached the first group of records potentially responsive to plaintiff's request in the processing queue and, since then, it has reduced the total time required to process records in response to the request by eliminating a significant volume of non-responsive records.  (See Suppl. Decl. ¶ 21.)  Given that the Library had been processing records for only a few months, the demands from the unexpected flood of requests submitted by the public beginning January 20, 2006, and the limited budget and staff of the Library to process the records requests, exceptional circumstances necessitate the processing schedule above.  Pursuant to 5 U.S.C. § 552(a)(6)(C), which provides for additional time to process FOIA requests under such circumstances, defendant requests that the Court adopt the processing schedule above and stay the case pending processing completion and Presidential review.  The processing schedule is entirely consistent with FOIA, and indeed, mandated by the considerations inherent in the PRA.

Although NARA provides in this report its anticipated completion dates for detailed review and *processing* of the 10,000 pages of potentially responsive records and represents that

it will exercise due diligence to review and process the additional 20,000 pages of telephone log books, NARA cannot provide a *production* schedule because of the right afforded to representatives of the incumbent and former Presidents to review the Presidential records prior to public disclosure.  Under Executive Order 13233, 44 U.S.C. § 2206, 36 C.F.R. § 1270.46 and consistent with constitutional principles of executive privilege, the former President maintains time to review any records otherwise set for disclosure by NARA and the incumbent maintains additional time to concur with the former President's disclosure decisions.[1]  On average, Presidential representatives have required 237 days to complete their review of Clinton Presidential records.  (See Suppl. Decl. ¶ 14.)  As soon as NARA completes processing each group of Presidential records, it will notify the Presidential representatives of records scheduled for release and turn over any requested records for the representatives' review.  Upon completion of the representatives' review for constitutionally based privileges or as otherwise required by law, NARA will produce disclosable records responsive to the request and identify any groups of records or records withheld as exempt, to the extent obligated by law.

## DEFENDANT'S PROPOSED PROCESSING SCHEDULE IS JUSTIFIED

Given the unexpected deluge of FOIA requests and the volume of records responsive to these requests that the Clinton Presidential Library has received, the limited staff available to process the requests, and the significant progress that the Library has made in ensuring efficient and effective processing, additional time to process the records is warranted to allow defendant to complete its task of processing plaintiff's FOIA request.

---

[1]  In American Historical Association v. NARA, Civ. No. 01-2447 (Kollar-Kotelly, J.), Slip. Op., Oct. 1, 2007, the court enjoined NARA from relying on section 3(b) of Executive Order 13233, but left intact all other provisions of the Executive Order.  NARA will not take any action that is inconsistent with the court's Order.

**BACKGROUND**

I.  **Statutory and Regulatory Framework of the PRA**

   A.  **Statutory Restrictions on the Release of Presidential Records**

   Plaintiff's FOIA request involves Presidential records which are potentially subject to

12-year statutory restrictions on disclosure.  The PRA sets forth a scheme for the preservation

and disclosure of Presidential and Vice-Presidential records.  44 U.S.C. §§ 2201, 2207.

"Presidential records" covered by the PRA include "documentary materials, or any reasonably

segregable portion thereof, created or received by the President, his immediate staff, or a unit or

individual of the Executive Office of the President whose function is to advise and assist the

President, in the course of conducting activities which relate to or have an effect upon the

carrying out of the constitutional, statutory, or other official or ceremonial duties of the

President."  44 U.S.C. § 2201(2).  Included among "Presidential records" are documentary

materials created or received by the Office of the First Lady, an advisor to the President and a

component of the Executive Office of the President, when those materials meet the definition of

"Presidential records" set forth in the PRA.  See, e.g., Executive Office of the President available

at http://www.whitehouse.gov/government/eop.html (last visited Aug. 2, 2007); H.R. Rep. No.

95-1487, at 12 (1978), reprinted at 1978 U.S.C.C.A.N. 5732, 5743 ("When the President's

spouse or other family member or associate serves as a de facto member of the President's staff,

the documents which reflect such service are included in the ambit of presidential records[.]");

cf. Ass'n of Am. Phys. & Surgeons, Inc. v. Clinton, 997 F.2d 898, 904 (D.C. Cir. 1993)

("Congress itself has recognized that the President's spouse acts as the functional equivalent of

an assistant to the President.").  Thus, plaintiff's FOIA request encompasses Presidential records.

The PRA requires a page-by-page, line-by-line review and restrictions on any material falling into one of the Presidential restrictions before the disclosure of Presidential records such as those that may be responsive to plaintiff's FOIA request. Documentary materials deemed Presidential records become the property of the United States, 44 U.S.C. § 2202, and may be disclosed to the public under limitations imposed by the PRA. Id. § 2204. The PRA imposes upon the Archivist of the United States ("Archivist") "an affirmative duty to make [Presidential] records available to the public as rapidly and completely as possible consistent" with limitations under the PRA. Id. § 2203(f)(1). However, there is no public access to Presidential records under FOIA for a period of five years after the President leaves office. Id. § 2204(b)(2). In addition, the President may, before leaving office, "specify durations, not to exceed 12 years, for which access shall be restricted with respect to information" within one of six enumerated categories: (1) classified information designated by Executive order; (2) documents relating to appointments to Federal office; (3) documents specifically exempted from disclosure by statute other than FOIA; (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential; (5) confidential communications requesting or submitting advice, between the President and his advisers, or between such advisers; or (6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. See 44 U.S.C. §§ 2204(a)(1) – (a)(6). Thus Presidential records falling into one of the six categories may be withheld for up to 12 years, even if the record is the subject of a FOIA request. The PRA provides that the Archivist's decision to categorize a record as falling under one of the six enumerated, restricted categories, and then to withhold the record within the 12 year period, "shall not be subject to judicial review." Id. § 2204(b)(3); see also

H.R. Rep. No. 95-1487, at 4, 16 ("The subsection also provides that when a presidential restriction is in effect, a determination by the archivist regarding access it not subject to judicial review . . .."); Armstrong v. Executive Office of the President, 1 F.3d 1274, 1294 (D.C. Cir. 1993). Pursuant to 44 U.S.C. § 2204(a), during his time in Office, President Clinton asserted his right to apply the six enumerated restrictions in the PRA for the full 12 year period to all Presidential records. (See Suppl. Decl. ¶ 8.) Any documents covered by one of the six categories as currently defined in consultation with the former President are therefore not releasable until January 22, 2013, at which time those records not also subject to a FOIA exemption may be proposed for release. (See id. ¶ 12.) The five-year moratorium on public disclosure mandated by the PRA expired on January 20, 2006, and the Clinton Presidential Library began to receive FOIA requests for documents upon that date. (Id.)

