**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.  1:07-cv-01267 (JR) |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. NATIONAL ARCHIVES AND | ) | |
| RECORDS ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**STATUS REPORT AND PROCESSING SCHEDULE**

Plaintiff, Judicial Watch, Inc. ("Judicial Watch"), respectfully submits this response to

Defendant's Status Report and Processing Schedule:

**MEMORANDUM OF LAW**

I.    **Factual Background.**

Judicial Watch is a non-profit, educational foundation organized under the laws of the

District of Columbia.  Verified Complaint for Declaratory and Injunctive Relief ("Verified

Complaint") at para. 3.  Judicial Watch seeks to promote integrity, transparency, and

accountability in government and fidelity to the rule of law.  *Id.*  In furtherance of its public

interest mission, Judicial Watch regularly serves Freedom of Information Act ("FOIA"), 5 U.S.C.

§ 552, requests on Federal, state, and local government agencies, entities, and offices, and

disseminates its finding to the public.  *Id.*

The Presidential Records Act ("PRA"), 44 U.S.C. § 2201 *et seq.*, establishes a five-year

moratorium on the disclosure of presidential records after a president leaves office.  After five

years, presidential records become subject to FOIA requests, unless a president expressly

designates a longer period of time, not to exceed twelve years.  On January 20, 2006, the five-year moratorium on the records of former President William Jefferson Clinton expired.  On or about April 5, 2006, Plaintiff sent a FOIA request to the Clinton Presidential Library ("the Library"), which is operated and maintained by Defendant and serves as the repository for former President Clinton's records, requesting access to the following:

> First Lady Hillary Rodham Clinton's calendars, to include but not limited to her daily office diary, schedule, day planner, telephone log book, and chronological file.

*Id.* at para. 5.  The time-frame for the request was from January 1, 1993 to January 20, 2001, which approximates the time period during which Mrs. Clinton served as First Lady.  *Id.*

By letter dated April 13, 2006, the Library acknowledged receiving Plaintiff's FOIA request on April 5, 2006 and notified Plaintiff that it had assigned the request FOIA Case No. 2006-0886-F.  *Id.* at para. 7.  The Library also acknowledged that it possessed a substantial volume of records potentially responsive to the request.  *Id.*  Pursuant to 5 U.S.C. § 552(a)(6)(A)(I), the Library was required to respond to the request within twenty working days, or on or before May 3, 2006.  As of July 16, 2007, in excess of one year beyond the due date for a response, the Library failed to produce any records responsive to the request or demonstrate that responsive records are exempt from production.  *Id.* at para. 9.  The Library also failed to avail itself of the extension of time provision contained in the statute.  5 U.S.C. § 552(a)(6)(A), (B).  As a result, Judicial Watch had no other recourse but to file this lawsuit, which it did on July 17, 2007.  At the same time, Plaintiff filed an application for injunctive relief.

On August 30, 2007, the Court denied Plaintiff's application for injunctive relief, but ordered Defendant to "file a dispositive motion or, in the alternative, to file a report setting

forth the schedule according to which it will complete its production of documents to Plaintiff"

within thirty days. On October 2, 2007, Defendant filed a twenty-two page document entitled

"Defendant's Status Report and Processing Schedule" ("Def.'s Report"), which was

accompanied by a fifteen page declaration.[1] In the report, Defendant estimates that it will

complete its review of approximately 10,000 pages of records, constituting Mrs. Clinton's daily

schedule as First Lady, by the end of January 2008. Def.'s Report at 1. While Defendant

acknowledges that there are an additional 20,000 pages of telephone log books potentially

responsive to Plaintiff's request, Defendant fails to give *any* estimate of when it will complete its

review of these records. *Id.*

Defendant also asserts, however, that, upon completion of its review of the records, an

indefinite period of additional time is required to permit "presidential review" for possible claims

of privilege before the records are made public. *Id.* at 2-3. Defendant thus requests an indefinite

stay of this litigation, citing *Open America v. Watergate Special Prosecution Force*, 547 F.2d

605 (D.C. Cir. 1976).

Plaintiff does not object to Defendant's projected date of January 2008 to complete its

processing of the 10,000 pages of Mrs. Clinton's daily schedule. Plaintiff does object, however,

to Defendant's failure to provide *any* estimate of the date by which it will complete its processing

of the 20,000 pages of telephone log books. Plaintiff also objects to staying this litigation

indefinitely. Not only has Defendant failed to satisfy its burden of demonstrating that a stay is

warranted to allow it additional time to complete its processing of responsive records, but

Defendant's assertion that it must have an indefinite period of time to permit "presidential

---

[1]     Technically, Defendant's filing was one day late.

3

review" is contrary to Defendant's own regulations and is inconsistent with an injunction entered

against Defendant on October 1, 2007.

II.    **Argument.**

    A.    **FOIA Requires Timely Production.**

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of

a democratic society, needed to check against corruption and to hold the governors accountable

to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). FOIA also

prevents excessive government secrecy. In enacting FOIA, "Congress sought to open agency

action to the light of public scrutiny." *U.S. Department of Justice v. Tax Analysts*, 492 U.S. 136,

142 (1989); *see also Department of Justice v. Reporters Committee*, 489 U.S. 749, 772 (1989);

*Department of Air Force v. Rose*, 425 U.S. 352, 372 (1976). Records are "presumptively

disclosable unless the government can show that one of the enumerated exemptions applies."

*Consumer Federation of America v. Department of Agriculture*, 455 F.2d 283, 287 (D.C. Cir.

2006) (quoting *Bureau of National Affairs, Inc. v. U.S. Department of Justice*, 742 F.2d 1484,

1498 (D.C. Cir. 1984).

Equally important to effectuating the purpose of FOIA is ensuring that agency records be

disclosed in a timely manner. As the legislative history of FOIA makes clear, Congress

recognized that delay in releasing information can be "tantamount to denial" of access. *See* H.

Rep. No. 876, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Admin. News, 6267,

6271. "The value of information is partly a function of time." *Fiduccia v. United States DOJ*,

185 F.3d 1035, 1041 (9th 1999). Consequently, agencies are required to determine within twenty

days of the receipt of a request for records "whether to comply with such request" and "to

immediately notify the person making such request of such determination and the reasons thereof." 5 U.S.C. § 552(a)(6)(A)(i). This time limit can be extended by ten working days if the agency determines that "unusual circumstances" exist. 5 U.S.C. § 552(a)(6)(B).

Although more than eighteen months have passed since Defendant received Plaintiff's FOIA request on April 5, 2006, Defendant has not produced *any* responsive records to Plaintiff. Defendant admits that it has not yet completed processing even a portion of the records responsive to the request and did not even begin processing these records until June 14, 2007. Def.'s Report at 1, 13. Not only has Defendant completely failed to comply with FOIA's twenty-day time period, but, when pressed by the Court to provide a schedule for completing its production of records to Plaintiff, Defendant failed to provide even a final, concrete estimate of when it expects to be able to produce responsive records.[2] Defendant's conduct demonstrates a complete disregard for the law.

**B.    Defendant Failed to Satisfy Its Burden of Demonstrating That a Stay is Warranted.**

FOIA's twenty day time limit may be extended if an agency makes a showing that it is facing "exceptional circumstances" and is "exercising due diligence" in responding to a request. *See* 5 U.S.C. § 552 (a)(6)(C)(I). This "safety valve" provision was "carefully crafted to put a substantial burden on the government to justify to the courts any noncompliance with FOIA time limits." *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605, 617 (D.C. Cir. 1976). In *Open America*, the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") found that "exceptional circumstances" exist only when an agency meets the following

---

[2]      Indeed, in every case cited by Defendant in which a stay was sought, the agency provided a date certain by which it proposed to complete its processing of a request.

test:  (1) the agency is deluged with a volume of requests for information "vastly in excess" of that anticipated by Congress; (2) the agency's existing resources are inadequate to deal with the volume of such requests within the time limits set forth by FOIA; and (3) the agency can show that it is exercising due diligence in processing the request.  *Open America*, 547 F.2d at 616.

In 1996, Congress passed the Electronic Freedom of Information Act Amendments ("E-FOIA Amendments") to address, in part, "the single most frequent complaint about the operation of the FOIA:  agency delays in responding to FOIA requests."  *See* H. Rep. No. 795, 104th Cong., 2d Sess., *reprinted in* 1996 U.S. Code Cong. & Admin. News, 3448, 3466.  In enacting the E-FOIA Amendments, Congress declared:

> In *Open America* . . . the District of Columbia Circuit Court of Appeals held that exceptional circumstances exist when the agency can show it has inadequate resources to process FOIA requests within statutory time limits . . . Relying upon overly broad dictum in this case, agencies have employed the exceptional circumstances -- due diligence exception to obtain judicial approval for lengthy delays whenever they have a backlog.
>
> Backlogs of requests for records under the FOIA should not give agencies an automatic excuse to ignore the time limits.

*See* H. Rep. No. 795, 104th Cong., 2d Sess., *reprinted in* 1996 U.S. Code Cong. & Admin. News, 3448, 3456-57.  With the E-FOIA Amendments, Congress doubled the time allowed to agencies to respond to FOIA requests, but expressly limited those circumstances previously considered exceptional:

> For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

5 U.S.C. § 552(a)(6)(C)(ii).  Courts have denied stays where agencies have shown no more than predictable workloads or have failed to show reasonable progress in reducing the backlog of pending requests.  *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 259 (D.D.C. 2005); *Wilderness Society v. United States Department of the Interior*, 2005 U.S. Dist. LEXIS 20042, *32-34 (D.D.C. September 12, 2005); *Hunter v. Christopher*, 923 F. Supp. 5, 8 (D.D.C. 1996).

**1.    Defendant Failed to Demonstrate the Existence of**
**"Exceptional Circumstances" Warranting a Stay.**

Defendant fails to demonstrate that "exceptional circumstances" exist warranting a stay of this lawsuit.