**B. Applicable FOIA Exemptions**

Documents responsive to plaintiff's FOIA request must also be examined to determine whether certain FOIA exemptions are applicable. The Archivist may withhold documents not subject to restriction under the PRA under FOIA exemptions from disclosure. The PRA incorporates the provisions of the FOIA, including the enumerated exemptions from public access contained in 5 U.S.C. § 552(b), except the (b)(5) exemption covering "privileged" records. See 44 U.S.C. § 2204(c)(1). Applicable FOIA exemptions -- including but not limited to Exemption 2 for certain internal administrative records, and Exemption 7, for law enforcement records, 5 U.S.C. 552(b)(2) & (b)(7), respectively -- may apply to records not otherwise covered by one of the PRA restrictions, and to Presidential records first processed beyond the 12-year PRA restriction period. See 44 U.S.C. § 2204(c)(1). The PRA further provides that none of its

provisions "shall be construed to confirm, limit or expand any constitutionally based privilege which may be available to an incumbent or former President." Id. § 2204(c)(2).

## C. Requirement for Presidential Review

Consistent with those constitutionally-based privileges outlined in the PRA, Executive Order 13233 and NARA's regulations, the former and incumbent Presidents are afforded an opportunity to review all Presidential records, not otherwise restricted by operation of section 2204 of the PRA, prior to their public disclosure for purposes of determining whether to invoke any constitutionally-based privileges. See 36 C.F.R. § 1270.46; see also 44 U.S.C. § 2204(c)(2). Records responsive to plaintiff's FOIA request, as all FOIA requests, are subject to this requirement. The PRA and Executive Order 13233 provides that the Presidential Library must provide notice of a request for Presidential records to the former and incumbent President as soon as practicable and should provide a copy of any records requested by the former or incumbent Presidents. The former President has time to complete a privilege review for requests that are not unduly burdensome, followed by an undetermined time period for the incumbent President to review the records as well.[2] Id. § 3.d. Currently, in the Library's experience, an average of 237 days has been required for Presidential review of Clinton Presidential records.

The legislative history of the PRA explains the rationale behind the delayed disclosure of restricted Presidential records and the mechanisms for ensuring Presidential review. In passing the bill that became the PRA, Congress recognized that "premature disclosure" of Presidential records could have a "chilling effect on presidents and the frankness of advice they could expect from their staffs." H.R. Rep. No. 95-1487, at 8. It was felt, in fact, that the failure to recognize

---

[2] As noted above, NARA will not take any action inconsistent with the court's Order in American Historical Association.

that potential "might eventually diminish the completeness of the written record created and left by chief executives." <u>Id.</u>  Congress acknowledged, in passing the PRA, the need to consider the "expectation of confidentiality of executive communications to avoid the prospect of a constitutional infirmity." <u>Id.</u>  Thus, the PRA sought to balance these considerations against the desire for "ready availability" of Presidential records.  <u>Id.</u>; <u>see also</u> <u>id.</u> at 15 (Congress sought to balance "the objectives of assuring availability with the concern that the premature disclosure of sensitive presidential records will eventually result in less candid advice being place on paper and a depleted historical record").

Consistent with FOIA, NARA may expedite certain record requests "to the head of [its] FOIA queue."  36 C.F.R. § 1520.28; <u>see also</u> 5 U.S.C. § 552(a)(6)(E)(v) (regarding expedited FOIA requests).  In light of the provisions of the Executive Order, however, including the requirement of a Presidential notification period, and consistent with the PRA, NARA's regulations provide that the agency "cannot expedite requests for Presidential records."  36 C.F.R. § 1250.28(b).

### D.  The Clinton Presidential Library:  FOIA Requests and Queue Structure

NARA received legal custody of Presidential records of former President William J. Clinton, including records from the Office of the First Lady, on January 20, 2001.  (<u>See</u> Suppl. Decl. ¶ 12.)  NARA deposited the records in the Clinton Presidential Library when it opened in November 2004.  The Clinton Presidential Library is a component of NARA and, therefore, all staff members of the Clinton Presidential Library are also NARA staff members.  (<u>Id.</u> ¶ 2.)  NARA regulations direct that FOIA requests for Presidential records of the Clinton Administration be directed to the Director of the Clinton Presidential Library for processing.

See 36 C.F.R. §§ 1250.22. FOIA requests from the Clinton Presidential Library have been placed in queue structures to ensure fair and efficient processing.

The Clinton Presidential Library has 17 separate access queues, 16 for FOIA and one for mandatory review of classified documents. The queues are divided by the type of records requested (e.g., textual, electronic, audio-visual); whether the requests are deemed complex, simple, or capable of immediate processing (which correspond to our preliminary search resulting in an estimate of the request being over 5000 pages, 501-5000 pages, or under 501 pages, respectively). Within each queue, the FOIA cases are organized by date received. A matrix format is used to rotate through each of the queues; as the next-in-line FOIA request is selected from each queue, the queue from which the FOIA request is selected for processing will then go to the end of the queue line. (See Suppl. Decl. ¶¶ 20, 21.)

The Clinton Presidential Library queue structure has been evolving since it began FOIA processing. In an attempt to better serve its requestors, the Library has added additional queues and adjusted queue requirements. For example, the Library recently added an additional queue for records that are the subject of multiple FOIA requests. The current queue structure is thus the result of experience gained by processing many FOIA request searches as well as extensive discussions among staff at the Clinton Presidential Library, the Office of General Counsel, and the Presidential Materials Staff in Washington, D.C. (See Suppl. Decl. ¶¶ 21, 31.) Additionally, NARA's Office of Presidential Libraries and the Presidential Materials Staff, after discussions with the Supervisory Archivists of three Presidential Libraries (George H.W. Bush, Ronald Reagan, and William J. Clinton) decided to undertake an in-house study in the spring of 2007 to review ways to achieve faster processing of Presidential records. As a result of this study, a one-

year pilot project was initiated to implement the most promising proposals.  Such proposals

include halting the time-consuming routine referral of classified records to originating and/or

equity agencies.  (See id. ¶ 32.)

The five-year moratorium on disclosure mandated by the PRA expired on January 20,

2006, and the Clinton Presidential Library began to receive FOIA requests for documents on that

date.  Between January 20, 2006, and April 5, 2006 (the date of the present FOIA request), the

Library received 211 FOIA requests, totaling an estimated 5,260,372 records.  A total of 397

FOIA requests have been received between January 20, 2006 and September 26, 2007.  From

January 20, 2006 to September 26, 2007, archivists at the Library have processed 57 FOIA cases

representing approximately 188,304 records.  The Library currently has 287 pending FOIA

requests, estimated to require the processing of approximately10,500,000 pages of Presidential

records.  (See Suppl. Decl. ¶ 12.)  The Clinton Presidential Library has had no more than six

archivists available to process all of its pending FOIA requests for textual and electronic records

as a portion of their overall job duties and responsibilities.  (Id. ¶ 24.)  As explained more fully

below and in the Supplemental Declaration of Emily Robison submitted in support of the

proposed processing schedule, the Library has exercised due diligence in processing its backlog

of requests and taken extraordinary measures to increase the efficiency of the exacting review

required under the PRA.  (See id. ¶¶ 24-33.)