First, Defendant has not demonstrated that the volume of requests it has received is "vastly in excess" of anything contemplated by Congress or that this volume is anything more than a predictable agency workload.  Defendant must have been aware that the Library would receive a high volume of FOIA requests, especially considering that:  (1) the Clinton presidency was highly controversial and the subject of an unprecedented degree of media and public scrutiny; (2) President Clinton is one of only two presidents to be impeached in the history of the United States; (3) Mrs. Clinton played a particularly prominent role in her husband's presidency; (3) while First Lady, Mrs. Clinton ran for and was elected to the U.S. Senate and currently is a sitting U.S. Senator for the State of New York; (4) Mrs. Clinton had long been considered a likely candidate for the Presidency of the United States and formally declared her candidacy nearly a year ago; (5) Mrs. Clinton is widely considered to be the "front runner" for the Democratic Party's nomination; and (6) if elected, Mrs. Clinton would be the first female

President of the United States and the first spouse of a former president to be elected.  In short, Defendant should have known that public interest in the records of the Clinton Library would be substantial, and it also should have known that the number of requests for records would likely exceed by a substantial margin the number of requests received by the libraries of President Clinton's predecessors.  It simply is not credible for Defendant to assert that it has been "burdened" with an "unprecedented" number of FOIA requests.  A predictable workload yields nothing more than a predictable backlog.

Second, the "sheer total volume of records" held by the Clinton Library does not constitute an "exceptional circumstance" under FOIA, nor should it excuse Defendant's delay in failing to meet FOIA's statutorily mandated time period.  Defendant must have been fully aware, long before the five-year moratorium on the disclosure of Clinton presidential records expired, of the volume of records the Library would be required to review in order to process and respond to FOIA requests.  Under the PRA, Defendant had five years time to coordinate, organize, and index the Library's records in order to prepare for the inevitably large number of FOIA requests the Library would likely receive.  Nonetheless, Defendant admits the Library waited until shortly before the moratorium expired to send two of its archivists to the George H.W. Bush Presidential Library in College Station, Texas to review the Bush Library's handling of FOIA requests. Def.'s Report at 16.  Defendant's assertion that the Library's staff participated in "one or more" training exercises and was briefed via telephone conference by Defendant's staff on "FOIA processing issues" demonstrates a particularly lackluster effort to try to satisfy its FOIA obligations.  *Id.*

Third, "inadequate staff, insufficient funding or a great number of requests are not within the meaning of 'exceptional circumstances' as that language is used in the statute nor were they within the contemplation of its framers as evidenced by the legislative history." *Hamlin v. Kelley*, 433 F. Supp. 180, 182 (N.D. Ill. 1977). Defendant's claim that the Library's resources are insufficient to address the number of FOIA requests it receives does not justify a stay.

In addition to not being able to demonstrate "exceptional circumstances," Defendant has failed to show that the Library is making reasonable progress in reducing its backlog of pending requests. Instead, it appears that the backlog of requests is multiplying at an ever-increasing rate. Defendant asserts that the Library received 211 FOIA requests in the first three months following the expiration of the PRA moratorium. Def.'s Report at 10. Of these 211 FOIA requests, it has taken the Library twenty one months to process only 57 requests. *Id.* Since the first three months, however, the Library received an additional 186 requests. *Id.* Clearly, the Library has not gained any ground. Rather, it appears to be falling further behind as its backlog is increasing. Defendant's request for a stay should be denied for the additional reason that the Library has failed to demonstrate reasonable progress in reducing its backlog of pending requests.

### 2.    Defendant Failed to Demonstrate That it Exercised "Due Diligence" in Responding to Plaintiff's Request.

Defendant's effort to show "due diligence" in responding to Plaintiff's request is also lacking. Defendant appears to try to make this showing by citing budgetary proposals for possible future increases in personnel for Fiscal Year 2009 and a 2007 in-house study conducted by the Office of Presidential Libraries and Defendant's Presidential Materials Staff discussing ways to achieve faster processing. Def.'s Report at 19-20. Neither of these points demonstrate

that Defendant has acted with due diligence in processing *Plaintiff's* request.  Instead, the possibility of added personnel and "streamlining" of the FOIA request process only demonstrates how the Library *might* treat *future* FOIA requests with due diligence.

The Library has not, in fact, treated Plaintiff's request with due diligence.  Defendant admits that the Library did not even begin to process a portion of Plaintiff's April 5, 2006 request until June 14, 2007, more than fourteen months after the request was received.  Def.'s Report at 2, 13.  Defendant also admits that, although the Library received similar requests prior to receiving Plaintiff's April 5, 2006 request and subsequently received "two or more" additional requests for similar records, the Library did not add a queue for records that are the subject of multiple requests until just "recently."  Def.'s Report at 9, 13.  Such treatment simply does not amount to due diligence.

In sum, Defendant has failed to carry its burden of demonstrating that "exceptional circumstances" exist and that it is exercising "due diligence" in responding to Plaintiff's request. Defendant has failed to show that any stay, much less a stay of indefinite duration, is warranted.

## C.   Defendants' Reliance on Executive Order 13233 to Justify An Indefinite Stay is Unlawful.

In 1978, Congress enacted the PRA to establish public ownership and control of presidential records and to provide public access to presidential records after a president leaves office.  *Nixon v. United States*, 978 F.2d 1269, 1277 n.19 (D.C. Cir. 1992).  The PRA directs that the "Archivist shall have an affirmative duty to make such records available to the public as rapidly and completely as possible consistent with the provisions of this Act."  44 U.S.C. § 2203(f)(1).  The PRA requires that the Archivist give a former president notice "when the

10

disclosure of particular documents may adversely affect any rights and privileges which the former President may have." 44 U.S.C. § 2206(3).

The PRA established that the Archivist may promulgate regulations to "carry out the provisions of this chapter." *Id.* at § 2206. Defendant lawfully promulgated such regulations in accordance with the Administrative Procedure Act. *See* 36 C.F.R. § 1270.46. Those regulations provide that, whenever the Archivist intends to make public any presidential record, a former president must be given thirty days written notice to allow him to assert any rights or privileges that might foreclose access to the materials. 36 C.F.R. § 1270.46(a) and (d). Once this thirty day notice period has expired, the Archivist is free to release the records, unless the former president asserts that some or all of the records are subject to a claim of privilege. *Id.* at § 1270.46(c) and (d). If, in such case, the Archivist nevertheless determines the records in question should be disclosed, appropriate notice must be given to the former president and the Archivist must wait an additional thirty days before releasing the records. *Id.* at § 1270.46(c) and (d). Copies of all notices are to be provided to the incumbent president as well. *Id.* at § 1270.46(e).

On November 1, 2001, President Bush issued Executive Order 13233, entitled "Further Implementation of the Presidential Records Act." Executive Order 13233 provides that the Archivist must notify both the former president *and* the incumbent of any request for access to presidential records subject to the PRA and must provide both the former and incumbent president with copies of the relevant records upon their request. Executive Order 13233, § 3(a). The order further provides:

> After receiving the records he requests, the former President shall review those
> records as expeditiously as possible, and for no longer than 90 days for requests
> that are not unduly burdensome. The Archivist shall not permit access to the

records by a requester during this period of review or when requested by the former President to extend the time for review.

Executive Order 13233, § 3(b).[3]

On October 1, 2007, the Hon. Colleen Kollar-Kotelly, U.S.D.J., declared Defendant's reliance on section 3(b) of Executive Order 13233 to be "arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of the [Administrative Procedures Act]" in another lawsuit involving the PRA. *See National Historical Association v. NARA*, Civ. No. 01-2447, Slip Op. (D.D.C. Oct. 1, 2007) (Kollar-Kotelly, J.), attached hereto as Exhibit 1. Specifically, the Court found:

> [Executive Order 13233] effectively eliminates the Archivist's discretion to release a former president's documents while such documents are pending a former president's review, which can be extended -- presumably indefinitely -- upon the former president's request . . .  Furthermore, [Executive Order 13233] provides a 90-day floor for a former president's review of documents.  While Defendants are correct that 36 C.F.R. § 1270.46(d) does not specify a "maximum" time for review, Defendants seem to miss that after 30 days from a former president's receipt of notice of documents to be disclosed, the Archivist may make a discretionary decision with respect to the release of such documents though they are pending the former president's review.  Accordingly, in relying on § 3(b) of [Executive Order], the Archivist effectively denies himself the discretion (and accordingly the need to make reasoned, discretionary decisions with respect to the length of review) to release documents still under a former president's review as he is permitted to do pursuant to 36 C.F.R. § 1270.46(d).

---

[3]    Executive Order 13233 also requires that the incumbent president have the opportunity to review records for an indeterminate amount of time "to decide whether to concur with the former president's decision to request withholding or authorize access to the records" (*see* Executive Order 13233, § 3(d)), thus adding another step to the review process not set forth in the PRA or its implementing regulations and further delaying public disclosure.

*Id.* at 33-34 (internal citations and quotations omitted).  The Court therefore enjoined "the Archivist from further relying on Section 3(b) of Executive Order 13,233."[4]  *Id.* at 37-38.

Nonetheless, the very next day, Defendant filed its status report, in which it invoked the exact same portion of Executive Order 13233 that the Court in *National Historical Association* had declared to be unlawful and enjoined Defendant from relying on further.  Defendant asserted:

> NARA cannot provide a *production* schedule because of the right afforded to representatives of the incumbent and former Presidents to review Presidential records prior to public disclosure.  Under Executive Order 13233, 44 U.S.C. § 2206, 36 C.F.R. § 1270.46 and consistent with constitutional principles of executive privilege, the former President maintains time to review any records otherwise set for disclosure by NARA and the incumbent maintains additional time to concur with the former President's disclosure decisions.

Def.'s Report at 3.  While Defendant also asserted that it would not take any action inconsistent with the Court's injunction (*see* Def.'s Report at 3 n.1 & 7 n.2), it appears to have done precisely that.  *See*, *e.g.*, Def.'s Report at 3, 7-8, 20-22.

If, as Defendant asserts, it truly means to comply with the PRA, its own regulations implementing the PRA, and the Court's injunction in *American Historical Association*, it only needs to provide thirty days notice of its intent to disclose records.  6 C.F.R. § 1270.46(a).  Once the thirty day notice period expires, it is free to disclose the records.  36 C.F.R. § 1270.46(c) and (d).  In the event former President Clinton asserts that any or all of the records should not be made public because of some claim of right or privilege, Defendant is still free to produce the records, provided that another thirty days notice is given to former President Clinton.  36 C.F.R.