## II.  **Factual Background**

By letter dated April 5, 2006, plaintiff submitted a FOIA request to the FOIA

Coordinator of the Clinton Presidential Library, seeking access to "Clinton Presidential records,"

specifically "First Lady Hillary Rodham Clinton's calendar, to include but not limited to her

daily office diary, schedule, day planner, telephone log book, and chronological file." Plaintiff

identified the time period as spanning eight years between January 1, 1993, and January 20,

2001, and requested a waiver of search and duplication fees. As justification for its fee waiver

request, plaintiff advanced that "the subject-matter of the request concerns the operations and

activities of government, namely daily operations, duties and activities of the former First Lady."

Plaintiff further contended that "the American public deserves full disclosure of the schedule and

details of duties of the former First Lady of the United States . . . particularly . . . given Mrs.

Clinton's position as a 'special government employee' and her subsequent employment as a U.S.

Senator . . . [and] because relatively little is known chronologically about the daily events and

meetings, diplomatic and otherwise, in which the First Lady was involved throughout the first

and second terms of the Clinton administration." Plaintiff did not request expedited processing

of its request. (See Suppl. Decl. ¶¶ 11, 15.)

     The Supervisory Archivist for the Clinton Presidential Library replied by letter dated

April 13, 2006, noting that a preliminary search of the First Lady's calendar revealed

approximately 62,600 pages of textual records and 125,732 pages of electronic records.[3] The

Supervisory Archivist also noted that the page total "is an estimate and that all pages processed

might not be relevant to your specific topic." She explained the review process, outlining how

---

[3] The initial, rough estimate of 62,600 pages of textual records has now been determined after a
physical search to consist of approximately 30,000 pages, of which approximately 10,000 pages
are daily schedules for First Lady Hillary Rodham Clinton, and the remaining approximately
20,000 pages consist of telephone log books for the Office of the First Lady, which contain as a
subset an as-yet undetermined number of message slips for Mrs. Clinton. No responsive record
corresponding to a "daily office diary," a "day planner," or a "chronological file" belonging to
First Lady Hillary Rodham Clinton was found. The 125,732 pages of electronic records, which
entirely consist of e-mail records of two of the First Lady's appointed schedulers on staff, have
since been determined not to be responsive to plaintiff's request. Accordingly, there are a
maximum of 30,000 pages of textual records that may be responsive to plaintiff's request. (See

the Library processed FOIA requests for records, like the First Lady's, covered by the PRA and

placed the requests in one of 16 FOIA processing queues:

> The staff of the Clinton Library is currently processing and reviewing FOIA requests that precede your request. To treat everyone equitably, we have placed your request in our complex electronic unclassified processing queue by the date it was received in our office. FOIA requests received by the Clinton Library are processed and reviewed for access under provisions of the PRA and FOIA and are subject to Executive Order 13233, which requires that we notify the representatives of the former President and the incumbent President prior to the release of any Presidential records.

On July 25, 2006, plaintiff responded, acknowledging "the processing and review procedures . . .

under the provisions of FOIA, the [PRA], and Executive Order 13233," and requesting an

estimated completion date. The Supervisory Archivist responded on August 9, 2006, identifying

156 FOIA requests pending before plaintiff's request and at least 2,000,000 pages of records to

process before plaintiff's request would reach the front of its queue. She further explained that

she could not estimate a completion date, in part because the Clinton Presidential Library had

begun processing FOIA requests only seven months prior upon the expiration of the five-year

restriction period provided under the PRA. (See Suppl. Decl. ¶¶ 17, 18.)

Plaintiff again requested a status update and an estimated completion date by letter dated

January 16, 2007. The Supervisory Archivist responded on February 9, 2007, that the FOIA

request had moved up in its processing queue, but that it had not yet reached the front of the

queue. Explaining the time-consuming task of processing all the requests before it, the

Supervisory Archivist explained that she "must complete a page-by-page review of all records to

determine if this material can be released or if it requires withholding under one of the six [PRA]

restrictive categories and/or the eight applicable FOIA exemptions that apply to Clinton

---

Suppl. Decl. ¶ 18.)

Presidential records."  (See Suppl. Decl. ¶ 19.)

NARA's search revealed approximately 30,000 pages of potentially responsive records queued for processing.  (See Suppl. Decl. ¶ 18.)  Because the Clinton Presidential Library received other FOIA requests involving records relating to Mrs. Clinton's schedule prior to receipt of the original request from plaintiff Judicial Watch, and subsequently received two or more additional requests for similar records, it made a determination earlier in 2007 to initiate processing of a portion of plaintiff's request – constituting an estimated 10,000 pages – as part of its multi-request queue.  (See id. ¶ 21.)  As a result, the Clinton Presidential Library has thus begun to process those 10,000 records as of June 14, 2007.  The remainder of plaintiff's request (which constitutes an as-yet undetermined number of messages from the approximately 20,000 pages of telephone log books from the Office of First Lady) is still pending in the multi-request queue, behind what currently consists of five FOIA requests received prior to plaintiff's request.[4] (See id. ¶¶ 22, 23.)

## DISCUSSION

### I.  Prevailing Authority Supports The Proposed Processing Schedule

An agency receiving a FOIA request generally must determine whether to comply with the request within 20 working days.  See 5 U.S.C. § 552(a)(6)(A)(i).  Once the initial twenty days has passed without an agency determination on the request, the FOIA requester "shall be deemed to have exhausted his administrative remedies," id. at § 552(a)(6)(C)(i), and the requestor can file suit in federal court.  The Court may, however, "allow the agency additional

---

[4] Note, however, that under the matrix process of review utilized by the Clinton Presidential Library, in which each of the 16 FOIA queues are rotated after the next in line FOIA request is selected, there are 80 FOIA requests pending ahead of the telephone log books portion of plaintiff's FOIA request.  (See Suppl. Decl. ¶ 21.)

time to complete its review of the records" upon a showing that "exceptional circumstances exist and that the agency is exercising due diligence in responding to the request." Id. § 552(a)(6)(C)(i).  This provision "was designed and inserted specifically as a safety valve for [FOIA]."  Open America v. Watergate Special Prosecution Force, 547 F.2d 605, 610 (D.C. Cir. 1976).  Exceptional circumstances exist in the present case, and although NARA has exercised due diligence, additional time is necessary to allow it to process plaintiff's request.

As part of the Electronic Freedom of Information Act Amendments of 1996, Congress amended 5 U.S.C. § 552(a)(6)(C)(i) to afford agencies taxed by FOIA requests additional processing time by adding the following two subsections:

(ii)    For purposes of [5 U.S.C. § 552(a)(6)(C)], the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

(iii)    Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing the request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

See 5 U.S.C. § 552(a)(6)(C)(ii), (iii).[5]

The amendments were consistent with the D.C. Circuit's decision in Open America v. Watergate Special Prosecution Force, 547 F.2d 605 (D.C. Cir. 1976), which held that an agency is entitled to additional time to process a FOIA request under § 552(a)(6)(C) when it:

---

[5] The 1996 Amendments to FOIA conformed to the decision in Open America v. Watergate Special Prosecution Force, 547 F.2d 605 (D.C. Cir. 1976), affirmed the proposition that stays should be granted to agencies faced with a large volume of FOIA requests, and clarified that even a "predictable agency workload of requests" constituted "exceptional circumstances" when an agency could demonstrate that it was making progress in reducing its backlog.  See, e.g., H.R. Rep. No. 104-795, at 24, reprinted in 1996 U.S.C.C.A.N. 3448, 3467 (noting that the FOIA Amendments were "consistent" with the holding in Open America).