---

[4]        The order accompanying the Court's ruling expressly states, "This is a final, appealable order."  *See National Historical Association v. NARA*, Civ. No. 01-2447, Order (D.D.C. Sept. 30, 2007), attached as Exhibit 1.  No appeal has been taken, and the Court was not asked to stay its ruling pending the outcome of any appeal.  Nor has any such stay been entered.

§ 1270.46(c) and (d). There is no lawful reason why Defendant must wait an indefinite period of time to "permit presidential review." As the Court found in *American Historical Association*, Defendant has the discretion to release records even though they are still pending a former president's review. Exhibit 1 at 34. Defendant can produce responsive records as early as thirty days after notice has been given under 36 C.F.R. § 1270.46. Consequently, there is no need for an indefinite stay.

It is axiomatic that an agency must abide by its own regulations. *Cherokee National of Oklahoma v. Babbitt*, 117 F.3d 1489, 1499 (D.C. Cir. 1997). If Defendant abides by 36 C.F.R. § 1270.46, responsive records could be released to Plaintiff as early as the end of February or early March 2008. If the Library completes its processing of Mrs. Clinton's daily schedule by the end of January 2008, Defendant need only provide thirty days notice before releasing the records to Plaintiff. 36 C.F.R. § 1270.46(a) and (d). The Court should not allow Defendant to use provisions of Executive Order 13233 that have been declared to be unlawful, and on which further reliance has been expressly enjoined, to indefinitely delay the production of responsive records to Plaintiff. Defendant need only comply with the requirements of 36 C.F.R. § 1270.46.

## III. Conclusion.

For the foregoing reasons, Defendant should be required to complete its processing of Mrs. Clinton's daily schedule by the end of January 2008 and provide prompt notice of disclosure under 36 C.F.R. § 1270.46. Similarly, Defendant should be required to complete its processing of the telephone logs at issue by a reasonable date certain and again provide prompt notice of disclosure under 36 C.F.R. § 1270.46. To the extent Defendant determines that any responsive records should be withheld, Defendant should be required to produce appropriate

14

*Vaughn* Indexes within these same time periods.  Defendant's request for an indefinite stay of this lawsuit pursuant to *Open America* should be denied.

Dated:  November 7, 2007                         Respectfully Submitted,

                                                 JUDICIAL WATCH, INC.

                                                 /s/ Paul J. Orfanedes
                                                 Paul J. Orfanedes
                                                 D.C Bar No. 429716
                                                 Jason B. Aldrich
                                                 D.C Bar No. 495488
                                                 Suite 500
                                                 501 School Street, S.W.
                                                 Washington, DC 20024
                                                 (202) 646-5172

                                                 *Attorneys for Plaintiff*

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN HISTORICAL ASSOCIATION, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 01-2447 (CKK) |
| NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, *et al.*, | |
| Defendants. | |

MEMORANDUM OPINION
(October 1, 2007)

Plaintiffs[1] filed suit against the National Archives and Records Administration

("NARA"), and the Archivist of the United States,[2] (collectively, "the Government" or

---

[1]Plaintiffs listed on the First Amended Complaint, filed July 2, 2004, are the American Historical Association, a nonprofit organization founded "for the promotion of historical studies, the collection and preservation of historical documents and artifacts, and the dissemination of historical research," Stanley I. Kutler, Professor Emeritus of History and Law at the University of Wisconsin, the National Security Archive, a nongovernmental research institute and library, the Organization of American Historians, a nonprofit organization "devoted to promoting the study and teaching of American history," Public Citizen, Inc., a public interest organization "dedicated to protecting the rights of members of the public as both consumers and citizens," the Reporters Committee for Freedom of the Press, a nonprofit "association of reporters and editors dedicated to protecting freedom of the press," and the American Political Science Association, "the world's largest professional organization for the study of politics." First Am. Compl. ("Compl.") ¶¶ 3-9.

[2]At the time this suit was filed, John W. Carlin served as the eighth Archivist of the United States. In February 2005, Allen Weinstein became the ninth Archivist of the United States, and consequently replaces Mr. Carlin as a Defendant in this suit. *See* NARA.gov, Archivists of the United States, http://www.archives.gov/about/history/archivists/ (last visited July 23, 2007).

"Defendants"), seeking injunctive and declaratory relief related to Executive Order 13,233, signed by President George W. Bush on November 1, 2001, which purported to "further implemen[t]" the Presidential Records Act ("PRA") of 1978, 44 U.S.C. §§ 2201-2207 (1991).  In Count I of Plaintiffs' First Amended Complaint ("Complaint"), Plaintiffs asked the Court to find that Executive Order 13,233 constitutes an impermissible exercise of the executive power, and to enjoin its implementation.  Compl. ¶¶ 66-73.  In Count II of their Complaint, Plaintiffs asked the Court to order the release of specific documents that had been withheld, initially under the terms of the Executive Order, but later under the incumbent president's independent invocation of constitutional privilege.  Compl. ¶¶ 74-83.

The Court originally dismissed the instant suit on jurisdictional grounds on March 28, 2004.  However, Plaintiffs subsequently filed a motion to alter or amend the Court's ruling pursuant to Federal Rule of Civil Procedure 59(e), informing the Court that material facts that were omitted by the Parties in the initial round of briefing impacted the Court's grounds for dismissal.  Although Defendants argued that the Court had reached the correct result, Defendants did not dispute the facts as presented by Plaintiffs.  On September 24, 2005, the Court granted Plaintiffs' Motion to Alter or Amend the Judgment, agreeing to reconsider its earlier ruling.  In the same Order and accompanying Memorandum Opinion, the Court granted summary judgment for Defendants with respect to Count II of Plaintiffs' Complaint, finding that Plaintiffs were required to show some "demonstrated, specific need" for the records they sought in order to overcome the president's assertion of constitutional privilege, but that Plaintiffs had conceded that they could make no such required showing of need.  The Court further asked the Parties to

2

file renewed dispositive cross-motions with respect to Count I.

Accordingly, presently before the Court are the Parties' renewed dispositive motions with respect to Count I of Plaintiffs' Complaint, specifically Defendants' [57] Motion to Dismiss and Plaintiffs' [58] Motion for Summary Judgment. Both motions are fully briefed. After considering the aforementioned filings, the history of the case, the [60] amicus brief filed in support of Plaintiffs' Motion for Summary Judgment, and the relevant statutes, case law, executive orders, and legislative history, the Court shall GRANT IN PART and DENY IN PART Defendants' [57] Motion to Dismiss, and GRANT IN PART and DENY IN PART Plaintiffs' [58] Motion for Summary Judgment. While the Court finds that Plaintiffs' challenges are not ripe with respect to all but one of the sections of Executive Order 13,233 with which they take issue, the Court finds that Plaintiffs' claim under section 3(b) is justiciable. Furthermore, the Court finds the Archivist's reliance on section 3(b) to be arbitrary, capricious, and contrary to law in violation of the Administrative Procedure Act ("APA"). Accordingly, the Court need not reach Plaintiffs' alternative argument that Plaintiffs have a nonstatutory right to judicial review and a declaration under 28 U.S.C. § 2201 because Executive Order 13,233 is contrary to the terms of the PRA and lacks a valid constitutional basis. The Court shall therefore declare that the Archivist's reliance on section 3(b) of Executive Order 13,233 is unlawful pursuant to the APA and prohibit the Archivist from further reliance on this provision.

## I. BACKGROUND

*A.    Historical Context*

Prior to 1974, the wide array of materials generated during a presidency were generally

3

considered the property of that president when his term ended, although those ownership rights

might be limited somewhat by the public interest in them as records of government activity. *See*

*Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 431 (1977); *Nixon v. United States*, 978 F.2d 1269,

1270 (D.C. Cir. 1992). In the midst of the Watergate investigation, however, Congress passed

the Presidential Recordings and Materials Preservation Act ("PRMPA"), which transferred

control of President Richard Nixon's presidential records to the Administrator of General

Services (later changed to the "Archivist"), and directed the Administrator to develop regulations

providing for public access to the materials. *See* 44 U.S.C. § 2111 note. The PRMPA was

upheld as constitutional in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977).

Although the Court in *Nixon v. Administrator of General Services* held that there is a legal

foundation for a former president's claim to executive privilege surviving his tenure in office, the

Court also held that the former president's interest in keeping the records private erodes over

time. *Id.* at 449, 451.

    1. Presidential Records Act

   Several years later, Congress passed the Presidential Records Act of 1978 ("PRA" or "the

Act"), which addressed this issue of public access to presidential papers in a broader context. In

keeping with the view that presidential records are not personal property, the PRA states that

"[t]he United States shall reserve and retain complete ownership, possession, and control of

Presidential records; and such records shall be administered in accordance with the provisions of

this chapter." 44 U.S.C. § 2202. The Act confers on the Archivist of the United States

"responsibility for the custody, control, and preservation of, and access to, the Presidential

records" generated during the outgoing president's term or terms.  44 U.S.C. § 2203(f)(1).  It

further directs that the "Archivist shall have an affirmative duty to make such records available to

the public as rapidly and completely as possible consistent with the provisions of this Act."  *Id.*

In conjunction with this mandate, the PRA includes several provisions for the restriction of

access to presidential records.[3]

_____

[3]  In August 2001, in anticipation of the expiration of the restrictions on former President
Reagan's records, the Archivist publicly addressed the procedures governing the opening of
presidential records under the PRA in the following manner:

> The PRA also establishes a process for access to the records of Presidents
> from Ronald Reagan onwards.  It allows public access to the records beginning five
> years after the President leaves office, but permits the former President and the Vice
> President to invoke up to six specific restrictions to public access for up to twelve
> years.
>      For the first five years after the President leaves office, his records are
> generally exempt from public access of any kind, including the Freedom of
> Information Act (FOIA). During this period, only Congress, the courts, and the
> incumbent and former Presidents may have access.
>      For the next seven years, anyone can request access to Presidential records
> through the Freedom of Information Act (FOIA), but various exemptions under the
> PRA and FOIA still apply. The PRA exemptions include national security
> information that is properly classified; information about appointees to Federal office;
> information specifically exempt from disclosure by law; trade secrets and confidential
> business information; confidential communications requesting or submitting advice
> between the President and his advisors or between such advisors; and information
> which, if disclosed, would cause a clearly unwarranted invasion of personal privacy.
> These exemptions are imposed by the Archivist, following a thirty-day review by
> both the former and current Presidents.
>      After twelve years, the PRA exemptions no longer apply. Only the FOIA
> exemptions apply at that point, except one: there is no longer an automatic statutory
> exemption to withhold communications between the President and his advisors and
> among the advisors themselves or any other deliberative records.  However, even
> after twelve years, both the former and current Presidents still review Presidential
> records prior to release to consider whether to assert the privilege that covers
> communications between the President and his advisors and among the advisors
> themselves, or any other deliberative records. Executive Order 12667, issued by
> President Reagan in January 1989, establishes the procedures for notifying the former

First, prior to leaving office, a president can restrict access to certain categories of information for up to twelve years. *Id.* § 2204(a)(1)-(6). In relevant part, the PRA allows a president to restrict access to "confidential communications requesting or submitting advice, between the President and his advisers, or between such advisers" for twelve years. *Id.* § 2204(a)(5).[4]

Second, records not restricted for the twelve-year period shall be made available by the Archivist to the public after five years, generally subject to the conditions of the Freedom of Information Act, 5 U.S.C. § 552.[5] 44 U.S.C. §§ 2204(b)(2)(A), 2204(c)(1). Each of these FOIA exemptions may apply to presidential records indefinitely.[6] As to the applicability of FOIA

---

and incumbent Presidents and for asserting that privilege against the release of Presidential records.

John W. Carlin, *Opening the Reagan Records* (August 2001), *at* http://www.archives.gov/presidential-libraries/laws/access/reagan.html (last visited September 30, 2007).

[4]The other categories of information are: classified materials related to national defense or foreign policy, 44 U.S.C. § 2204(a)(1); materials "relating to appointments to Federal office," *id.* § 2204(a)(2); information "specifically exempted from disclosure by statute," *id.* § 2204(a)(3); privileged or confidential trade secrets and commercial or financial information, *id.* § 2204(a)(4); and information "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." *Id.* § 2204(a)(6). Purely personal documents are excluded from the PRA's definition of "Presidential records," *id.* § 2201(2)(B)(ii).

[5]Four of the exemptions from access are the same as categories to which a president may delay access for twelve years.

[6]The exemptions are: national security information, 5 U.S.C. § 552(b)(1); information on internal personnel matters, *id.* § 552(b)(2); information statutorily exempted from disclosure, *id.* § 552(b)(3); privileged or confidential "trade secrets and commercial or financial information," *id.* § 552(b)(4); information "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," *id.* § 552(b)(6); certain types of "[r]ecords or information compiled for law enforcement purposes," *id.* § 552(b)(7); information used by "an agency responsible for

6

exemptions, the one exception to this direction is that presidential records cannot be withheld from members of the public based on FOIA exemption (b)(5).  44 U.S.C. § 2204(c)(1).  In the ordinary FOIA context, the public is not entitled to materials that fall under exemption (b)(5), "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  In the context of presidential records, however, the (b)(5) exemption is inapplicable, so such materials are considered records belonging to the National Archives, and must be "granted on nondiscriminatory terms" to members of the public.  44 U.S.C. § 2204(c)(1).

Third, the PRA states that "[n]othing in this Act shall be construed to confirm, limit, or expand any constitutionally-based privilege which may be available to an incumbent or former President."  *Id.* § 2204(c)(2).

Fourth, the PRA also applies to vice-presidential records:

> Vice-Presidential records shall be subject to the provisions of this chapter in the same manner as Presidential records.  The duties and responsibilities of the Vice President, with respect to Vice-Presidential records, shall be the same as the duties and responsibilities of the President under this chapter with respect to Presidential records.  The authority of the Archivist with respect to Vice-Presidential records shall be the same as the authority of the Archivist under this chapter with respect to Presidential records . . . ."

*Id.* § 2207.

Finally, under the PRA, the Archivist must promulgate regulations to "carry out the provisions of this chapter."  *Id.* § 2206.  Pursuant to the PRA, such regulations should include, in relevant part, "provisions for notice by the Archivist to the former President when the disclosure

―――――――――――――――――

the regulation or supervision of financial institutions," *id.* § 552(b)(8); and "geological and geophysical information and data, including maps, concerning wells," *id.* § 552(b)(9).

7

of particular documents may adversely affect any rights and privileges which the former

President may have[.]" *Id.* § 2206(3).

Accordingly, the National Archives and Records Administration has implemented the

PRA by promulgating a regulation providing that whenever the Archivist intends to make public

any presidential record, he must provide 30 days' notice to the former president to allow him, or

his designated representative,[7] to assert any rights or privileges that would foreclose access to the

materials.  36 C.F.R. § 1270.46(a), (b), (d).  If after receiving notice from the Archivist, the

former president raises such a right or privilege he believes would preclude disclosure, "and the

Archivist nevertheless determines that the record in question should be disclosed, in whole or in

part, the Archivist shall notify the former President or his representative," and shall "[s]pecify the

date on which the record will be disclosed." *Id.* § 1270.46(c).  "The Archivist shall not disclose

any records covered by any notice required . . . for at least 30 calendar days from receipt of the

notice by the former President[.]" *Id.* § 1270.46(d).  Copies of either notice to a former president

---

[7]NARA's regulations implementing the PRA state that "[a] President or former President may designate some person or persons to exercise, upon death or disability of the President or former President, any or all of the discretion or authority granted to the President or former President by chapter 22 of Title 44, United States Code." 36 C.F.R. § 1270.20(a).  However, "[w]hen a President or former President designates a person or persons to act for him pursuant to paragraph (a) of this section, this designation shall be effective only if the Archivist has received notice of the designation before the President or former President dies or is disabled." *Id.* § 1270.20(b).  "In those instances where a President has specified, in accordance with 44 U.S.C. 2204(a), restrictions on access to Presidential records, but has not made a designation under § 1270.20 of this subpart, the Archivist shall, upon the death or disability of a President or former President, exercise the discretion or authority granted to a President or former President by 44 U.S.C. 2204." *Id.* § 1270.22.  *See also* 44 U.S.C. § 2204(d) ("Upon the death or disability of a President or former President, any discretion or authority the President or former President may have had under this chapter shall be exercised by the Archivist unless otherwise previously provided by the President or former President in a written notice to the Archivist.").

8

of impending disclosure must be provided to the incumbent president as well. *Id.* § 1270.46(e).

2.    Executive Order 12,667

President Ronald Reagan signed Executive Order 12,667 ("Reagan Order") on January 18, 1989, "in order to establish policies and procedures governing the assertion of Executive privilege by incumbent and former Presidents in connection with the release of Presidential records" by NARA under the PRA. Reagan Order, 54 Fed. Reg. 3403; *see also* 44 C.F.R. § 2204 note. The Reagan Order specified three situations in which presidential records could be withheld–national security, law enforcement, and the executive deliberative process privilege–and gave the incumbent president the authority to assert a privilege over the records of a former president. *Id.* §§ 1(g), 3.

When the Archivist notified an incumbent and former president of his intent to open records, the Reagan Order required him to "identify any specific materials, the disclosure of which he believes may raise a substantial question of Executive privilege." *Id.* § 2(a). After 30 days, the Archivist would be free to disclose the records, "unless during that time period the Archivist [received] a claim of Executive privilege by the incumbent or former President or the Archivist has been instructed by the incumbent President or his designee to extend the time period." *Id.* § 2(b). The Reagan Order provided that both the incumbent and former presidents could assert executive privilege, but that the Archivist would only be bound to accept the privilege claim of an incumbent president. *Id.* §§ 3-4. The Reagan Order required the Archivist to abide by an incumbent president or his designee's direction as to whether to accept or deny a former president's claim of privilege, unless ordered otherwise by a court. *Id.* § 4.

The Reagan Order was revoked by Executive Order 13,233, as discussed *infra*.

    3.     <u>Executive Order 13,233</u>

         i.     *Factual Backdrop for Executive Order 13,233*

The records generated during President Reagan's terms in office were the first to be subject to the provisions of the PRA.  Before leaving office, President Reagan exercised his right under the PRA to restrict appropriate materials for the maximum twelve-year period, including "confidential communications" with his advisors.  Compl. ¶ 26.  President George W. Bush took office in January 2001, the same time that President Reagan's twelve-year restrictions on certain records expired, and in February 2001, NARA notified President Bush and former President Reagan that it intended to release these materials because the period of their restriction had expired.  Compl. ¶¶ 27, 33.  The notice did not state that any records "raise a substantial question of Executive privilege" within the meaning of § 2(a) of the Reagan Order.  Compl. ¶ 33.

In response to NARA's notice, then-White House Counsel Alberto R. Gonzales twice instructed the Archivist to extend the time available for President Bush to review the soon-to-be-released presidential records, for a total extension of 180 days.  Compl. ¶ 36; Pls.' Stmt. of Facts ¶ 7.  At the end of the 180 days, White House Counsel Gonzales instructed the Archivist to extend the time for White House review for "a few additional weeks," stating that the extended review period "has been necessary for this Administration to review the many constitutional and legal questions raised by potential release of sensitive and confidential Presidential records, and to decide upon the proper legal framework and process to employ in reviewing such records on an ongoing basis."  *See* [54] Mem. Op. at 9-10; Compl. ¶ 37.