14

is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of subsection (6)(A), and when the agency can show that it "is exercising due diligence" in processing the requests.

Id. at 616 (quoting 5 U.S.C. § 552(a)(6)(C)); see also Oglesby v. U.S. Dep't of the Army, 920 F.2d 57, 64 (D.C. Cir. 1990) ("Frequently, if the agency is working diligently, but exceptional circumstances have prevented it from responding on time, the court will refrain from ruling on the request itself and allow the agency to complete its determination.").

Under  D.C. Circuit law, exceptional circumstances have been construed to exist and a stay pursuant to FOIA and the Open America doctrine may be granted: "(1) when an agency is burdened with an unanticipated number of FOIA requests; and (2) when agency resources are inadequate to process the requests within time limits set forth in the statute; and (3) when the agency shows that it is exercising 'due diligence' in processing the requests; and (4) the agency shows 'reasonable progress' in reducing its backlog of requests."  Williams v. FBI, 2000 WL 1763680, *2 (D.D.C. 2000); see also Summers v. Dep't of Justice, 925 F.2d 450, 452 n.2 (D.C. Cir. 1991) (noting first three factors).  All four factors exist in the instant case.

**A. The Clinton Presidential Library Has been Burdened with an Unanticipated Number of FOIA Requests**

First, the five-year moratorium on disclosure mandated by the PRA expired only on January 20, 2006, and the Clinton Presidential Library began to receive FOIA requests on that date.  The Library is therefore still in its infancy in receiving and processing requests, and continuing to develop and refine its queue structure for efficient processing.  In the first three months after January 20, 2006 alone, the Clinton Presidential Library received 211 FOIA requests, totaling over 5,260,000 records.  Indeed, between January 20, 2006 and September 26,

2007, the Library has received a total of 397 FOIA requests.  (<u>See</u> Suppl. Decl. ¶ 12.)  In the first

year of processing, the Library thus experienced an unexpected jump in the volume and

complexity of the incoming FOIA requests themselves.  In contrast to the experiences of the

George H.W. Bush Presidential Library and the Ronald Reagan Presidential Library, the Clinton

Presidential Library received over 336 FOIA requests in its first year of processing – a three-fold

increase over the approximately 100 FOIA requests received by the George H.W. Bush

Presidential Library and the Ronald Reagan Presidential Library in their respective first years of

processing FOIA requests.  Moreover, unlike the experience of NARA staff at the other

Presidential libraries, the FOIA requesters to the Clinton Presidential Library have been less

willing to substantially narrow broad and far-ranging requests.  (<u>See</u> <u>id.</u> ¶ 29.)

 In anticipation of the opening of Clinton Presidential Library records to FOIA processing

on January 20, 2006, two Library archivists traveled in 2005 to the George H.W. Bush

Presidential Library in College Station, Texas, to review the Bush Library's handling of FOIA

requests under the Presidential Records Act.  (<u>See</u> <u>id.</u> ¶ 26.)  Clinton Library staff also

participated in one or more training exercises held in person and via phone conferencing with

NARA headquarters staff familiar with FOIA processing issues in general, including being

briefed by the Director of NARA's Presidential Materials Staff and her staff, as well as by

various other NARA FOIA officials.  (<u>See</u> <u>id.</u>)

 Notwithstanding all of these attempts at due diligence, the sheer total volume of records

held at the Clinton Library has contributed to unanticipated delays in the Clinton's Library

ability to process FOIA requests after January 2006.  For example, the Clinton Library holds an

estimated 78 million pages of Presidential textual records, compared to the 43.8 million pages of

Reagan Library and 33.7 million pages of Bush Library Presidential textual records governed by the PRA. The Clinton Library also legally holds an estimated 20 million presidential electronic mail records, 2 million electronic cables and 60 other electronic systems, which is orders of magnitude greater than similar electronic records holdings elsewhere in these other Libraries, and, if printed in a textual format, would rival in size the entire volume of Presidential records generated during the eight years of President Reagan's administration. This increase in the volume of holdings and variety of formats of media necessarily requires more complex and time-consuming searching and pulling of records, as well as demanding greater efforts to maintain intellectual control over this vast collection of records through traditional hard copy finding aids and electronic indices of various kinds. (See id. ¶ 27.)

As the first Presidential Library to have a significant volume of born-electronic records, the Clinton Presidential Library has received FOIA requests for more than one million emails in the twenty months since Clinton Presidential records became subject to FOIA. While NARA is expending significant resources to address the explosion in volume of electronic records through its Electronic Records Archive project, and while upgrades in functionality have been made to the system that currently holds Clinton Presidential electronic records, the Clinton Library must print electronic records to paper prior to arranging, reviewing, and describing them as textual records. Additionally, the Clinton Library archival staff has spent large amounts of staff time on an unanticipated process known as a "de-hexification," a process converting attachments to individual email records that cannot be read due to an unknown or unreadable file into something approaching readable form. (See id. ¶ 28.)

**B. The Clinton Presidential Library Has Limited Resources, Inadequate to Process the Flood of FOIA Requests Within 20 Days**

The Clinton Presidential Library can allocate no more than six archivists for processing all of its pending FOIA requests for textual and electronic records as a portion of their overall job duties and responsibilities.  (See id. ¶ 24.)  Counting each archivist as a "Full Time Equivalent" or "FTE" position in government, approximately 51.5% of total FTE time has been devoted to processing FOIA requests.  This processing requires not only page-by-page, line-by-line review to ensure that all exempt information is properly identified and redacted, but also includes the time-consuming tasks of searching for, arranging, describing, and performing basic preservation on the responsive records.  Also included in this time is that required to conduct re-reviews of records as needed in response to ongoing negotiations with representatives of the former President and Presidential representatives.  (See id.)

Since January 2006, the remaining 48.5% portion of cumulative FTE time has been spent on reference services, including answering all incoming general reference requests from the public, as well as requests received from places such as the White House, the Clinton Foundation, the former President, government agencies, and others.  Archivists staff the Library's textual and audio-visual research rooms when researchers are present.  Archivists also spend time responding to what are called "special access" requests under 44 U.S.C. § 2205, including since January 20, 2006, four significant special access requests from the incumbent President, and one from a federal court.  Additionally, archivists spend time improving the functionality of access to electronic records, including working with contractors on upgrades to the Presidential Electronic Record Library known as "PERL."  Finally, archivists spend time

working on museum exhibit issues, assisting the Curator with writing text, and dealing with a variety of administrative issues as they arise.  (See id. ¶ 25.)

### C. The Clinton Presidential Library Is Exercising Due Diligence in Processing FOIA Requests and Has Shown Reasonable Progress in Reducing its BackLog

NARA is aware of the unprecedented number and volume of FOIA requests received by the Clinton Presidential Library to date and has been working to address the issue.  Most significantly, the Office of Presidential Libraries has submitted to the Archivist of the United States a budget request for Fiscal Year 2009 that includes funding for 15 additional new archivists for processing Presidential records.  If funded, the Clinton Presidential Library would receive the largest number of these archival resources, and this staff would be dedicated to reducing the FOIA backlog at the library.  (See id. ¶ 30.)