On November 1, 2001, President Bush issued Executive Order 13,233 ("Bush Order" or

"E.O. 13,233"), entitled "Further Implementation of the Presidential Records Act." Bush Order,

66 Fed. Reg. 56025; *see also* 44 U.S.C. § 2204. The stated purpose of the Bush Order is "to

establish policies and procedures implementing [the Presidential Records Act] with respect to

constitutionally based privileges . . . ." *Id.* preamble. The Bush Order "is not intended to

indicate whether and under what circumstances a former President should assert or waive any

privilege. The order is intended to establish procedures for former and incumbent Presidents to

make privilege determinations." *Id.* § 9. However, "[t]his order does not limit the former

President's or the incumbent President's right to withhold records on any ground supplied by the

Constitution, statute, or regulation." *Id.* § 7.

      ii.    *Stated Constitutional and Legal Background for Executive Order 13,233*

Section 2 of the Bush Order details the order's constitutional and legal background. *Id.* §

2. After the twelve-year period during which a former president's records can be shielded from

public view, the PRA directs the Archivist to follow the FOIA guidelines when releasing

presidential records. *Id.* § 2(a). While the PRA explicitly states that FOIA exemption (b)(5) is

not a permissible basis on which the Archivist may withhold documents from the public after the

twelve-year period has elapsed, *see* 44 U.S.C. § 2204(c)(1), the Bush Order states that 44 U.S.C.

§ 2204(c)(2) "recognizes that the former President or the incumbent President may assert any

constitutionally based privileges, including those ordinarily encompassed within [FOIA

exemption (b)(5)]." Bush Order § 2(a).

The Bush Order includes a detailed description of what purportedly constitutes a

president's constitutionally-based privilege.  The Bush Order removes the privilege for law

enforcement records, and adds several categories instead:

> The President's constitutionally based privileges subsume privileges for records that
> reflect:  military, diplomatic, or national security secrets (the state secrets privilege);
> communications of the President or his advisors (the presidential communications
> privilege); legal advice or legal work (the attorney-client or attorney work product
> privileges); and the deliberative processes of the President or his advisors (the
> deliberative process privilege).

*Id.*  In addition, the Order states that the executive exercise of a constitutionally-based privilege

does not expire simply due to the passage of time, relying on *Nixon v. Administrator*, which held

that "constitutionally based privileges available to a President 'survive[] the individual

President's tenure.'"  *Id.* § 2(b) (quoting *Nixon v. Administrator*, 433 U.S. at 449).

    The order also maintains that "a former President, although no longer a Government

official, may assert constitutionally based privileges with respect to his Administration's

Presidential records, and [the Supreme Court] expressly rejected the argument that 'only an

incumbent President can assert the privilege of the Presidency.'"  *Id.* (quoting *Nixon v.

Administrator*, 433 U.S. at 448).  Finally, the Bush Order sets out a standard that those requesting

presidential documents must meet.  As opposed to the FOIA standard, which requires no

showing of need for the information sought, the Bush Order requires a "'demonstrated, specific

need' for particular records, a standard that turns on the nature of the proceeding and the

importance of the information to that proceeding."  *Id.* § 2(c) (quoting *United States v. Nixon*,

418 U.S. 683, 713 (1974)).

### iii.    Procedures Under the Bush Order

    The Bush Order sets out several procedures for the Archivist when administering

presidential records. When the Archivist receives a request for unreleased presidential records, the Bush Order requires the Archivist to notify both the former president and incumbent president, and provide them with the records sought upon request. Bush Order § 3(a). The Archivist may not release the records while the former president reviews any he has requested:

> After receiving the records he requests, the former President shall review those records as expeditiously as possible, and for no longer than 90 days for requests that are not unduly burdensome. The Archivist shall not permit access to the records by a requester during this period of review or when requested by the former President to extend the time for review.

*Id.* § 3(b). The incumbent president or his designee may conduct a concurrent or subsequent review of the records in question. *Id.* § 3(d). If the former president requests that the records be withheld as privileged, and the incumbent president concurs in the former president's decision, the incumbent president informs the former president and the Archivist of his agreement. *Id.* § 3(d)(1)(i).

The Bush Order also permits former presidents to raise the executive privilege, even in the face of disagreement by the incumbent president, and permits the incumbent to raise the privilege with respect to a former president's papers, even if the former president does not raise the privilege himself. *Id.* §§ 3(d)(1)(ii), 3(d)(2)(ii). The Bush Order indicates that the incumbent president "will concur" in the former president's privilege decision "[a]bsent compelling circumstances." *Id.* § 4. The Archivist may not disclose the records until the incumbent president informs the Archivist that both he and the former president agree to permit access, "or until ordered to do so by a final and nonappealable court order." *Id.* § 3(d)(1)(i); *see also id.* §§ 3(d)(1)(ii), 3(d)(2)(i), 3(d)(2)(ii).

The Bush Order states that a former President may designate a single or group of representatives to act on his behalf "for purposes of the [PRA] and this order," including "with respect to the assertion of constitutionally based privileges." *Id.* § 10. The Bush Order indicates that "[i]n the absence of any designated representative after the former President's death or disability, the family of the former President may designate a representative [or group thereof] to act on the former President's behalf for purposes of the Act and this order, including with respect to the assertion of constitutionally based privileges." *Id.*

Finally, the Bush Order maintains that the records of a former vice president are to be administered with the same procedures as those of a former president, and that both the PRA and the Bush Order apply to vice presidential records in the same manner as they would apply to presidential records. *Id.* § 11.

B.    *Procedural History*

As previously indicated, *see supra* at 2-3, only Count I of the Complaint remains. In Count I of Plaintiffs' Complaint, Plaintiffs allege that the following terms of the Bush Order are contrary to law:

- "[T]hat access to materials may be delayed for an unlimited period of time after the expiration of the 12-year restriction period while a former president and the incumbent president 'review' materials proposed for release[.]" Compl. ¶ 68(i).

- "[T]hat when a former president makes a claim of executive privilege . . . , the incumbent president 'will concur' in that claim absent 'compelling circumstances,' . . . ." *Id.* ¶ 68(ii).

- "[T]hat, regardless of whether the incumbent president 'concurs' in a former president's claim of privilege under the 'compelling circumstances' standard, the Archivist 'shall not permit access to the records' unless and until the former president agrees, or a court orders that materials be released, even if the claim of

14

privilege is legally improper or unfounded[.]" *Id.* ¶ 68(iii).

- "[T]hat the constitutional privileges of the executive branch may be asserted by a surrogate who has never held the office of the presidency, if the surrogate has been 'designated' to do so by a former president who is deceased or disabled or by the family of a deceased or disabled former president, even though the Constitution does not allow for assertion of a claim of executive privilege by someone who has not held the office of president[.]" *Id.* ¶ 68(iv).

- "[T]hat a former vice president may assert a claim of executive privilege independent of the privilege of the former or incumbent president, . . . even though there is no constitutional basis for a vice presidential executive privilege." *Id.* ¶ 68(v).

Plaintiffs allege that "[i]mplementation of the Bush Order by the Archivist constitutes agency action that is arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority and limitations within the meaning of the APA (5 U.S.C. § 706(2)(A) & (C))." *Id.* ¶ 72.  "In the alternative," Plaintiffs argue that "regardless of whether there has yet been agency action with respect to the Bush Order, plaintiffs have a nonstatutory right to obtain judicial review of the lawfulness of the Bush Order's restrictions on the defendants' ability to comply with their legal obligations.  Because the Bush Order is contrary to the terms of the PRA and lacks a valid constitutional basis, plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the Order is unlawful and an injunction providing that the defendants may not implement it." *Id.* ¶ 73.

On October 31, 2005, Defendants filed [57] Defendants' Motion to Dismiss, moving the Court to dismiss Count I pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Defendants argue that Plaintiffs' claims under Count I should be dismissed for lack of standing and ripeness.  Defs.' Mot. to Dismiss at 1.  Defendants differentiate between provisions of the

15

Bush Order that relate to the *review* of documents for privilege from those that relate to the *assertion* of executive privilege in making their justiciability arguments. With respect to provisions of the Bush Order that pertain to the actual *assertion* of executive privilege by a former or incumbent president, Defendants argue that after the Court dismissed Count II of Plaintiffs' Amended Complaint, "[n]o other documents are now subject to the assertion of executive privilege by either President Bush or by a former President or his representatives." *Id.* at 2. Plaintiffs as a result "cannot demonstrate that they are subject to any real or immediate harm arising from those provisions in E.O. § 3 that deny access to presidential records in the event that a former or incumbent President or their representative assert privilege." *Id.* Furthermore, Defendants argue that "Plaintiffs just as clearly cannot demonstrate that they are subject to any real or immediate injury arising from E.O. § 4, which provides that the incumbent President will 'concur' in the privilege decision of a former President absent 'compelling circumstances.'" *Id.* With respect to provisions of the Bush Order governing the *review* of records by former presidents or their representatives or former vice presidents that occurs prior to any assertion of privilege, Defendants acknowledge that this review process delays Plaintiffs' access to records, but argue that

> it is beyond dispute that the President and former Presidents have the *constitutional* right to invoke privilege over presidential communications, which in turn necessarily contemplates that these officials or their representatives be given the time and opportunity to review records for privilege. Owing to the unavoidable and necessary "delay" that is required for this process, it is impossible for plaintiffs to demonstrate that Section 3 of the E.O. gives rise on its face to a legally cognizable injury-in-fact that is redressable by the Court.

*Id.* at 3. Defendants also argue that Plaintiffs' *review* claims can be dismissed on the merits if

16

found to be justiciable, because "[t]he PRA . . . does not impose any temporal limitations on a

President's or former President's authority to invoke constitutional privilege, and instead makes

clear that its provisions cannot be construed to 'limit' such privileges[,]" as well as that a Court-

imposed limitation on the time period within which an incumbent or former President could

review documents "would unquestionably trench upon separation-of-powers principles."  *Id.*

On November 30, 2005, Plaintiffs filed their Renewed Motion for Summary Judgment

(hereinafter, "Plaintiffs' Motion for Summary Judgment") with respect to Count I and their

Opposition to Defendants' Motion to Dismiss.  On December 20, 2005, Defendants filed their

Reply to Defendants' Motion to Dismiss and their Opposition to Plaintiffs' Motion for Summary

Judgment (hereinafter, "Defendants' Opposition/Reply").  On January 13, 2006, Plaintiffs filed

their Reply to Plaintiffs' Motion for Summary Judgment (hereinafter, "Plaintiffs' Reply").