Apart from seeking additional funding for positions, NARA has also taken concrete steps to address the Clinton Presidential Library's FOIA backlog.  For example, as part of a government-wide effort undertaken in response to Executive Order 13392 to improve the disclosure of government information, NARA's PRA libraries created "multi-request FOIA queues."  As referenced above, FOIA requests are moved to this queue when a library receives multiple requests for significant portions of the same series or sub-series of records.  Once the requests are transferred to the frequently requested queue, the library has been systematically processing the entire file or collection as opposed to individual folders.  Because systematic processing is faster than FOIA processing, this assists in responding more rapidly to FOIA requesters who wish to gain access to the same or similar files.  It also has had the effect of opening up more materials to access, because in lieu of making individual folders available, researchers can gain access to entire series or sub-series of records.  By opening an entire series

19

or sub-series, researchers' access to these records is permitted without the necessity of filing a FOIA request, which would ultimately add to the existing FOIA backlog. (See id. ¶ 31.)

Additionally, NARA's Office of Presidential Libraries and NARA's Presidential Materials Staff, after discussions with the Supervisory Archivists of the three PRA libraries undertook an in-house study in the Spring of 2007 to review ways to achieve faster processing of Presidential records. As a result of this study, a one-year pilot project was initiated to implement the most promising proposals. (See id. ¶ 32.)

NARA and the Clinton Presidential Library are taking, and will continue to take, reasonable steps, in light of present-day resource and budget constraints, to address the important issue of expedient FOIA processing. Indeed, the Library has shown reasonable progress in reducing its backlog of requests, processing 57 requests in full since the opening of the Library. From January 20, 2006 to September 26, 2007, archivists at the Library have processed 57 FOIA requests representing approximately 188,304 records. Specifically for plaintiff's request, the Library's multi-request queue system ensures a fair, but efficient processing of records, demonstrated by the Library's commitment to completing a portion of plaintiff's request by the end of January 2008. (See id. ¶¶ 12, 21.) Moreover, seven FOIA requests totaling approximately 165,200 pages are currently being processed by Clinton Presidential Library archival staff. As each of these FOIA requests is completed, archival staff will pull the next FOIA request to be processed from its respective queue. (See id. ¶ 21.)

Finally, NARA cannot waive or abrogate the Presidents' constitutional privilege to review the documents for executive privilege prior to public disclosure. See, e.g., 36 C.F.R. § 1270.46. Consistent with executive privileges, both the former and incumbent Presidents are

afforded time to review the records.  As described above, the average Presidential review has required 237 days to review Clinton Presidential records.  (See id. ¶ 14.)

## II.  Additional Time is Routinely Granted When An Agency Demonstrates, As Here, Exceptional Circumstances

Courts have frequently issued orders extending the time to respond to FOIA requests, including orders granting stays of several years in length or otherwise permitting agencies several years to process documents under exceptional circumstances.  See, e.g., Piper v. U.S. Dep't of Justice, 339 F. Supp. 2d 13, 16 (D.D.C. 2004) (discussing a stay of two years given to the FBI); Appleton, 254 F. Supp. 2d at 11 (granting FDA's motion for stay pending completion of search and production of documents); Williams v. FBI, 2000 WL 1763680, at *3 (giving the FBI until May 2, 2001, to review records requested prior to August 21, 1998); Judicial Watch of Fla., Inc. v. U.S. Dep't of Justice, 102 F. Supp. 2d 6, 9 & n.1 (D.D.C. 2000) (discussing an order giving the FBI until June 8, 2000, to respond to a request dated July 15, 1997); Edmond v. U.S. Attorney, 959 F. Supp. 1, 4 (D.D.C. 1997) (giving the U.S. Attorney's Office until April 1, 1998, to respond to a request filed August 14, 1992); Rabin v. U.S. Dep't of State, 980 F. Supp. 116, 123-24 (E.D.N.Y. 1997) (granting motion for Open America stay and permitting Department of State over three years to process plaintiff's FOIA request); Jimenez v. FBI, 938 F. Supp. 21, 31 (D.D.C. 1996) (permitting the FBI a total of nearly five years from the date of plaintiff's FOIA request to respond to the request); Ohaegbu v. FBI, 936 F. Supp. 7, 8-9 (D.D.C. 1996) (granting request for stay and permitting July 1997 response to FOIA request submitted in July 1995). Stays and extended periods for processing are especially warranted for Presidential records requests such as the one here.  Given the structure of the PRA and the preservation of constitutionally-based privileges in the statutory scheme, it is unsurprising that most, if not all,

21

Presidential records requests may not be completed and result in the production of records within 20 days. Aside from the page-by-page, line-by-line review required by NARA archivists, each Presidential representative must be provided an opportunity to review any and all records subject to disclosure.

Specifically, because NARA can demonstrate both exceptional circumstances and due diligence in handling plaintiff's request, as well as reasonable progress in reducing its backlog of the sudden flow of Clinton Presidential Library records, the Court may stay the proceedings to allow the Library time to process plaintiff's request and permit Presidential review. NARA is prepared to submit a status report within 120 days of the entry of the stay, and at 120-day intervals thereafter, to advise the Court and plaintiff of the status of plaintiff's request and provide any available revised estimates of the time required to complete processing.

## <u>CONCLUSION</u>

For the foregoing reasons, the processing schedule should be adopted by the Court.

Dated: October 2, 2007                          Respectfully submitted,

                                                PETER D. KEISLER
                                                Assistant Attorney General

                                                JEFFREY A. TAYLOR
                                                United States Attorney

                                                JOHN R. TYLER
                                                Senior Trial Counsel


OF COUNSEL                              _/s/ Helen H. Hong_____
JASON R. BARON (DC Bar No. 366663)      HELEN H. HONG (CA SBN 235635)
Director of Litigation                  Trial Attorney
Office of the General Counsel           U.S. Department of Justice, Civil Division
NARA                                    P.O. Box 883, 20 Massachusetts Ave., NW
8601 Adelphi Road, Suite 3110           Washington, D.C.  20044
College Park, MD 20740                  Telephone: (202) 514-5838
Telephone: (301) 837-1499               Fax: (202) 616-8460
Fax: (301) 837-0293                     helen.hong@usdoj.gov
jason.baron@nara.gov                    Counsel for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 2, 2007, a true and correct copy of the foregoing

Defendant's Status Report and Processing Schedule was served electronically by the U.S.

District Court for the District of Columbia Electronic Document Filing System (ECF) and that

the document is available on the ECF system.