## II.  LEGAL STANDARD

*A.        Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1)*

A court must dismiss a case when it lacks subject matter jurisdiction pursuant to Federal

Rule of Civil Procedure 12(b)(1).  A court may appropriately dispose of a case under 12(b)(1) for

lack of justiciability, and may "consider the complaint supplemented by undisputed facts

evidenced in the record, or the complaint supplemented by undisputed facts plus the court's

resolution of disputed facts."  *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193,

198 (D.C. Cir. 2003) (internal citations and quotations omitted).  *See also Jerome Stevens

Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("[T]he district court may consider

materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of

jurisdiction."); *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999), *aff'd*, 38 Fed. App'x 4 (D.C. Cir. 2002) ("[W]here a document is referred to in the complaint and is central to plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment.") (citing *Greenberg v. The Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999)).

"At the motion to dismiss stage, counseled complaints, as well as *pro se* complaints, are to be construed with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005). Despite the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence. *Am. Farm Bureau v. Envtl. Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000).

B.    *Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)*

The Federal Rules of Civil Procedure require that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. ___, 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *accord Erickson v. Pardus*, 551 U.S. ___, 127 S. Ct. 2197, 2200 (2007) (per curiam).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 1964-65; *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986).  Instead, the

18

complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp.*, 127 S. Ct. at 1965 (citations omitted). Hence, although "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is impossible, and 'that a recovery is very remote and unlikely,'" *id.* (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)), the "threshold requirement" of Fed. R. Civ. P. 8(a)(2) is "that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief,'" *id.* at 1966 (quoting Fed. R. Civ. P. 8(a)(2)).

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994); *see also Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) ("The complaint must be 'liberally construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged."). While the court must construe the Complaint in the Plaintiff's favor, it "need not accept inferences drawn by the plaintiff[] if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Comm'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Moreover, the court is not bound to accept the legal conclusions of the non-moving party. *See Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997). The court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. *See*

19

*E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993).  Factual allegations in briefs or memoranda of law may not be considered when deciding a Rule 12(b)(6) motion, particularly when the facts they contain contradict those alleged in the complaint. *Henthorn v. Dep't of Navy*, 29 F.3d 682, 688 (D.C. Cir. 1994); *cf. Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (when a motion to dismiss is based on the complaint, the facts alleged in the complaint control).

C.    *Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56*

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, Defendant, as the moving party, "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.  Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  *See Anderson v. Liberty*

20

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251-52 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).  "Mere allegations or denials of the adverse party's pleading are not enough to prevent the issuance of summary judgment."  *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

## III.  DISCUSSION

### A.    *Most of Plaintiffs' claims are not ripe for adjudication*

As an Article III court, this Court's judicial power is limited to adjudicating actual "cases" and "controversies."  *Allen v. Wright*, 468 U.S. 737, 750 (1984).  "In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of

21

principles termed 'justiciability doctrines,' among which are standing[,] ripeness, mootness, and the political question doctrine." *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citing *Allen*, 468 U.S. at 750). These doctrines incorporate both the prudential elements, which "'Congress is free to override,'" *id.* (quoting *Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1278 (D.C. Cir. 1994)), and "'core component[s]'" which are "'essential and unchanging part[s] of the case-or-controversy requirement of Article III,'" *id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

Ripeness is a requirement of justiciability; like standing, which shall be discussed in the next section, it requires a constitutional minimum of impending injury in fact. Prudential ripeness considerations also "'requir[e] us to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration.'" *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 95 (D.C. Cir. 2005) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior,* 538 U.S. 803, 808 (2003) (quoting *Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 57 n.18 (1993))). "Under our case law, 'the primary focus of the ripeness doctrine is to balance the petitioners' interest in prompt consideration of allegedly unlawful agency action against the agency's interest in crystallizing its policy before that policy is subject to review and the court's interest in avoiding unnecessary adjudication and in deciding issues in a concrete setting.'" *Id.* (quoting *AT & T Corp. v. FCC,* 349 F.3d 692, 699 (D.C. Cir. 2003) (internal quotation marks omitted)).

In evaluating the "fitness for review" of Plaintiffs' claims, the Court notes that all but one

of the provisions of the Bush Order challenged by Plaintiffs in their Complaint pertain to the *assertion* of executive privilege. *See supra* at 14-15; Compl. ¶ 68. Specifically, Plaintiffs challenge the presumption that an incumbent president will concur in a former president's assertion of executive privilege, set forth in E.O. § 4 (Compl. ¶ 68(ii)); the Archivist's withholding of records when a former president has invoked said privilege, as set forth in E.O. § 3(d) (Compl. ¶ 68(iii)); the assertion of executive privilege by representatives of a former president, as set forth in E.O. § 10 (Compl. ¶ 68(iv)); and the assertion of executive privilege by a former vice president, as set forth in E.O. § 11 (Compl ¶ 68(v)). But while Plaintiff National Security Archive has FOIA requests for documents "currently pending for review by the representatives of former President Reagan," Defs.' Mot. to Dismiss at 8 (citing attached Fawcett Decl. ¶ 9), Plaintiffs do not allege that an incumbent or former president or incumbent or former vice president has actually asserted a privilege with respect to any document requests presently[8] at issue. *See* Defs.' Mot. to Dismiss at 4-7, 11-13.[9] "[A] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 299 (1998) (internal quotation marks and citations omitted). It is not certain or even likely that privilege shall be asserted by a former president or

---

[8] Count II, which ultimately encompassed nine documents where a privilege assertion had been made, was previously dismissed by the Court, as the grounds for challenging the asserted privilege were lacking. *See* [54] Mem. Op.

[9] As the Court has not received any updates from the Parties since the pending motions were filed, and as the Parties are on notice of their obligation to update the Court as to changes in the factual record from the Court's prior reconsideration of an earlier holding based on facts that the Parties did not initially clarify for the Court, *see* [54] Mem. Op. at 24, the Court shall appropriately assume that the pending motions before it reflect the current factual landscape of the dispute between the Parties.

his representatives or by a former vice president with respect to any of Plaintiffs' pending document requests such that Plaintiffs' challenges to the *assertion* provisions of the Bush Order are purely speculative and not ripe at this time.

With respect to the "hardship" prong, the Court recognizes that this suit has been lengthy and labor-intensive for the Parties (as well as for the Court). However, with respect to Plaintiffs' claims related to the *assertion* of executive privilege (rather than claims related to the delay caused by *review* for privilege), the cause of Plaintiffs' hardship in this case is in fact the delay necessitated by the *review* for privilege, as no assertion of privilege with respect to any currently pending document requests has occurred. Any hardship to the Parties of postponing review with respect to the *assertion* provisions of the Bush Order does not overcome the fact that Plaintiffs' claims in this regard lack ripeness at this time.

As the Court concludes that Plaintiffs' claims pursuant to §§ 3(d), 4, 10, and 11 of the Bush Order–which relate to the assertion of executive privilege–are not ripe for review, the Court shall dismiss without prejudice Plaintiffs' challenges to these provisions of the Bush Order. Accordingly, the Court need not address the Parties' arguments with respect to standing as to these provisions. The Court shall now turn to assess whether Plaintiffs' challenge to the provision of the Bush Order pertaining to the *review* of documents for privilege by former presidents (§ 3(b)) is justiciable at this time.

B. *Plaintiffs have standing to pursue their challenge to the Archivist's reliance on Section 3(b) of Executive Order 13,233, which is ripe for review*

1. Standing

In order to satisfy the constitutional standing requirements, a plaintiff must establish (1)

24

that it has suffered an injury in fact, which is the invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there is a causal connection between the injury and the conduct at issue, such that the injury is fairly traceable to the challenged act; and (3) that it is likely as opposed to speculative that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. Furthermore, in an action requesting injunctive or declaratory relief, such as the instant case, a demonstration of imminent, future injury is required to demonstrate standing. "In actions for injunctive relief, harm in the past [] is not enough to establish a present controversy, or in terms of standing, an injury in fact." *Am. Soc'y for the Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 336 (D.C. Cir. 2003). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974). In a claim for injunctive relief, a plaintiff "must allege a likelihood of future *violations* of [its] rights . . . , not simply future *effects* from past violations." *Fair Employment Council*, 28 F.3d at 1273. "'Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate–as opposed to merely conjectural or hypothetical–threat of future injury.'" *Natural Res. Def. Council v. Pena*, 147 F.3d 1012, 1022 (D.C. Cir. 1998) (quoting *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994)). *See also City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) ("Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury . . . ."). Plaintiffs in the instant case bear the burden of demonstrating that

25

they have standing to bring suit with respect to each of their claims. *See Lujan*, 504 U.S. at 561 ("The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing].").

The Court notes at the outset that Plaintiffs specifically state in their Motion for Summary Judgment that they allege no challenge to the incumbent president's review of requested documents as set forth in § 3(d). *See* Pls.' Mot. for Summ. J. at 17-18 ("Plaintiffs are not challenging the incumbent president's right to review presidential materials for privilege. . . . As the government acknowledges, the former officeholders' review precedes and does not overlap with that of the incumbent under the Order; hence, it constitutes an injury wholly separate from any delay attributable to the incumbent's own review.").

Defendants argue that "plaintiffs [] cannot demonstrate standing/ripeness to challenge E.O. § 3(b) on the ground that it delays access to presidential records pending the review for privilege by a *former* President," or pending the review by representatives of a former president, because "the incumbent President retains the constitutional authority to take into account the privilege viwes [*sic*] of a deceased President's representatives–or, for that matter, anyone else–as part of his *own* review process." Defs.' Mot. to Dismiss at 15, 16-17. In short, Defendants argue that because it is "the practice of the incumbent President to wait for comments on privilege" from the former presidents' representatives, the delay is not "caused" by E.O. § 3(b), nor would it be redressed by its undoing in light of the current president's practice. *Id.* at 17. *See also* Defs.' Opp'n/Reply at 3 ("[I]t is irrelevant whether former Vice Presidents or President Reagan's representatives have the authority to invoke privilege (a position that defendants do not concede)

26

because the injury that plaintiffs complain of–a delay in obtaining access to President Reagan's

records and the records of former Vice Presidents–would occur in any event.").