*/s/ Helen H. Hong*_____

HELEN H. HONG

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 1:07-cv-01267 (JR) |
| | ) | |
| U.S. NATIONAL ARCHIVES AND | ) | |
| RECORDS ADMINISTRATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**SUPPLEMENTAL DECLARATION OF EMILY ROBISON IN SUPPORT OF
DEFENDANT'S STATUS REPORT AND PROCESSING SCHEDULE**

I, Emily Robison, declare as follows:

1.   I am the Acting Director and the Deputy Director of the William J. Clinton Presidential Library, having served in the position of Acting Director since May 2007.  My background, training, and experience is as an archivist, having been continuously employed at the Clinton Presidential Library in the capacity of Supervisory Archivist from February 2002 to August 2004, and Deputy Director from September 2004 to May 2007.  In my current capacity, I supervise the staff of the Clinton Presidential Library, which include: one Supervisory Archivist who supervises eight archivists, one archives specialist, one archives technician, and a part-time student; one Curator who (as of September 4, 2007) supervises 3.6 Full-Time Equivalent ("FTE") museum staff, one education specialist, 5.3 FTE audiovisual museum staff, and 3.1 FTE admissions clerks; one IT contractor; and five administrative staff members of the Library.

2.    Pursuant to Title 44 of the U.S. Code, Chapter 21, the Clinton Presidential Library is a component of the National Archives and Records Administration (NARA), and, therefore, all staff members of the Clinton Presidential Library are also NARA staff members.

3.    Due to the nature of my official duties, I am familiar with the procedures followed by the Clinton Presidential Library in responding to requests for Presidential records from its files pursuant to the provisions of the Presidential Records Act of 1978, 44 U.S.C. § 2201, et seq. ("PRA"), the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), and Executive Order 13233.  NARA regulations direct that FOIA requests for Presidential records of the Clinton Administration be directed to the Director of the Clinton Presidential Library for processing. See 36 C.F.R. §§ 1250.22.

4.    Specifically, I am familiar with the treatment which has been afforded the April 5, 2006 FOIA request submitted by Judicial Watch, Inc., seeking "First Lady Hillary Rodham Clinton's calendar, to include but not limited to her daily office diary, schedule, day planner, telephone log book, and chronological file" for an eight-year time period between January 1, 1993 and January 20, 2001.  That April 5, 2006 FOIA request was assigned FOIA case number 2006-0886-F.

5.  I am also familiar with the above-captioned case, having previously filed a Declaration in this case on August 6, 2007.  The exhibits filed in support of that Declaration are incorporated herein.  This Supplemental Declaration is based on my personal knowledge, as well as on facts supplied to me by NARA staff as known to them in the course of their duties.

## PRESIDENTIAL RECORDS ACT OF 1978

6.   The PRA sets forth a scheme for the preservation and disclosure of Presidential and Vice-Presidential records.  See 44 U.S.C. §§ 2201, 2207.  "Presidential records" covered by the PRA include "documentary materials, or any reasonably segregable portion thereof, created or received by the President, his immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President."  44 U.S.C. § 2201(2).  Included among "Presidential records" are documentary materials created or received by the Office of the First Lady, when those materials meet the above definition.

7.   Documentary materials deemed Presidential records become the property of the United States, 44 U.S.C. § 2202, and may be disclosed to the public under limitations imposed by the PRA.  Id. § 2204.  The PRA imposes upon the Archivist of the United States ("Archivist") "an affirmative duty to make [Presidential] records available to the public as rapidly and completely as possible consistent" with limitations under the PRA.  Id. § 2203(f)(1).  However, there is no public access to Presidential records under FOIA for a period of five years after the President leaves office.  In addition, the President may, before leaving office, "specify durations, not to exceed 12 years, for which access shall be restricted with respect to information" within one of six enumerated categories:  (1) classified information designated by Executive order; (2) documents relating to appointments to Federal office; (3) documents specifically exempted from disclosure by statute other than FOIA; (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential; (5) confidential communications

3

requesting or submitting advice, between the President and his advisers, or between such advisers; or (6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.  See 44 U.S.C. §§ 2204(a)(1) – (a)(6).  Thus Presidential records falling into one of the six categories may be withheld for up to 12 years, even if the record is the subject of a FOIA request.  The PRA provides that the Archivist's decision to withhold a record within the 12 year period under one of the six enumerated restrictions of the PRA "shall not be subject to judicial review."  Id. § 2204(b)(3).

8.  During his time in office, President William J. Clinton asserted his right to apply the six enumerated restrictions in 44 U.S.C. § 2204(a)(1) – (a)(6) for the full 12 year period, and we may withhold documents covered by the restrictions as currently defined in consultation with the former President.

9.  In addition, the PRA incorporates the provisions of the FOIA, including the enumerated exemptions from public access contained in 5 U.S.C. § 552(b)(5), subject to the exception that the (b)(5) exemption, 5 U.S.C. 552(b)(5), is unavailable.  See 44 U.S.C. § 2204(c)(1). Applicable FOIA exemptions, including but not limited to Exemption 2 for certain internal administrative records, and Exemption 7, for law enforcement records, 5 U.S.C. §§ 552(b)(2) & (b)(7), respectively, may apply to records not otherwise covered by one of the PRA restrictions. Such FOIA exemptions may also be applied to Presidential records first processed beyond the 12 year PRA restriction period.  See 44 U.S.C. § 2204(c)(1).  The Archivist may therefore withhold documents from disclosure under FOIA exemptions even when they are not subject to restriction under the PRA.

10.    Once a Presidential Library intends to disclose Presidential records, NARA must notify the incumbent and former Presidents, through their designated representatives, in order to provide them an opportunity to review the records for any constitutionally-based privileges that may apply.  36 C.F.R. § 1270.46; <u>see also</u> Executive Order 13233, § 3; 44 U.S.C. § 2206.

11.    In light of the constitutionally-based provisions of the PRA and Presidential Executive Order 13233, including the requirement of a Presidential notification period, NARA's regulations provide that the agency "cannot expedite requests for Presidential records."  36 C.F.R. § 1250.28(b).[1]  Plaintiff did not request that NARA expedite this FOIA request.

12.    NARA received legal custody of the Presidential records of former President Clinton, including records from the Office of the First Lady, on January 20, 2001.  The five-year moratorium on disclosure mandated by the PRA expired on January 20, 2006, and the Clinton Presidential Library began to receive FOIA requests for documents on that date.  Between January 20, 2006, and April 5, 2006 (the date of the present FOIA request, see ¶ 4), the Library received 211 FOIA requests, totaling an estimated 5,260,372 records.  A total of 397 FOIA requests have been received between January 20, 2006 and September 26, 2007.   From January 20, 2006 to September 26, 2007, archivists at the Library have processed 57 FOIA requests representing approximately 188,304 records.  We currently have 287 pending FOIA requests, which we estimate involves the processing of approximately 10,500,000 pages of Presidential records.  Any documents covered by one of the six restrictions on disclosure are not releasable until January 22, 2013, at which time those processed and restricted records that are not also subject to a FOIA exemption will be proposed for release.

---

[1] NARA's regulations at § 1250.28(b) reflect the provisions of prior Executive Order 12667.