The Court rejects Defendants' standing arguments in light of the posture of at least one of

Plaintiffs' document requests.[10]  Plaintiff National Security Archive has FOIA requests for

documents "currently pending for review by the representatives of former President Reagan,"

Defs.' Mot. to Dismiss at 8 (citing Fawcett Decl. ¶ 9), and accordingly has been harmed by the

delay created by E.O. § 3(b).  The *average* delay caused by a former president's review of a

document request is 170 days, or nearly six months.  *See* Fawcett Decl. ¶ 7.  Denial of "timely

access" constitutes "informational injury," thereby precluding any "serious challenge" to the

injury element of the standing analysis.  *Byrd v. EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999), *cert.*

*denied*, 120 S. Ct. 1418 (2000).  *See also Payne Enters., Inc. v. United States*, 837 F.2d 486, 491

(D.C. Cir. 1988) ("Courts have long recognized that there 'may very well be circumstances in

which prolonged delay in making information available . . . require[s] judicial intervention.'"

(quoting *Lybarger v. Cardwell*, 577 F.2d 764, 767 (1st Cir. 1978))).  The Archivist's reliance on

§ 3(b) has "caused" the delay, because in relying on § 3(b), the Archivist is not permitted to

release the requested documents prior to review by a former president.  *See* Bush Order § 3(b)

("After receiving the records he requests, the former President shall review those records as

---

[10]  While Defendants also argue that "[P]laintiffs bring this claim as a facial challenge" such that "plaintiffs must demonstrate that E.O. § 3(b) is *facially* unlawful in all respects because it allows the President even a single minute to conclude the review process," Defs.' Mot. to Dismiss at 13-14, and while the Court would find this argument pertinent to the merits of Plaintiffs' claim rather than the justiciability thereof, the Court nonetheless finds that Plaintiffs' challenge to § 3(b) of the Bush Order is more appropriately and narrowly decided pursuant to the APA rather than on strictly constitutional grounds.

expeditiously as possible, and for no longer than *90 days* for requests that are not unduly burdensome.  The Archivist *shall* not permit access to the records by a requester during this period of review or when requested by the former President to extend the time for review.") (emphasis added).  Under the PRA and its implementing regulations as relied upon by the Archivist prior to his reliance on the Bush Order in his interpretation thereof, it is within the Archivist's discretion to release documents pending review by a former president after a former president has had notice of said document request for at least 30 days.  *See* 36 C.F.R. § 1270.46(d) ("The Archivist shall not disclose any records covered by any notice required by paragraphs (a) or (c) of this section for at least 30 calendar days from receipt of the notice by the former President, unless a shorter time period is required by a demand for Presidential records under § 1270.44.").

Finally, despite Defendants' argument that the incumbent president has "constitutional authority" to incorporate unending privilege reviews by others into his own privilege review, a claim the Court shall further assess on the merits in the following section, Defendants' reliance on what the incumbent president *would likely do* in the absence of the Bush Order supports rather than refutes that the delay caused by this review would be redressed in the absence of the Bush Order.  *See Shays*, 414 F.3d at 95 (""[w]here an agency rule causes an injury, as here, the redressability requirement may be satisfied by vacating the challenged rule.'" (quoting *Ctr. for Energy & Econ. Dev. v. EPA*, 398 F.3d 653, 657 (D.C. Cir. 2005) (internal quotation marks and ellipsis omitted)).  Accordingly, the Court concludes that Plaintiffs have standing to pursue their

28

claim that the delay created by § 3(b) of the Bush Order violates the APA.[11]

       2.    Ripeness

The Court finds that in this case, the question involves statutory and other legal interpretation "that would not benefit from further factual development of the issues presented[,]" "[n]or will our review inappropriately interfere with further administrative action" since the Archivist has determined that he will implement the PRA in compliance with the Bush Order. *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 479 (2001) (internal citations and quotations omitted). *See also Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005) ("We have repeatedly held that '[c]laims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues.'" (quoting *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003))). Furthermore, "[u]nder the ripeness doctrine, the hardship prong . . . is not an independent requirement divorced from the consideration of the institutional interests of the court and agency.'" *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 641 (D.C. Cir. 2002) (quoting *Payne Enters.*, 837 F.2d at 493). Plaintiffs

---

[11] The Court incorporates in its review of § 3(b) the review process as conducted by representatives of former presidents and former vice presidents. While the specific provisions of § 10 and § 11 of the Bush Order challenged by Plaintiffs in their Complaint pertain to the assertion of privilege by the representatives of a former president or by a former vice-president, Plaintiffs' claims contesting the *assertion* of privilege by these individuals are not ripe, as previously discussed. While Plaintiffs argue that "a nonexistent privilege [cannot] justify a privilege review that delays access to materials that, after the completion of the 12-year restriction period, are required to be released to the public 'as rapidly and completely as possible,' (44 U.S.C. § 2203(f)(1)) subject only to constitutionally based privileges (44 U.S.C. § 2204(c)(2))," Pls.' Mot. for Summ. J. at 40, the Court need not reach the question of whether assertion of privilege by representatives of former presidents or former vice presidents is a constitutionally-based privilege, as the Archivist's reliance on this indefinite delay permitted by this provision is in and of itself arbitrary, capricious, and in violation of the PRA and its implementing regulations.

(who have an interest in accessing historical presidential and vice presidential records in a timely fashion for academic and other purposes) and the NARA (and Archivist) itself have an interest in the Court's making a conclusive finding as to whether the Archivist's reliance on § 3(b) is proper such that documents pending review by former presidents and their representatives can be released at the Archivist's discretion after the 30-day period set forth in the PRA's implementing regulations.

Defendants argue that Plaintiffs' claim pursuant to § 3(b) is not ripe, citing "very significant reasons . . . for withholding consideration of plaintiffs' claims, every one of which touches upon sensitive separation-of-powers principles concerning the invocation of executive privilege by past Presidents and the incumbent." Defs.' Mot. to Dismiss at 18. Defendants further argue that the Court should avoid addressing constitutional questions when possible, particularly when such questions are posed "in a vacuum, without reference to any actual invocation of privilege by a former or incumbent Executive official." *Id.* at 19. However, Plaintiffs' claim is clearly not made in a vacuum with respect to § 3(b), as requested documents are pending review by a former president. *See* Fawcett Decl. ¶ 9. Furthermore, despite Defendants' claims to the contrary, *see* Defs.' Mot. to Dismiss at 20, demonstration by Plaintiffs of a "specific or urgent need for the documents they seek" is not required until after privilege is invoked by a former or incumbent president pursuant to the Bush Order, *see* § 2(c). Accordingly it is not part of the Court's ripeness calculus with respect to the review process itself. Furthermore, while Defendants appear to characterize Plaintiffs' claim as a "broad facial challenge," the Court need not decide this case on purely constitutional grounds, as the Court

30

shall assess in the first and final instance whether the Archivist's reliance on the Bush Order

violates the APA rather than whether the Bush Order should be rejected *en toto* as

unconstitutional.

> C.  *The Archivist's reliance on § 3(b) of Executive Order 13,233 is arbitrary,*
> *capricious, an abuse of discretion, and not in accordance with law and*
> *accordingly in violation of the APA*

Plaintiffs argue that "[i]mplementation of the Bush Order by the Archivist constitutes

agency action that is arbitrary, capricious, an abuse of discretion, not in accordance with law, and

in excess of statutory authority and limitations within the meaning of the APA." Compl. ¶ 72.

Pursuant to 5 U.S.C. § 706(2), "the reviewing court shall–(2) hold unlawful and set aside agency

action, findings, and conclusions found to be–(A) arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Accordingly, as only

Plaintiffs' challenge to the Archivist's reliance on § 3(b) of the Bush Order has been found to be

ripe for review, the Court must determine whether the Archivist's reliance on § 3(b) is either

"arbitrary, capricious, an abuse of discretion, [and] not in accordance with law," and/or "in

excess of statutory authority and limitations." The Court shall proceed by first determining

whether and how § 3(b) actually conflicts with the PRA and/or its implementing regulations, and

then shall determine if they can be reconciled to the extent that they do not conflict.

Pursuant to 44 U.S.C. § 2203(f)(1):

> Upon the conclusion of a President's term of office, or if a President serves
> consecutive terms upon the conclusion of the last term, the Archivist of the United States
> shall assume responsibility for the custody, control, and preservation of, and access to, the
> Presidential records of that President. The Archivist shall have an affirmative duty to

> make such records available to the public as rapidly and completely as possible consistent
> with the provisions of this Act.

44 U.S.C. § 2203(f)(1).  The PRA clarifies that "[n]othing in this Act shall be construed to

confirm, limit, or expand any constitutionally-based privilege which may be available to an

incumbent or former President."  *Id.* § 2204(c)(2).  The PRA also explicitly charges the Archivist

with promulgating regulations to carry out the PRA.  *Id.* § 2206.

In order to carry out the provisions of the PRA, regulations were created to "implement

the provisions of the [PRA]" by "setting forth policies and procedures governing preservation,

protection, and disposal of, and access to Presidential and Vice-Presidential records . . . ."  36

C.F.R. § 1270.10.  Pursuant to 36 C.F.R. § 1270.46, "[t]he Archivist shall not disclose any

records covered by any notice [given by the Archivist to a former president] required by

paragraphs (a) or (c) of this section for at least 30 calendar days from receipt of the notice by the

former President . . . ."  *Id.*  The Bush Order, on the other hand, states that "[a]fter receiving the

records he requests, the former President shall review those records as expeditiously as possible,

and for no longer than 90 days for requests that are not unduly burdensome.  The Archivist shall

not permit access to the records by a requester during this period of review or when requested by

the former President to extend the time for review."  E.O. § 3(b).

The Parties disagree as to whether this provision of the Bush Order runs afoul of the PRA

and its implementing regulations.  *See Marks v. Cent. Intelligence Agency*, 590 F.2d 997, 1003

(D.C. Cir. 1978) ("Of course, an executive order cannot supersede a statute.").  Defendants argue

that "[t]here is not actual conflict between the E.O. and any of the PRA's provisions . . . ."  Defs.'

Opp'n/Reply at 15.  Specifically, Defendants argue that 36 C.F.R. § 1270.46(d) "does not set

forth a maximum time within which former Presidents must conclude their privilege review." *Id.*

at 22.