**EXECUTIVE ORDER 13233**

13.  Consistent with principles of executive privilege, Executive Order 13233 provides that the former and incumbent Presidents be afforded an opportunity to review all Presidential records, not otherwise restricted by operation of section 2204 of the PRA, prior to their public disclosure for purposes of determining whether to invoke any constitutionally-based privileges.  See also 44 U.S.C. § 2204(c)(2).  Executive Order 13233 further provides that the Archivist must provide notice of a request for Presidential records to the former and incumbent President and, as soon as practicable, should provide a copy of any records requested by the former or incumbent Presidents.

14.  NARA has been following the requirements of Executive Order 13233 by notifying the representatives of the former and incumbent Presidents of its intent to release non-exempt records.  An average of 237 days has been required for Presidential review of Clinton Presidential records.

**FOIA CASE LOG NUMBER 2006-0886-F**

15.  After receiving Judicial Watch's April 5, 2006 FOIA request ("Request"), archivists at the Clinton Presidential Library conducted what we term a "preliminary search" to determine the approximate volume of records that could be responsive, in order to place the request in the appropriate FOIA queue.  The preliminary search for relevant calendar records to Judicial Watch's request consisted of searching a series of databases in the nature of "finding aids," which collectively provide a rough index to the holdings of the Clinton Administration at the Clinton Presidential Library, as supplemented by the institutional knowledge of our Clinton Presidential Library staff archivists.  One of the applications searched is a database known as

CDSS (the Clinton Document Search System), which allows Clinton Presidential Library

archivists to search the description of Clinton Presidential records retired and filed in the White

House Office of Records Management (WHORM) Subject Files, or folder titles of Staff Member

Office Files entered into the WHORM system. This database serves as a finding aid to millions

of pages of textual Clinton Presidential records.  Additionally, a search was conducted of an MS

Access database created by the Clinton Presidential Library staff, consisting of folder title lists as

originally supplied to NARA by WHORM, constituting a less than fully comprehensive set of

White House Box Inventory Lists.  Finally, the preliminary search also included a search of e-

mails captured by the Automated Records Management System (known as "ARMS") for

potentially responsive e-mail records.

16.   The Clinton Presidential Library conducted a preliminary search of its electronic finding

aids and databases for First Lady Hillary Rodham Clinton's calendar records for the time period

between January 1, 1993 and January 20, 2001.  This database search suggested that there were

roughly 62,600 pages of potentially responsive textual records.  This figure included daily

schedules for First Lady Hillary Rodham Clinton and telephone log books for the Office of the

First Lady that contain, as a subset, an as-yet-undetermined number of message slips for

Mrs. Clinton.   In conducting the electronic search, we located no responsive records

corresponding to a "daily office diary," a "day planner," or a "chronological file" belonging to

First Lady Hillary Rodham Clinton.

17.   By letter dated April 13, 2006, the Clinton Presidential Library's Supervisory Archivist

notified Judicial Watch that its Request had been received and assigned case number 2006-0886-

F.  As indicated above, our initial letter provided Judicial Watch with notice that a preliminary

search had found 62,600 pages of textual records. The letter also indicated that an additional 125,732 pages of electronic records could be responsive to the Request; however, our letter also indicated that the "page total is an estimate and that all pages processed might not be relevant to [the] specific topic."

18.    Since then, the Clinton Presidential Library determined that the 125,732 pages of electronic records -- which consist entirely of e-mail records not of the First Lady, but rather of two of the First Lady's appointed schedulers on staff -- are not responsive to Judicial Watch's Request. In addition, we have since conducted a more accurate physical search of the potentially responsive textual records and determined that these documents total approximately 30,000 pages, not 62,600 pages. The approximately 30,000 pages of textual records include 10,000 pages of daily schedules and 20,000 pages of telephone log books for the Office of First Lady. Accordingly, as set out above, we believe there to be a maximum of approximately 30,000 pages of textual records that may be responsive to the Request.

19.    We further corresponded with Judicial Watch in letters dated July 25, 2006, August 9, 2006, January 16, 2007 and February 9, 2007. In the correspondence, Judicial Watch requested an estimated completion date for the Request. The Supervisory Archivist responded that the Request had been placed into a processing queue and that approximately 156 requests preceded the Request, requiring processing and review of over 2,000,000 pages of records pursuant to the PRA, FOIA and Executive Order 13233. She also noted that "[b]ecause the Clinton Library has only been processing records in response to FOIA requests for less than seven months, we do not yet have a sense of how long it will take us to process the [pending requests] . . . nor how long it will take us to process [the Request] once they reach the front of our queue." Upon receipt of

further inquiries, similar responses from the Clinton Presidential Library were provided in subsequent correspondence.

20.    The Clinton Presidential Library has 17 separate access queues, 16 for FOIA and one for mandatory review of classified documents.  The queues are divided by the type of records requested (e.g., textual, electronic, audio-visual); whether the requests are deemed complex, simple, or capable of immediate processing (which correspond to our preliminary search resulting in an estimate of the request being over 5000 pages, 501-5000 pages, or under 501 pages, respectively).  Within each queue, the FOIA cases are organized by date received.  A matrix format is used to rotate through each of the queues; as the next-in-line FOIA request is selected from each queue, the queue from which the FOIA request is selected for processing will then go to the end of the queue line.  The Clinton Presidential Library queue structure has been evolving since we began FOIA processing.  In an attempt to better serve our requestors, we have added additional queues and adjusted queue requirements.  Our current queue structure is the result of experience gained by conducting many FOIA request searches as well as discussions between staff at the Clinton Presidential Library, the Office of General Counsel, and the Presidential Materials Staff in Washington, D.C.

21.    We have recently added an additional queue for records that are the subject of multiple FOIA requests.  Because we received requests involving records relating to Mrs. Clinton's schedule prior to receipt of the original request from plaintiff Judicial Watch, and because we subsequently received two or more additional requests for similar records, we made a determination earlier in 2007 to initiate processing of a portion of the instant Request – constituting an estimated 10,000 pages – as part of our "multi-request" queue, and had thus

begun to process these records as of June 14, 2007, shortly before the filing of the Complaint in

this action.  The remainder of the present Request (constituting the telephone log books from the

Office of First Lady) is still pending in the multi-request queue.  There are currently five FOIA

requests in this multi-request queue ahead of this portion of the Judicial Watch Request.  Under

the matrix process described in ¶ 20, in which we rotate through each of the 16 queues, however,

there are 80 FOIA requests ahead of the remainder portion of the Request.   Seven FOIA

requests totaling approximately 165,200 pages are currently being processed by Clinton

Presidential Library archival staff.  As each of these FOIA requests is completed, archival staff

will pull the next FOIA request to be processed from its respective queue.

22.    Once processing of the first portion of the Request is completed, pursuant to the terms of

the PRA and Executive Order 13233, NARA will notify the representatives of the former and

incumbent President of the Clinton Presidential Library's proposed release of these records

under Executive Order 13233.  Notwithstanding all of the constraints the Library is operating

under (see ¶¶ 24-33), consistent with the estimate given in my first declaration of a processing

time of five to six months from that date, we estimate that it will take through January 2008 to

complete processing of the 10,000 pages of records representing the first portion of plaintiff's

request.   We presently intend to process the remainder portion as it arises under the current

matrix system.  However, given continuing uncertainty as to how much faster we can accomplish

the processing of our current backlog of FOIA requests given resource and budget constraints,

we are not in a position to provide a reasonable estimate at this time as to how long it may take

to process the remaining portion of the FOIA request.