> Because the regulations themselves do not impose a deadline for the conclusion of
> privilege reviews by former Presidents, the 90-day limitation imposed under the E.O. is
> clearly permissible.  Plaintiffs otherwise complain . . . that former Presidents are
> theoretically given unlimited time to conduct privilege reviews because the E.O. requires
> the Archivist to grant additional time for former Presidents to conclude their privilege
> reviews if requested. . . .  But the regulations themselves do not prohibit former
> Presidents from requesting the Archivist to grant additional time to conclude this
> constitutionally protected task.  Nor do the regulations prohibit the incumbent President
> from commanding the Archivist to grant additional time.  There is no conflict between
> these provisions, contrary to plaintiffs' claims.

*Id.* at 22-23.  However, Plaintiffs do not agree that either the PRA or its implementing

regulations permit unlimited review by a former president sans any discretion by the Archivist:

> The government's contention that the Order does not in fact conflict with the
> regulations promulgated by the Archivist under the PRA . . . is wrong in key respects.
> First, the Archivist's regulations provide that he may make records public on as little as
> 30 days' notice to a former president (36 C.F.R. § 1270.46(d)) and that even if more time
> is given for the former president's review, it is the *Archivist* who determines the date on
> which the records will be disclosed (36 C.F.R. § 1270.46(b)(iv)).  The Bush Order, by
> contrast, provides that no less than 90 days' notice is required, and it empowers the
> former president to extend the time of release unilaterally either by requesting an
> extension (a 'request' the Archivist is required to honor, *see* Bush Order § 3(b)) or simply
> by not authorizing the release of the records within the allotted time, thus preventing the
> Archivist from proceeding with the release.

Pls.' Reply at 15-16.

Simply put, Plaintiffs' argument prevails.  The Bush Order effectively eliminates the

Archivist's discretion to release a former president's documents while such documents are

pending a former president's review, which can be extended–presumably indefinitely–upon the

former president's request.  *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-

67 (1954) ("[I]f the word 'discretion' means anything in a statutory or administrative grant of

33

power, it means that the recipient must exercise his authority according to his own understanding and conscience."). Furthermore, the Bush Order provides a 90-day floor for a former president's review of documents. While Defendants are correct that 36 C.F.R. § 1270.46(d) does not specify a "maximum" time for review, Defendants seem to miss that after 30 days from a former president's receipt of notice of documents to be disclosed, the Archivist may make a discretionary decision with respect to the release of such documents though they are pending the former president's review. Accordingly, in relying on § 3(b) of the Bush Order, the Archivist effectively denies himself the discretion (and accordingly the need to make reasoned, discretionary decisions with respect to the appropriate length of review) to release documents still under a former president's review as he is permitted to do pursuant to 36 C.F.R. § 1270.46(d).

As the PRA clarifies that "[n]othing in this Act shall be construed to confirm, limit, or expand any constitutionally-based privilege which may be available to an incumbent or former President," 44 U.S.C. § 2204(c)(2), the Archivist's reliance on § 3(b) would not be construed to violate the Act or its implementing regulations if § 3(b) is necessary to preserve a constitutionally-based privilege available to an incumbent or former president. "Unless, therefore, the delays attributable to the Order are either necessary to protect constitutionally based privileges . . . or otherwise necessary to serve some statutory purpose (which the government does not assert), they cannot be squared with the Act's requirements." Pls.' Mot. for Summ. J. at 44. *See also* Pls.' Reply at 23 ("To the extent that the delays occasioned by the Order are not required to protect the constitutionally based privilege, therefore, they violate the

Act's requirement that records be released 'as rapidly as possible.' 44 U.S.C. § 2203(f)(1)."). In examining whether the delay created by the Bush Order is required to protect any constitutionally-based privilege, the Court shall assume without deciding that a former president and/or his representatives and a former vice president have some authority to invoke executive privilege. The Court nonetheless concludes that the Archivist's reliance on § 3(b) of the Bush Order is not necessary to preserve any constitutionally-based privilege.

Even if the Court assumes (without so deciding) that a former president is entitled to invoke privilege independent of the incumbent president, Defendants do not attempt to reconcile the discrepancy between the review time permitted under the Bush Order and the PRA as somehow necessarily incident to constitutional privilege. *See* Pls.' Reply at 13 ("Under the flexible approach adopted in *Nixon v. Administrator* (and repeatedly reaffirmed by the Court in such cases as *Mistretta v. United States*, 488 U.S. 361, 380 (1989), and *Morrison v. Olson*, 487 U.S. 654, 693 (1988), congressional or judicial regulation of the manner in which the privilege is asserted would violate separation of powers principles only if 'it prevent[ed] the Executive Branch from accomplishing its constitutionally assigned functions.'"). Indeed, none of the pertinent cases touching on a former president's executive privilege holds that the *length* of time for review has constitutional implications.

In *Public Citizen v. Burke*, 843 F.2d 1473 (D.C. Cir. 1988), the Archivist indicated his determination to follow a Department of Justice Office of Legal Counsel memorandum that did not conform with existing regulations to the then-PRMPA, which charged the Archivist with custody of the materials of former President Nixon. *Id.* at 1474, 1476-77. The memorandum

35

obligated the Archivist to honor any claim of executive privilege by an incumbent president or former President Nixon. *Id.* The D.C. Circuit held that as the incumbent president was not constitutionally obligated to honor former President Nixon's invocation of privilege, neither should the Archivist be so obligated. *Id.* at 1479. Because the Archivist had relied on a memorandum removing his own deference, which was not an agency interpretation of the law but rather the Office of Legal Counsel's interpretation of the Constitution and its requirements, the D.C. Circuit held that reliance on said memorandum was not entitled to deference. *Id.* at 1478. Ultimately, the court rejected the Archivist's reliance on the memorandum in interpreting regulations to the PRMPA:

> If, whenever Mr. Nixon asserts executive privilege, the Archivist in effect loses jurisdiction over his responsibilities to affect disclosure, the former President has gained power to withdraw from the Archivist some indefinite portion of the responsibilities that Congress delegated to him-and transfer those responsibilities to the Judiciary. We think that is a strained interpretation of congressional purpose, indeed one which, but for OLC's constitutional concerns, apparently would not be advanced by the government. We read the statute, as do appellees, as imposing on the Archivist the responsibility to arrange for disclosure of a category of the Nixon papers.

*Id.* at 1480. The court's assessment that "the Archivist's regulations, as interpreted by the OLC memorandum, rely on erroneous construction of the Constitution and therefore cannot be sustained[,]" *id.*, is applicable to the instant case to extent that the Constitution does not require the Archivist to permit a former president an unlimited amount of time to review materials for privilege. While presumably a former president must have *some* time to review documents for privilege, as a former president may at very least be heard to assert claims of executive privilege, *see Nixon v. Administrator.*, 433 U.S. at 439, the Court does not find any support for the proposition that removing discretion from the Archivist with respect to what constitutes a

36

reasonable time for said review after 30 days has expired would somehow threaten a former president's ability to make privilege determinations. *See Nixon v. Freeman*, 670 F.2d 346, 357 n.14 (D.C. Cir. 1982), *cert. denied, Nixon v. Carmen*, 459 U.S. 1035 (1982) ("[Congress' wish that 'the Administrator . . . give priority to processing Watergate-related materials'] does not imply congressional acquiescence to delayed public access to other historically significant materials whose processing has been completed by the archivists.").

As the Court finds that the Archivist's reliance on § 3(b) of Executive Order 13,233 violates the APA, the Court need not reach Plaintiffs' alternative argument that Plaintiffs have a nonstatutory right to judicial review and a declaration under 28 U.S.C. § 2201 because Executive Order 13,233 is contrary to the terms of the PRA and lacks a valid constitutional basis. *See Lambrix v. Singletary*, 520 U.S. 518, 524 (1997) ("Constitutional issues are generally to be avoided"); *In re Fashina*, 486 F.3d 1300, 1303 (D.C. Cir. 2007) ("[P]rudence ordinarily dictates that we tackle nonconstitutional issues first, so that, if their resolution is dispositive, we need not reach the constitutional issue.").

## IV. CONCLUSION

Based on the aforementioned reasoning, the Court shall GRANT IN PART and DENY IN PART Defendants' [57] Motion to Dismiss; GRANT IN PART and DENY IN PART Plaintiffs' [58] Motion for Summary Judgment; dismiss without prejudice for lack of justiciability Plaintiffs' challenges to §§ 3(d), 4, 10, and 11 of Executive Order 13,233; declare that the Archivist's reliance on § 3(b) of Executive Order 13,233 is arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of the APA; enjoin the Archivist from

further relying on § 3(b) of Executive Order 13,233; and DISMISS the instant case. An Order

accompanies this Memorandum Opinion.


Date:   October 1, 2007


                                            _____/s/_____

                                            COLLEEN KOLLAR-KOTELLY
                                            United States District Judge


38

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN HISTORICAL
ASSOCIATION, *et al.*,

    Plaintiffs,

      v.

NATIONAL ARCHIVES AND RECORDS
ADMINISTRATION, *et al.*,

    Defendants.

Civil Action No. 01-2447 (CKK)

## ORDER
(September 30, 2007)

Based on the reasoning set forth in an accompanying Memorandum Opinion to follow, it is, this 30th day of September, 2007, hereby

ORDERED that Defendants' [57] Motion to Dismiss IS GRANTED IN PART and DENIED IN PART; it is also

ORDERED that Plaintiffs' [58] Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART; it is also

ORDERED that the Court shall DISMISS WITHOUT PREJUDICE Plaintiffs' challenges to §§ 3(d), 4, 10, and 11 of Executive Order 13,233 for lack of justiciability; it is also

ORDERED that the Court shall declare the Archivist's reliance on § 3(b) of Executive Order 13,233 to be arbitrary, capricious, an abuse of discretion, and not in accordance with law in

violation of the APA; it is also

ORDERED that the Court shall enjoin the Archivist from further relying on § 3(b) of

Executive Order 13,233; it is also

ORDERED that this case is DISMISSED.

**This is a final, appealable order.**

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

2