23.    Once our review of the first portion of the request is complete as expected in January 2008,

we will promptly follow the notification procedures set forth above.  However, we are not in a position to expedite the privilege review by the former and incumbent Presidents under the terms of PRA, NARA's regulations and Executive Order 13233.  Once the review process has been completed, NARA will inform Judicial Watch of the Clinton Presidential records that are available and whether any records are being withheld.

## FOIA PROCESSING AT THE CLINTON PRESIDENTIAL LIBRARY

24.  The Clinton Presidential Library can allocate no more than six archivists for processing all of its pending FOIA requests for textual and electronic records.  Counting each archivist as a "Full Time Equivalent" or "FTE" position in government, we estimate that from January 20, 2006 until September 2007, only 51.5% of total archival FTE time was available to process FOIA requests.  This processing requires not only a page-by-page, line-by-line review to ensure that all exempt information is properly identified and redacted but also the time-consuming tasks of searching for, arranging, describing, and performing basic preservation on the responsive records.  Also included in this time is time required to conduct re-reviews of records as needed in response to ongoing negotiations with representatives of the former President.

25.  Since January 2006, the remaining 48.5% portion of cumulative FTE time has been spent on reference services, including answering all incoming general reference requests from the public, as well as requests received from places such as the White House, the Clinton Foundation, the former President, government agencies, and others.  Archivists staff the Library's textual and audio-visual research rooms when researchers are present.  Archivists also spend time responding to what are called "special access" requests under 44 U.S.C. § 2205, including since January 20, 2006, four significant special access requests from the incumbent

President, and one from a federal court. Additionally, archivists spend time improving the functionality of access to electronic records, including working with contractors on upgrades to the Presidential Electronic Record Library known as "PERL." Finally, archivists spend time working on museum exhibit issues, assisting the Curator with writing text, and dealing with a variety of administrative issues as they arise.

26. In anticipation of the opening of Clinton Presidential Library records to FOIA processing on January 20, 2006, two archivists on my staff traveled in 2005 to the George H.W. Bush Presidential Library in College Station, Texas, to review the Bush Presidential Library's handling of FOIA requests under the Presidential Records Act. Clinton Presidential Library staff also participated in one or more training exercises held in person and via phone conferencing with NARA headquarters staff familiar with FOIA processing issues in general, including being briefed by the Director of NARA's Presidential Materials Staff and her staff, as well as by various other NARA FOIA officials.

27. Notwithstanding all of these attempts at due diligence, the sheer total volume of records held at the Clinton Presidential Library has contributed to unanticipated delays in the Clinton Library's ability to process FOIA requests after January 2006. For example, the Clinton Presidential Library holds an estimated 78 million pages of Presidential textual records, whereas in contrast the Reagan Presidential and Bush Presidential Libraries hold 43.8 million and 33.7 million pages of textual records governed by the PRA, respectively. The Clinton Presidential Library also legally holds an estimated 20 million presidential electronic mail records, 2 million electronic cables, and 60 other electronic systems, which is orders of magnitude greater than similar electronic records holdings elsewhere in these other Libraries and, if printed in a textual

format, would rival in size the entire volume of Presidential records generated during the eight years of the Reagan Administration.   This increase in the volume of holdings and variety of formats necessarily requires more complex and time-consuming searching and pulling of records, as well as demanding greater efforts to maintain intellectual control over this vast collection of records through traditional hard copy finding aids and electronic indices of various kinds.

28.   As the first Presidential Library to have a significant volume of born-electronic records, the Clinton Presidential Library has received FOIA requests for more than one million emails in the twenty months since Clinton Presidential records became subject to FOIA.  While NARA is expending significant resources to address the explosion in volume of electronic records through its Electronic Records Archive project, and while upgrades in functionality have been made to the PERL system that currently holds Clinton Presidential electronic records, the Clinton Presidential Library must print electronic records to paper prior to arranging, reviewing, and describing them as textual records.  Additionally, the Clinton Presidential Library archival staff has spent large amounts of staff time on an unanticipated process known as "de-hexification," i.e., converting attachments to individual email records that cannot be read due to an unknown or unreadable file into something approaching readable form.

29.   Additionally, in the first year of FOIA processing since January 2006, the Library has experienced an unexpected jump in the volume and complexity of the incoming FOIA requests themselves.  In contrast to what transpired at the Reagan and Bush Presidential Libraries, we received 336 FOIA requests in the first calendar year of FOIA processing, between January 20, 2006 and December 31, 2006 – a three-fold increase over the approximately 100 FOIA requests

received during the first year of FOIA processing at the Reagan and Bush Presidential Libraries. Also, in contrast to the experience of NARA staff at those libraries, and despite the best efforts of Clinton Presidential Library staff, we have not been particularly successful in convincing FOIA requestors at our Library to work with us in substantially narrowing what often have been extremely far-ranging requests for "all" records on a number of topics, either by date, content, or by some other reasonable means.

30.   NARA is aware of the unprecedented number and volume of FOIA requests received by the Clinton Presidential Library to date and has been working to address this issue.  Most significantly, the Office of Presidential Libraries has submitted to the Archivist of the United States a budget request for Fiscal Year 2009 that includes funding for 15 new archivists for processing Presidential records.  If funded, the Clinton Presidential Library would receive the largest number of these archival resources, and this staff would be dedicated to reducing the FOIA backlog at the library.

31.   Apart from seeking additional funding for positions, we also have taken concrete steps to address our FOIA backlog.  For example, as part of a government-wide effort undertaken in response to Executive Order 13392 to improve the disclosure of government information, NARA's PRA libraries created "multi-request FOIA queues."  As referenced in ¶ 21, FOIA requests are moved to this queue when a library receives multiple requests for significant portions of the same series or sub-series of records.  Once the requests are transferred to the frequently requested queue, the library will begin systematically processing the entire file or collection as opposed to individual folders.  Because systematic processing is faster than FOIA processing, this assists in responding more rapidly to FOIA requesters who wish to gain access

because in lieu of making individual folders available, researchers can gain access to entire series or sub-series of records. By opening an entire series or sub-series, we will enable access to these records to future researchers without the necessity of filing a FOIA request, which would ultimately add to the existing FOIA backlog.

32. Additionally, NARA's Office of Presidential Libraries and Presidential Materials Staff, after discussions with the Supervisory Archivists of the three PRA libraries decided to undertake an in-house study in the spring of 2007 to review ways to achieve faster processing of Presidential records. As a result of this study, a one-year pilot project was initiated to implement the most promising proposals. Such proposals include halting what has been a time-consuming process of routinely referring to the originating and/or equity agencies those classified items processed in response to FOIA requests.

33. In sum, NARA and the Clinton Presidential Library are taking, and will continue to take, reasonable steps, in light of present-day resource and budget constraints, to address the important issue of improving FOIA request processing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2 day of October, 2007.

EMILY ROBISON
Acting Director
Clinton Presidential Library

15