**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
)
JUDICIAL WATCH, INC.,                    )
)
Plaintiff,           )
)            Civil Action No. 1:07-cv-01267 (JR)
v.                        )
)
U.S. NATIONAL ARCHIVES AND               )
RECORDS ADMINISTRATION,                  )
)
Defendant.         )
_____)


**DEFENDANT'S MOTION FOR _OPEN AMERICA_ STAY AND**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF DEFENDANT'S MOTION FOR A STAY OF THE PROCEEDINGS**

## **TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    Statutory and Regulatory Framework of the Presidential Records Act . . . . . . . . . . . . . . 2

    A.    Statutory Restrictions on the Release of Presidential Records  . . . . . . . . . . . . . . 3

    B.    FOIA Exemptions Applicable to Presidential Records  . . . . . . . . . . . . . . . . . . . . 4

    C.    Requirement for Presidential Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.    The Clinton Presidential Library, FOIA Requests, and Queue Structure  . . . . . . 6

    B.    Plaintiff's FOIA Request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

DISCUSSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.    This Court Should Grant a Stay of Proceedings to Permit the Clinton Presidential Library to Process its FOIA Requests in a Fair and Orderly Manner . . . . . . . . . . . . . . . . . . . . . . 12

    A.    The Clinton Presidential Library Can Demonstrate Exceptional Circumstances Warranting a Stay of Proceedings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.    The Clinton Presidential Library Has Received an Unprecedented Number of FOIA Requests  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        2.    The Clinton Presidential Library Has Limited Resources, Inadequate to Process the Flood of FOIA Requests Within 20 Days . . . . . . . . . . . . . . 16

        3.    The Clinton Presidential Library Is Exercising Due Diligence in Processing FOIA Requests and Has Shown Reasonable Progress in Reducing its Backlog  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    B.    Additional Time is Routinely Granted When An Agency Demonstrates, As Here, Exceptional Circumstances  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## INTRODUCTION

The Clinton Presidential Library ("Library") completed its exacting page-by-page, line-by-line review of approximately 10,000 of the 30,000 pages of records potentially responsive to plaintiff's April 5, 2006 Freedom of Information Act request ("Request") that is the subject of this action. The Library has notified the Presidential representatives of the records scheduled for disclosure and anticipates that it will produce those records to plaintiff Judicial Watch, Inc. in advance of the March 20, 2008 hearing.[1]

Despite the Library's diligent efforts in completing its processing of those 10,000 pages, the Library now moves for a stay of proceedings pursuant to 5 U.S.C. § 552(a)(6)(C), and Open America v. Watergate Special Prosecution Force, 547 F.2d 605 (D.C. Cir. 1976), for the remaining 20,000 pages of "telephone log books" portion potentially responsive to plaintiff's Request. Because exceptional circumstances exist in the present case, this Court should grant a stay of the proceedings, as additional time will be necessary to process this portion of plaintiff's FOIA request. Although the Library is exercising due diligence in responding to plaintiff's request, the large number of pending requests that pre-date plaintiff's request, the limited resources currently available to the Library for the processing of FOIA requests, and the reasonable progress that the Library has made in processing requests through its multi-request queue system, constitute exceptional circumstances necessitating a stay so that the Library may continue to process records in a fair and orderly manner.

In support of this motion, defendant has provided the Second Supplemental Declaration of Emily Robison, the Deputy Director of the Clinton Presidential Library, which explains that the Library intends to process the remaining 20,000 pages of the request as it arises in the queue structure. The Library would require a stay of at least one to two years before which it will *begin* processing the remaining records as the request arises in the queue structure; additional time would be required to complete processing and to afford an opportunity for Presidential

---

[1] If any unanticipated delays arise in producing records from the daily schedules portion of the Request, defendant will attempt to notify the Court in advance of the March 20, 2008 hearing.

review.[2]  Several factors prevent NARA from providing a date certain by which it can complete

processing this latter portion of the request, including:  the volume of records that are ahead of

plaintiff's request in the FOIA queue; that the Library has only been processing FOIA requests

for two years and may experience increases in its rate of processing as its staff gains greater

familiarity with the collection and FOIA processing; and that there currently exists uncertainty

about funding for additional requested resources that may be appropriated for the Library's

FOIA processing.  Given this uncertainty, if this Court grants a stay of proceedings, NARA is

prepared to submit a status report within 120 days of the entry of the stay (if deemed necessary

by the Court), to provide the Court and Plaintiff with an updated status of where the remaining

requested documents fall within the Library's FOIA queue system.

## BACKGROUND

### I.    Statutory and Regulatory Framework of the Presidential Records Act

The Presidential Records Act of 1978 ("PRA"), sets forth a scheme for the preservation

and disclosure of Presidential and Vice-Presidential records.  The PRA defines "Presidential

records" as:

> [D]ocumentary materials, or any reasonably segregable portion thereof, created or
> received by the President, his immediate staff, or a unit or individual of the
> Executive Office of the President whose function is to advise and assist the
> President, in the course of conducting activities which relate to or have an effect
> upon the carrying out of the constitutional, statutory, or other official or ceremonial
> duties of the President.

44 U.S.C. § 2201(2).  Included among "Presidential records" are documentary materials created

or received by the Office of the First Lady – an office within the Executive Office of the

President's White House Office – when those materials meet the definition of "Presidential

records" set forth in the PRA. See, e.g., Executive Office of the President, available at

http://www.whitehouse.gov/government/eop.html (last visited February 20, 2008); H.R. Rep.

---

[2] This estimate does not include the time that it will take the Library to *complete* its
processing of that request, nor the time that the representatives of the incumbent and former
Presidents are legally entitled to under the Presidential Records Act, 44 U.S.C. § 2204(c)(2) &
§ 2206, accompanying regulations, and Executive Order 13233, for the review and assertion of
any constitutional privileges.

No. 95-1487, at 12 (1978), reprinted at 1978 U.S.C.C.A.N. 5732, 5743 ("When the President's spouse or other family member or associate serves as a de facto member of the President's staff, the documents which reflect such service are included in the ambit of presidential records[.]"); cf. Ass'n of Am. Phys. & Surgeons, Inc. v. Clinton, 997 F.2d 898, 904, 911 (D.C. Cir. 1993). Thus, Plaintiff's FOIA request encompasses Presidential records.

A.    **Statutory Restrictions on the Release of Presidential Records**

Presidential records are the property of the United States, 44 U.S.C. § 2202, and upon conclusion of a President's term in office, the Archivist of the United States ("Archivist") assumes responsibility for the custody, control, and preservation of the Presidential records.  Id. § 2203(f)(1). The Archivist has an affirmative duty to make Presidential records available to the public as rapidly and completely as possible consistent with limitations under the PRA.  Id. Subject to several exceptions discussed below, Presidential records are to be generally administered in accordance with the provisions of the FOIA.  Id. § 2204(c)(1).

As an initial matter, there is no public access to Presidential records under the FOIA until the earlier of (a) five years after the date on which the Archivist obtains custody of the records, or (b) the Archivist's completion of processing and organization of the records or an integral file segment thereof.  Id. § 2204(b)(2).  In addition, the President may, before leaving office, "specify durations, not to exceed 12 years, for which access shall be restricted with respect to information" within one of six enumerated categories:  (1) classified information designated by Executive order; (2) documents relating to appointments to Federal office; (3) documents specifically exempted from disclosure by statute other than FOIA; (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential; (5) confidential communications requesting or submitting advice, between the President and his advisers, or between such advisers; or (6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.  See 44 U.S.C. §§ 2204(a)(1) - (6).  Thus, Presidential records falling into one of these six categories may be withheld for up to 12 years, even if the record is the subject of a FOIA request during

that time.  The PRA provides that the Archivist's decision to categorize a record as falling under one of the six enumerated, restricted categories, and then to withhold the record within the 12 year period, "shall not be subject to judicial review."  44 U.S.C. § 2204(b)(3); see also H.R. Rep. No. 95-1487, at 4, 16 ("The subsection also provides that when a presidential restriction is in effect, a determination by the archivist regarding access is not subject to judicial review . . .."); Armstrong v. Executive Office of the President, 1 F.3d 1274, 1294 (D.C. Cir. 1993).

Pursuant to 44 U.S.C. § 2204(a), during his time in Office, President Clinton asserted his right to apply the six enumerated restrictions in the PRA for the full 12 year period to all Presidential records.[3]  Any documents covered by one of the six categories as currently defined in consultation with the former President are therefore not releasable until January 22, 2013, at which time those records not also subject to a FOIA exemption may be proposed for release. The five-year moratorium on public disclosure mandated by the PRA expired on January 20, 2006, and the Clinton Presidential Library began to receive FOIA requests for documents on that date.

**B.    FOIA Exemptions Applicable to Presidential Records**

In addition to the aforementioned restrictions of the PRA, the PRA incorporates the provisions of the FOIA, including the enumerated exemptions from public access contained in 5 U.S.C. § 552(b), except the (b)(5) exemption covering "privileged" records. See 44 U.S.C. § 2204(c)(1).  Thus, the documents responsive to Plaintiff's request must also be examined under the applicable FOIA exemptions, including but not limited to Exemption 2 for certain internal administrative records, and Exemption 7, for law enforcement records, 5 U.S.C. § 552(b)(2) & (b)(7), respectively.  The Archivist may therefore withhold Presidential records under the FOIA exemptions, even if those records are not otherwise covered by one of the six enumerated

---

[3]  In 2002, President Clinton provided additional guidance to the Archivist, explaining that he intended to ease, for NARA's review and processing purposes, the application of two of the enumerated restrictions of the PRA, namely:  § 2204(a)(2), which concerns documents relating to appointments to Federal office; and § 2204(a)(5), which concerns confidential communications requesting or submitting advice, between the President and his advisers, or between such advisers.  President Clinton did not, however, waive these two restrictions in their entirety.

restrictions of the PRA, or if those PRA restrictions have expired under the 12-year PRA restriction period.  See 44 U.S.C. § 2204(c)(1). Given the requirements of the PRA, as well as those of the FOIA which have been adopted by the PRA, the Clinton Library archivists must engage in a page-by-page, line-by-line review of all records responsive to Plaintiff's request before any disclosure of those records can be made.

### C.    Requirement for Presidential Review

The PRA further provides that none of its provisions "shall be construed to confirm, limit, or expand any constitutionally-based privilege which may be available to an incumbent or former President." 44 U.S.C. § 2204(c)(2).  Consistent with those constitutionally-based privileges, the incumbent President and the former President (whose records are at issue) are both afforded an opportunity to review all Presidential records prior to their public disclosure. See 36 C.F.R. § 1270.46; see also Exec. Order No. 13233, 66 FR 56025 (2001).  Specifically, once the Archivist has made an initial determination to disclose Presidential records, he must provide notice of the Presidential records to be disclosed to the former and incumbent Presidents, as well as an opportunity for them to review the records so that they may assert any constitutionally-based privileges.  See 44 U.S.C. §§ 2204(c)(2), 2206(3); C.F.R. § 1270.46; Exec. Order No. 13233.[4]

The legislative history of the PRA explains the rationale behind the delayed disclosure of restricted Presidential records and the mechanisms for ensuring Presidential review.  In passing the bill that became the PRA, Congress recognized that "premature disclosure" of Presidential

---

[4] In American Historical Association v. National Archives and Records Administration, 516 F. Supp. 2d 90 (D.D.C. 2007), the court enjoined NARA from relying on section 3(b) of Executive Order 13233, but left intact all other provisions of the Executive Order.  The court held that after providing the former President with the minimum 30 days of notice that is provided for under NARA's regulations implementing the PRA, "the Archivist may make a discretionary decision with respect to the release of such documents though they are pending the former president's review." Id. at 110.  NARA will not take any action that is inconsistent with the court's Order.  As will be made clear below, however, the role that Executive Order 13233 may play with respect to the records responsive to the remaining portion of Plaintiff's FOIA request is an issue that is neither ripe, nor relevant at this time, given the current status of Plaintiff's FOIA request in NARA's FOIA queue structure.

records could have a "'chilling effect' on presidents and the frankness of advice they could expect from their staffs." H.R. Rep. No. 95-1487, at 8.  It was felt, in fact, that the failure to recognize that potential "might eventually diminish the completeness of the written record created and left by chief executives."  Id.  Congress acknowledged, in passing the PRA, the need to consider the "expectation of confidentiality of executive communications to avoid the prospect of a constitutional infirmity."  Id.  Thus, the PRA sought to balance these considerations against the desire for "ready availability" of Presidential records.  Id.; see also id. at 15 (Congress sought to balance "the objectives of assuring early availability with the concern that the premature disclosure of sensitive presidential records will eventually result in less candid advice being placed on paper and a depleted historical record").

## II.    Factual Background

### A.    The Clinton Presidential Library, FOIA Requests, and Queue Structure

The Clinton Presidential Library is a component of NARA and, therefore, all staff members of the Clinton Presidential Library are also NARA staff members.  Supplemental Decl. of Emily Robison ¶ 2 (submitted on Oct. 2, 2007) ("Supp. Decl.").  NARA regulations provide that FOIA requests for Presidential records of the Clinton Administration be sent to the Director of the Clinton Presidential Library for processing.[5]  See 36 C.F.R. § 1250.22(c).

NARA received legal custody of the Presidential records of former President William J. Clinton, including records from the Office of the First Lady, on January 20, 2001.  See Supp. Decl. ¶ 12.  These records included approximately 78 million pages of textual records, over twenty million electronic email records, and over 60 other Clinton Presidential electronic systems.  Id.  ¶ 27.  Between January 20, 2001 and January 20, 2006 (the date that Clinton

---

[5]    Consistent with the FOIA, NARA may expedite certain record requests "to the head of [its] FOIA queue."  36 C.F.R. § 1250.28(a); see also 5 U.S.C. § 552(a)(6)(E)(v) (regarding expedited FOIA requests).  However, NARA's regulations currently provide that the agency "cannot expedite requests for Presidential records."  36 C.F.R. § 1250.28(b).  NARA also has separate fee authority for its archival records.  See 44 U.S.C. § 2116.  Thus, the Clinton Presidential Library is not governed by the FOIA fee and fee waiver provisions in 5 U.S.C. § 522(a)(4)(A)(vi), and therefore, the Library does not provide fee waivers for copying.  On the other hand, the Library does not charge search fees for the time that the Library's staff searches for documents responsive to FOIA requests.

Presidential records became available to FOIA requests), the Clinton Library staff received training in anticipation of the opening of the Library's records to FOIA processing. Id. ¶ 26. This training included two archivists on the Clinton Library staff traveling to the George H.W. Bush Presidential Library in College Station, Texas, to review the Bush Library's handling of FOIA requests under the Presidential Records Act. Id. The Library staff also participated in training exercises held in person and via phone conferencing with NARA headquarters staff familiar with FOIA processing issues in general, including being briefed by NARA's Presidential Materials Staff, as well as by various other NARA FOIA officials. Id.

Further, during this time, the Clinton Library staff was involved in establishing initial intellectual control over both the Presidential records and artifacts. Supp. Decl. ¶ 27; Second Supplemental Decl. of Emily Robison ¶ 3 ("2d Supp. Decl.") (attached as Exhibit 1). Archivists prepared a "master location register, combining numerous inventories and in-house databases in preparation for moving all materials to the Library site which opened November 18, 2004, and to assist Library staff in being able to respond to PRA and FOIA requests." 2d Supp. Decl. ¶ 3. The Library staff also created more detailed "finding aids," which provide a rough index of the Library's various collections. Id. In addition, Library staff responded to numerous special access requests and subpoenas. Id. Finally, the Clinton Library systematically processed and released over one million pages of Clinton Presidential records. Id.

The Clinton Presidential Library began receiving and accepting FOIA requests on January 20, 2006. Supp. Decl. ¶ 12. FOIA requests to the Clinton Presidential Library are placed in queues to ensure fair and efficient processing. Id. ¶ 20. The Clinton Presidential Library has 17 separate access queues, 16 for FOIA requests and one for mandatory review of classified documents. Id. The queues are divided by the type of records requested, as follows: (1) textual unclassified; (2) textual classified; (3) electronic classified; (4) electronic unclassified; and (5) audio-visual ("AV"). Id. While a request may include multiple types of records, each request is placed in the queue based on the record type that makes up the largest portion of the request, except in the case of audiovisual material, which is segregated into its

own queues.  Id.  These five queues are then further divided by the volume of records initially estimated to be responsive:  (1) large, i.e., over 5000 pages; (2) medium, i.e., 501-5000 pages; or (3) small, i.e., 500 or less pages.  Id.  Within each queue, the FOIA cases are organized by date received.  Id.  There is also a sixteenth queue for records subject to multiple requests.  Id. ¶ 21.  The Clinton Library rotates through its queues, and as the next-in-line FOIA request is selected from each queue, that queue will then go to the end of the queue line.  Id. ¶ 20.

The Clinton Presidential Library queue structure has been continually evolving in order to ensure as fair and efficient processing as possible given the limited archival resources at the Clinton Library.  Id.  In an attempt to better serve its requesters, the Library has added additional queues and adjusted queue requirements.  Id.  For example, in July of 2007, the Library added the sixteenth queue for records that are the subject of multiple FOIA requests.  Id. ¶ 21.  FOIA requests are moved into the multi-request queue when the Library received multiple requests for significant portions of the same series or sub-series of records.  Id. ¶ 31.  Once the requests are transferred to the multi-request queue, the library will begin systematically processing the entire file, series, or sub-series as opposed to individual folders.  Id.  This process allows the Library to respond more rapidly to FOIA requesters who wish to gain access to the same or similar files.  Id.  Also, by opening an entire series or sub-series, other researchers will have access to these records without the necessity of filing a FOIA request, which would ultimately add to the existing FOIA backlog.  Id.  Further, the Library recognizes that continued flexibility may be needed in the future processing of extremely large requests, and it may consider treating very large requests as multiple segments to minimize the impact that such requests have on staff resources and on other FOIA requesters in line.  The current queue structure is the result of experience gained by conducting many FOIA request searches as well as extensive discussions among staff at the Clinton Presidential Library, the Office of General Counsel, and the Presidential Materials Staff in Washington, D.C.  Id. ¶ 20.

Between January 20, 2006, and April 5, 2006 (the date of the present FOIA request), the Library received 211 FOIA requests, totaling an estimated 5,260,000 pages. See 2d Supp. Decl. ¶ 4. As of February 25, 2008, a total of 436 FOIA requests have been received by the Library since the five-year moratorium expired. Id. As of February 25, 2008, the archivists at the Library have processed 72 FOIA requests, representing a total of approximately 230,004 pages of textual and electronic records and 31,600 audio-visual records. Id. The Library currently has 300 pending FOIA requests, which it estimates will involve the processing of approximately 10,500,000 pages of Presidential records. Id.

The Library has no more than six archivists available to process, as a portion of their overall job responsibilities, all of the Library's pending FOIA requests for textual and electronic records (excluding the AV queues). Supp. Decl. ¶ 24. However, NARA's Office of Presidential Libraries expects that the President's budget submission to Congress for Fiscal Year 2009 will include a recommendation from the Archivist for funding 15 new archivists for processing Presidential records. Id. ¶ 30. Additionally, NARA's Office of Presidential Libraries and the Presidential Materials Staff decided to undertake an in-house study in the spring of 2007 to review ways to achieve faster processing of Presidential records. Id. ¶ 32. As a result, a one year pilot project was initiated to implement the most promising proposals. Id. Such proposals include halting the time-consuming routine referral of classified records to originating and/or equity agencies. Id. NARA is also expending significant resources to address the explosion in volume of electronic records through its Electronic Records Archives project, which, when operational, will give the Library the means to preserve, process, and provide sustained access to electronic records including Presidential electronic records. Id. ¶ 28.

### B.    Plaintiff's FOIA Request

By letter dated April 5, 2006, plaintiff submitted a FOIA request to the FOIA Coordinator of the Clinton Presidential Library, seeking access to "Clinton Presidential records," specifically "First Lady Hillary Rodham Clinton's calendar, to include but not limited to her daily office diary, schedule, day planner, telephone log book, and chronological file." Plaintiff

identified the time period as spanning eight years between January 1, 1993, and January 20, 2001, and requested a waiver of search and duplication fees. Plaintiff did not request expedited processing of its request. See Supp. Decl. ¶ 15.

The Supervisory Archivist for the Clinton Presidential Library replied by letter dated April 13, 2006, noting that a preliminary search of the First Lady's calendar revealed approximately 62,600 pages of textual records and 125,732 pages of electronic records.[1] The Supervisory Archivist also noted that the page total "is an estimate and that all pages processed might not be relevant to your specific topic." She explained the review process, outlining how the Library processed FOIA requests for records, like the First Lady's, covered by the PRA and placed the requests in one of 16 FOIA processing queues:

> The staff of the Clinton Library is currently processing and reviewing FOIA requests that precede your request. To treat everyone equitably, we have placed your request in our complex electronic unclassified processing queue by the date it was received in our office. FOIA requests received by the Clinton Library are processed and reviewed for access under provisions of the PRA and FOIA and are subject to Executive Order 13233, which requires that we notify the representatives of the former President and the incumbent President prior to the release of any Presidential records.

On July 25, 2006, plaintiff responded, acknowledging "the processing and review procedures . . . under the provisions of FOIA, the [PRA], and Executive Order 13233," and requesting an estimated completion date. The Supervisory Archivist responded on August 9, 2006, identifying 156 FOIA requests pending before plaintiff's request and at least 2,000,000 pages of records to process before plaintiff's request would reach the front of its queue. She further explained that she could not estimate a completion date, in part because the Clinton Presidential Library had

---

[1] The initial, rough estimate of 62,600 pages of textual records has now been determined after a physical search to consist of approximately 30,000 pages, of which approximately 10,000 pages are daily schedules for First Lady Hillary Rodham Clinton, and the remaining approximately 20,000 pages consist of telephone log books for the Office of the First Lady, which contain as a subset an as-yet undetermined number of message slips for Mrs. Clinton. No responsive record corresponding to a "daily office diary," a "day planner," or a "chronological file" belonging to First Lady Hillary Rodham Clinton was found. The 125,732 pages of electronic records, which entirely consist of e-mail records of two of the First Lady's appointed schedulers on staff, have since been determined not to be responsive to plaintiff's request. Accordingly, there are a maximum of 30,000 pages of textual records that may be responsive to plaintiff's request. (See Supp. Decl. ¶ 18.)

begun processing FOIA requests only seven months prior upon the expiration of the five-year restriction period provided under the PRA.  See Supp. Decl.  ¶¶ 15-19.

Plaintiff again requested a status update and an estimated completion date by letter dated January 16, 2007.  The Supervisory Archivist responded on February 9, 2007, that the FOIA request had moved up in its processing queue, but that it had not yet reached the front of the queue.  Explaining the time-consuming task of processing all the requests before it, the Supervisory Archivist explained that she "must complete a page-by-page review of all records to determine if this material can be released or if it requires withholding under one of the six [PRA] restrictive categories and/or the eight applicable FOIA exemptions that apply to Clinton Presidential records."  See id.

NARA's search revealed approximately 30,000 pages of potentially responsive records queued for processing.  See Supp. Decl. ¶ 18.  Because the Clinton Presidential Library received other FOIA requests involving records relating to Mrs. Clinton's schedule prior to receipt of the original request from plaintiff Judicial Watch, and subsequently received two or more additional requests for similar records, it made a determination earlier in 2007 to initiate processing of a portion of plaintiff's request – constituting an estimated 10,000 pages – as part of its multi-request queue.  See id. ¶ 21; 2d Supp. Decl. ¶ 5.  As a result, the Clinton Presidential Library completed processing those 10,000 records and notified the Presidential representatives for any Presidential review.  The Library anticipates providing the records scheduled for disclosure from the 10,000 pages of daily schedule records before March 20, 2008.  See 2d Supp. Decl. ¶ 5.

The remainder of plaintiff's request is still pending in the multi-request queue, behind what currently consists of two FOIA requests received prior to plaintiff's request.  Under the queue structure utilized by the Clinton Presidential Library, in which each of the 13 queues for textual and electronic records are rotated after the next in line FOIA request is selected, there are 30 FOIA requests pending ahead of the telephone log books portion of plaintiff's FOIA request.  See 2d Supp. Decl. ¶ 6.

At present, the Library's best estimate is that it will be at least one to two years before it can *begin* processing the remainder of Plaintiff's FOIA request.  See 2d Supp. Decl. ¶ 6.  As explained above, the Library then intends to allow for Presidential review of the materials as the Library completes its review of portions of the responsive documents.  See Supp. Decl. ¶ 22.

## DISCUSSION

**I.    This Court Should Grant a Stay of Proceedings to Permit the Clinton Presidential Library to Process its FOIA Requests in a Fair and Orderly Manner**

> **A.    The Clinton Presidential Library Can Demonstrate Exceptional Circumstances Warranting a Stay of Proceedings**

An agency receiving a FOIA request must determine whether to comply with the request within 20 working days.  See 5 U.S.C. § 552(a)(6)(A)(i).  Once the initial twenty days has passed without an agency determination on the request, the FOIA requester "shall be deemed to have exhausted his administrative remedies," id. at § 552(a)(6)(C)(i), and the requester can file suit in federal court.  The Court may, however, "allow the agency additional time to complete its review of the records" upon a showing that "exceptional circumstances exist and that the agency is exercising due diligence in responding to the request."  Id. § 552(a)(6)(C)(i).  The leading case construing section 552(a)(6)(C)(i) was the D.C. Circuit's decision in Open America v. Watergate Special Prosecution Force, 547 F.2d 605 (D.C. Cir. 1976), which held that an agency is entitled to additional time to process a FOIA request under § 552(a)(6)(C) when it:

> is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of subsection (6)(A), and when the agency can show that it "is exercising due diligence" in processing the requests.

Id. at 616 (quoting 5 U.S.C. § 552(a)(6)(C)); see also Oglesby v. U.S. Dep't of the Army, 920 F.2d 57, 64 (D.C. Cir. 1990) ("Frequently, if the agency is working diligently, but exceptional circumstances have prevented it from responding on time, the court will refrain from ruling on the request itself and allow the agency to complete its determination.").  The court noted that section 552(a)(6)(C) "was designed and inserted specifically as a safety valve for [FOIA]."

<u>Open Am.</u>, 547 F.2d at 610.  The <u>Open America</u> decision also recognized that the "real parties at interest" may not be the ones before the Court but the "other persons or organizations who made requests prior" to the plaintiff.  <u>Id.</u> at 614.  "If everyone could go to court when his request had not been processed within thirty days, and by filing a court action automatically go to the head of the line at the agency, we would soon have a listing based on priority in filing lawsuits, i.e., first in court, first out of the agency."  <u>Id.</u> at 615.  Thus, a plaintiff is not entitled to jump ahead of the line solely because it filed a lawsuit.

As part of the Electronic Freedom of Information Act Amendments of 1996, Congress amended 5 U.S.C. § 552(a)(6)(C), affirming the proposition in <u>Open America</u>, and clarifying that even a "predictable agency workload of requests" could constitute "exceptional circumstances" when an agency could demonstrate "reasonable progress in reducing its backlog of pending requests."  <u>See</u> 5 U.S.C. § 552(a)(6)(C)(ii) & (iii); H.R. Rep. No. 104-795, at 24, reprinted in 1996 U.S.C.C.A.N. 3448, 3467 (noting that the FOIA Amendments were "consistent" with the holding in <u>Open America</u>).

In the D.C. Circuit, the current articulation of the standard for granting a stay pursuant to the FOIA and the <u>Open America</u> doctrine is as follows:

> [A]n <u>Open America</u> stay may be granted (1) when an agency is burdened with an unanticipated number of FOIA requests; *and* (2) when agency resources are inadequate to process the requests within the time limits set forth in the statute; *and* (3) when the agency shows that it is exercising 'due diligence' in processing the requests; *and* (4) the agency shows 'reasonable progress' in reducing its backlog of requests.

<u>Elec. Frontier Found. v. U.S. Dep't of Justice</u>, 517 F. Supp.2d 111, 120 (D.D.C. 2007) (internal quotation marks omitted); <u>Appleton v. FDA</u>, 254 F. Supp. 2d 6, 8 (D.D.C. 2003) (noting first three factors); <u>Ctr. for Pub. Integrity v. U.S. Dep't of State</u>, 2006 WL 1073066, *2 (D.D.C. 2006) ("the amendments link the requirement to demonstrate 'reasonable progress' to those cases where an agency claims exceptional circumstances based on 'predictable agency workload' . . . . The legislative history contemplates that where an agency faces an 'unforeseen' increase in FOIA requests and the request for a stay is not based on a 'routine backlog,' a stay

may be justified notwithstanding the lack of a reduction in the backlog.") (citing H.R. Rep. No. 104-795, at 24).

"When considering a request for an <u>Open America</u> stay, [a]gency affidavits are accorded a presumption of good faith" by the court. <u>Elec. Frontier Found.</u>, 517 F. Supp.2d at 117 (internal quotation marks omitted). As will be shown below and through the attached declaration, the Clinton Presidential Library can demonstrate that exceptional circumstances exist, warranting a stay in this case.

### 1. The Clinton Presidential Library Has Received an Unprecedented Number of FOIA Requests

Notwithstanding the various preparations for FOIA processing that were taken by the Clinton Presidential Library, including reviewing the procedures of other Presidential libraries, undergoing training sessions, categorizing and preparing the Library's voluminous collection for FOIA processing, and systematically processing over a million pages of records, several factors have culminated in an unanticipated volume of FOIA requests and unanticipated delays in the Library's ability to process such requests.

First, the five-year moratorium on disclosure mandated by the PRA expired on January 20, 2006, and the Clinton Presidential Library began to receive FOIA requests on that date. The Library is therefore still in its infancy in receiving and processing requests, and is continuing to develop and refine its queue structure for efficient processing. In the first three months after January 20, 2006 alone, the Clinton Presidential Library received approximately 211 FOIA requests, totaling around 5,260,000 pages of records. <u>See</u> 2d Supp. Decl. ¶ 4. By the end of its first year of processing FOIA requests, the Library had received over 336 FOIA requests. <u>Id.</u> As of February 25, 2008, the Library has received a total of 436 FOIA requests. <u>Id.</u> Indeed, one of plaintiff's FOIA requests currently being litigated in another matter comprises at least one million pages of records. <u>Id.</u> ¶ 6 (referring to <u>Judicial Watch v. NARA</u>, Civ. No. 07-1987 (D.D.C.) (PLF), in which NARA has filed a motion to dismiss, and in the alternative, for an <u>Open America</u> stay).

To place these FOIA requests for Clinton Presidential records in their proper context, it is useful to compare and contrast the experiences of the other PRA libraries. While the Clinton Library received over 336 FOIA requests in its first year of processing, the George H.W. Bush Presidential Library and the Ronald Reagan Presidential Library both received approximately 100 FOIA requests in their respective first years of processing FOIA requests. See Supp. Decl. ¶ 29. Thus, the Clinton Presidential Library received an unexpected number of FOIA requests in its first year of processing, representing a three-fold increase in the requests made to the two most recent Presidential Libraries. Id. This increase in number of requests is compounded by the fact that despite the best efforts of the Clinton Presidential Library staff, and unlike the experience of NARA staff at the other Presidential libraries, the FOIA requesters to the Clinton Library have been less willing to substantially narrow broad and far-ranging requests. Id. It is clear, therefore, that within the Open America context, the Library has experienced an unanticipated number of FOIA requests. See Elect. Frontier Found., 517 F. Supp.2d at 119 (finding that an additional one-third as many requests per month, coupled with staff shortages demonstrated that the agency had been deluged with a number of unanticipated requests); Open America, 547 F.3d at 617 (Leventhal, J., concurring) (noting that the government's showing that the number of FOIA requests had increasing at an unforeseen rate was supported by its affidavit which compared the requests received by the agency in years past).

In addition, the sheer total volume of records held at the Clinton Library has itself contributed to unanticipated delays in the Library's ability to process FOIA requests after January 2006. As stated earlier, the Clinton Library holds an estimated 78 million pages of Presidential textual records. By comparison, the Reagan Library holds approximately 43.8 million pages of textual records, and the Bush Library holds about 33.7 million pages of textual records. See Supp. Decl. ¶ 27. Beyond that, the Clinton Library also holds an estimated 20 million Presidential electronic mail records, 2 million electronic cables and 60 other electronic systems, which is orders of magnitude greater than similar electronic record holdings elsewhere in these other Libraries, and, if printed in a textual format, would rival in size the entire volume

of Presidential records generated during the eight years of President Reagan's administration.

Id.  This increase in the volume of holdings and variety of formats of media necessarily requires

more complex and time-consuming searching and pulling of records, and demands greater efforts

to maintain intellectual control over this vast collection of records through traditional hard copy

finding aids and electronic indices of various kinds.  Id.

As the first Presidential Library to have a significant volume of born-electronic records,

the Clinton Presidential Library has received FOIA requests for more than one million emails in

the twenty months since Clinton Presidential records became subject to FOIA.  Id. ¶ 28.  While

NARA is expending significant resources to address the explosion in volume of electronic

records through its Electronic Records Archives project, and while upgrades in functionality

have been made to the system that currently holds Clinton Presidential electronic records, the

Clinton Library must print electronic records to paper prior to arranging, reviewing, and

describing them.  Id.  Additionally, the Clinton Library archival staff has spent large amounts of

staff time on an unanticipated process known as a "de-hexification," a process converting

attachments to individual email records that cannot be read due to an unknown or unreadable file

into something approaching readable form.  Id.

### 2. The Clinton Presidential Library Has Limited Resources, Inadequate to Process the Flood of FOIA Requests Within 20 Days

The Clinton Presidential Library can allocate no more than six archivists for processing

all of its pending FOIA requests for textual and electronic records, (as represented in the thirteen

non-AV queues) as a portion of their overall job duties and responsibilities.  Supp. Decl. ¶ 24.

Counting each archivist as a "Full Time Equivalent" or "FTE" position in government,

approximately 51.5% of total FTE time has been devoted to processing FOIA requests.  Id.  This

processing requires not only page-by-page, line-by-line review to ensure that all exempt

information is properly identified and redacted, but also includes the time-consuming tasks of

searching for, arranging, describing, and performing basic preservation on the responsive

records.  Id.  Also included in this process is the time required to conduct reviews of records as needed in response to ongoing discussions with representatives of the former President.  Id.

Since January 2006, the remaining 48.5% portion of cumulative FTE time has been spent on reference services, including answering all incoming general reference requests from the public, as well as requests received from places such as the White House, the Clinton Foundation, the former President, government agencies, and others.  Supp. Decl. ¶ 25. Archivists also staff the Library's textual and audio-visual research rooms when researchers are present.  During this time, archivists have responded to 3,600 separate reference inquiries. Archivists staff the Library's textual and audio-visual research rooms when researchers are present, and the Clinton Library has had 432 visits to its research room in this period.  Archivists also spend time responding to what are called "special access" requests under 44 U.S.C. § 2205, including since January 20, 2006, four significant special access requests from the incumbent President, and one from a federal court.  These requests are often time sensitive and require the review of classified information, thereby adding additional complexity to the work done by the archivists.  Additionally, archivists spend time improving the functionality of access to electronic records, including working with contractors on upgrades to the Presidential Electronic Record Library known as "PERL."  Finally, archivists spend time working on museum exhibit issues, assisting the Curator with writing text, and dealing with a variety of administrative issues as they arise.  See Supp. Decl. ¶ 25.

All of these other responsibilities of the archivists are not insignificant, and they weigh in favor of a finding that the Library has limited resources to process the large volume of FOIA requests within twenty days.  See Ctr. for Pub. Integrity, 2006 WL 1073066, at *3 (recognizing, inter alia, the other responsibilities of the office that handled FOIA requests, including time-consuming requests from Congress and other federal agencies); Edmonds v. FBI, 2002 WL 32539613, at *2 (D.D.C. Dec. 3, 2002) (noting that the "FOIA personnel also spend time on administrative appeals, litigation, and large projects," contributing to the exceptional circumstances warranting an Open America stay).

Limited resources and staffing shortages contribute to an exceptional circumstance finding under Open America, as they inherently affect the progress that can be made by the agency in processing FOIA requests.[2]  See Elect. Frontier Found., 517 F. Supp.2d at 119; Ctr. For Biological Diversity v. Gutierrez, 451 F. Supp. 2d 57, 70 (D.D.C. 2006) (noting that "'[r]easonable progress' is affected, of course, by the number of requests for information . . . and the budget allocated by Congress.").

      **3.**      **The Clinton Presidential Library Is Exercising Due Diligence in Processing FOIA Requests and Has Shown Reasonable Progress in Reducing its Backlog**

NARA is aware of the unprecedented number and volume of FOIA requests received by the Clinton Presidential Library to date and has been working to address the issue.  Most significantly, the President's budget submission to Congress for Fiscal Year 2009 includes a recommendation from the Archivist for funding 15 new archivists for processing Presidential records.  Supp. Decl. ¶ 30.  If funded, the Clinton Presidential Library would receive the largest number of these archival resources, and this staff would be dedicated to reducing the FOIA backlog at the library.  Id.

Apart from seeking additional funding for positions, NARA has also taken concrete steps to address the Clinton Presidential Library's FOIA backlog.  For example, as part of a government-wide effort undertaken in response to Executive Order 13392 to improve the disclosure of government information, NARA's PRA libraries created multi-request FOIA queues.  Supp. Decl. ¶ 31.  As referenced above, FOIA requests are moved to this queue when a library receives multiple requests for significant portions of the same series or sub-series of records.  Id.  Once the requests are transferred to the multi-request queue, the library has been systematically processing the entire series or subseries as opposed to individual folders.  Id. Systematic processing is faster than traditional FOIA processing, because it entails processing

---

[2]  Indeed, plaintiff submitted a FOIA request on April 4, 2006, requesting records totaling over three million pages which would arise before the current remaining portion of plaintiff's April 5, 2006 request.  See 2d Supp. Decl. ¶ 6.  Judicial Watch recently narrowed its request to approximately one million pages; nonetheless approximately 400,000 pages still remain ahead of the telephone log books portion of the Request.  Id.

records in their archival and historical context, rather than simply finding, pulling, and tracking records from many different file series. Id.  Therefore, systematic processing assists in responding more rapidly to FOIA requesters who wish to gain access to the same or similar files. Id.  The multi-request queue is part of a larger, complex first-in first-out queue system at the Library, which also supports a due diligence finding.  See generally Ctr. for Pub. Integrity, 2006 WL 1073066, at *4;  Appleton, 254 F. Supp. 2d at 9; Ohaegbu v. FBI, 936 F. Supp. 7, 8 (D.D.C. 1996); Cohen v. FBI, 831 F. Supp 850, 854 (S.D. Fla. 1993).

In addition, NARA's Office of Presidential Libraries, after discussions with the Supervisory Archivists of the three PRA libraries, undertook an in-house study in the Spring of 2007 to review ways to achieve faster processing of Presidential records, and has initiated a one-year pilot project of the most promising proposals.  Supp. Decl. ¶ 32.  NARA is also expending significant resources to address the explosion in volume of electronic records through its Electronic Records Archives project.  Id. ¶ 28.  Such undertakings serve as further evidence of due diligence.  See Elect. Frontier Found., 517 F. Supp.2d at 118-19 (noting that the agency "continues to make efforts to reduce the backlog and processing time for FOIA requests, by developing the Sentinal Project and establishing the Central Records Complex," which are "expected to reduce the FBI's FOIA request processing time in the long-run"); Appleton, 254 F. Supp. 2d at 9 (noting, inter alia, that the agency implemented new electronic filing and redaction systems).

Finally, with regard to Plaintiff's request in this case, the Clinton Presidential Library has demonstrated its good faith efforts and due diligence, by quickly assigning the request a FOIA request number, placing 10,000 pages of the request in the multi-request queue once that queue was created, and by always promptly responding to all inquiries by Plaintiff.  Indeed, the Clinton Library anticipates that it will provide plaintiff by March 20, 2008 "daily schedule" records scheduled for disclosure among the 10,000 pages painstakingly reviewed.  See 2d Supp. Decl. ¶¶ 5-6.  Such cooperation by the agency is yet another factor that demonstrates the agency's due diligence.  See Appleton, 254 F. Supp. 2d at 9.

NARA and the Clinton Presidential Library are taking, and will continue to take, reasonable steps, in light of present-day resource and budget constraints, to address the important issue of expedient FOIA processing.  In addition, while the Library is facing well beyond a "predictable agency workload of requests," it nonetheless has shown reasonable progress in reducing its backlog, processing 72 FOIA requests (representing 230,004 pages of textual and electronic records and 31,600 audio-visual records) since the opening of the Library.  2d Supp. Decl. ¶ 4.  Specifically for Plaintiff's request, the Library's multi-request queue system ensures a fair, but efficient processing of records, demonstrated by the Library's completion of processing a portion of plaintiff's request.  Moreover, twelve FOIA requests totaling approximately 73,106 pages are currently being processed by Clinton Presidential Library archival staff.  Id.  As each of these FOIA requests is completed, archival staff will pull the next FOIA request to be processed from its respective queue.

### B.  Additional Time is Routinely Granted When An Agency Demonstrates, As Here, Exceptional Circumstances

Courts have frequently issued orders extending the time to respond to FOIA requests, including orders granting stays of several years in length or otherwise permitting agencies several years to process documents under exceptional circumstances.  See, e.g., Elect. Frontier Found., 517 F. Supp.2d at 120 (granting agency's request for a one year stay, with the possibility of further extension at the end of that year if warranted); Piper v. U.S. Dep't of Justice, 339 F. Supp. 2d 13, 16 (D.D.C. 2004) (discussing a stay of two years given to the FBI); Appleton, 254 F. Supp. 2d at 7, 11 (granting FDA's motion to stay proceedings for over a year pending completion of search and production of documents); Williams v. FBI, 2000 WL 1763680, at *3 (giving the FBI until May 2, 2001, to review records requested prior to August 21, 1998); Judicial Watch of Fla., Inc. v. U.S. Dep't of Justice, 102 F. Supp. 2d 6, 9 & n.1 (D.D.C. 2000) (discussing an order giving the FBI until June 8, 2000, to respond to a request dated July 15, 1997); Edmond v. U.S. Attorney, 959 F. Supp. 1, 4 (D.D.C. 1997) (giving the U.S. Attorney's Office until April 1, 1998, to respond to a request filed August 14, 1992, with the opportunity to

seek a further extension if necessary at that time); Jimenez v. FBI, 938 F. Supp. 21, 31 (D.D.C.
1996) (granting FBI's request for a four year stay to respond to the FOIA request); Ohaegbu v.
FBI, 936 F. Supp. 7, 8-9 (D.D.C. 1996) (granting request for a one year stay).

      Stays and extended periods for processing are particularly important in cases like this,
where the agency has shown that it has taken its responsibilities under the FOIA very seriously,
by taking reasonable preparations in training its staff and preparing its records, by processing
requests in an orderly and fair basis, and, once a problem such as an unanticipated rise in FOIA
requests and backlog occurs, by taking significant steps towards alleviating that problem.  While
it is regrettable that the Library is currently without greater resources to be able to process all of
its FOIA requests within twenty days, it would be even more unfortunate, under these
circumstances, to disrupt the Library's queue system and judicially assign the remaining portion
of plaintiff's FOIA request for processing before other requests that are ahead of it.  2d Supp.
Decl. ¶ 8.  It has been recognized in Open America and its progeny, that such a solution is
fraught with inequity.  See Open America, 547 F.2d at 615 ("[B]y fixing a time limitation on
agency action and according a right to bring suit when the applicant has not been satisfied within
the time limits," Congress could not have intended that "an automatic preference" be given to the
FOIA plaintiff where the result is that other "requests will be displaced"); Caifano v. Wampler,
588 F. Supp. 1392, 1394 (N.D. Ill. 1984) (finding that an order that an agency "take action on a
plaintiff's [FOIA] request within a specified time period," "would be to 'vault' plaintiff's request
over the requests of other individuals who were ahead of him in the FOIA line but who did not
seek judicial relief.  This would unfairly prejudice those other individuals, and we will not do
that").  The inequity of line jumping in a situation where the agency has taken reasonable steps
to combat delay is even seen outside of the FOIA context.  See, e.g., Mashpee Wampanoag
Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003) (noting, in a mandamus
action concerning delays in the Department of Interior's consideration of a tribal council's
petition for federal recognition, that where there was no evidence that the agency was not
working on the petition or was treating the petitioner unfairly, "a judicial order putting the

petitioner at the head of the queue would simply move all others back one space and produce no net gain") (internal quotation marks and brackets omitted); In re Barr Labs. Inc., 930 F.2d 72, 75 (D.C. Cir. 1991) (finding same, in a mandamus action concerning delays in the FDA's consideration of an application for approval of generic drugs, and noting that where the problem stemmed from a lack of resources, it was for the "political branches to work out").

Because NARA can demonstrate both exceptional circumstances and due diligence in handling Plaintiff's request, the Court should stay the proceedings to allow the Library time to process Plaintiff's request in accordance with the Presidential Records Act.

If this Court grants a stay of the proceedings, Defendant respectfully requests that an Order be issued staying the pending proceeding for one year (with an opportunity at that point to seek additional time as needed to complete the processing), in order for the Library to begin processing the remaining portion of Plaintiff's request. NARA is prepared to submit a status report within 120 days of the entry of any stay, if necessary, to advise the Court and Plaintiff of the status of the remaining portion of the Request in the Library's FOIA queue.

## CONCLUSION

For all of the reasons noted above, Defendant respectfully requests that an Order be issued staying the pending proceeding in the manner described above.

Respectfully submitted this 1st day of March, 2008.

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

OF COUNSEL                          /s/ Helen H. Hong
JASON R. BARON
(DC Bar No. 366663)                 HELEN H. HONG
Director of Litigation              Trial Attorney, Federal Programs Branch
Office of the General Counsel       U.S. Department of Justice, Civil Division
NARA                                Tel: (202) 514-5838
8601 Adelphi Road, Suite 3110       Fax: (202) 616-8460
College Park, MD 20740              helen.hong@usdoj.gov
Telephone: (301) 837-1499
Fax: (301) 837-0293                 Courier Address:
jason.baron@nara.gov                20 Massachusetts Ave., NW, Rm. 6132
                                    Washington, D.C. 20530

                                    *Counsel for Defendant*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 1, 2008, a true and correct copy of the foregoing

Defendant's Motion for an <u>Open America</u> Stay and Memorandum of Points and Authorities was

served electronically by the U.S. District Court for the District of Columbia Electronic

Document Filing System (ECF) and that the documents are available on the ECF system.


/s/ Helen H. Hong_____

HELEN H. HONG

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,                    )
                                         )
              Plaintiff,                  )
                                         )
      v.                                 )      Civil Action No: 1:07-cv-01267 (JR)
                                         )
U.S. NATIONAL ARCHIVES AND               )
RECORDS ADMINISTRATION,                  )
                                         )
                                         )
              Defendant.                 )
_____)

## SECOND SUPPLEMENTAL DECLARATION OF EMILY ROBISON

      I, Emily Robison, declare as follows:

1.     I am the Deputy Director of the William J. Clinton Presidential Library.  My background,

training, and experience is as an archivist, having been continuously employed at the Clinton

Presidential Library in the capacity of Supervisory Archivist from February 2002 to August

2004, Deputy Director from September 2004 to May 2007, Acting Director from May 2007 to

November 2007, and currently as Deputy Director.  In my current capacity, I assist the Director

in supervising the staff of the Clinton Presidential Library.

2.     I am familiar with the above-captioned case, having previously filed a Declaration in this

case on August 6, 2007 and a Supplemental Declaration on October 2, 2007.  The Supplemental

Declaration is attached as Exhibit 1 to this Second Supplemental Declaration and incorporated

herein.  This Second Supplemental Declaration is based on my personal knowledge, as well as

on facts supplied to me by NARA staff as known to them in the course of their duties and is

intended to update and supplement the Supplemental Declaration filed on October 2, 2007.

## FOIA PROCESSING AT THE CLINTON PRESIDENTIAL LIBRARY

3.     Between January 20, 2001 and January 20, 2006, the Clinton Library staff was involved in establishing initial intellectual control over both presidential records and artifacts. Archivists prepared a master location register, combining numerous inventories and in-house databases in preparation for moving all materials to the Library site which opened November 18, 2004, and to assist Library staff in being able to respond to PRA and FOIA requests. Library staff also began to create more detailed "finding aids," which collectively provide a rough index to the holdings of the Clinton Administration at the Clinton Presidential Library, and they responded to numerous special access requests and subpoenas. Library staff also proceeded in this period to process and release over a million pages of Clinton Presidential records systematically.

4.     Between January 20, 2006, and April 5, 2006 (the date of the present FOIA request), the Library received 211 FOIA requests for Clinton Presidential records totaling a rough estimation of 5,260,000 pages. In the first year alone, the Library received 336 FOIA requests. As of February 25, 2008, a total of 436 FOIA requests have been received by the Library since the five-year moratorium expired. As of February 25, 2008, archivists at the Library have processed 72 FOIA requests, representing a total of approximately 230,004 pages of textual and electronic records, and 31,600 audio-visual records. We currently have 300 pending FOIA requests, which we roughly estimate will involve the processing of at least 10,500,000 pages of Presidential records. Twelve FOIA requests totaling approximately 73,106 pages are currently being processed by Clinton Presidential Library archival staff.

## FOIA CASE LOG NUMBER 2006-0886-F

5.    We made a determination earlier in 2007 to initiate processing of a portion of the instant

Request – constituting an estimated 10,000 pages – as part of our "multi-request" queue, and had

thus begun to process these records as of June 14, 2007, shortly before the filing of the

Complaint in this action.  The Library completed processing those daily schedule records on

January 31, 2008, and notified the Presidential representatives that some of those 10,000 pages

were scheduled for disclosure.  The Library anticipates providing the records scheduled for

release by March 20, 2008 and therefore completing that portion of the Request.

6.    The remainder of the present Request (constituting the telephone log books from the

Office of First Lady) is still pending in the multi-request queue.[1]  There are currently two FOIA

requests in this multi-request queue ahead of this portion of the Judicial Watch Request.

However, under the queue structure described in my Supplemental Declaration, in which we

rotate through each of the 13 queues for textual and electronic records,[2] there are 30 FOIA

requests ahead of the remainder portion of the Request.  Included among the requests is FOIA

request number 2006-0885-F by Judicial Watch for "any and all records of the Task Force on

National Health Care Reform," currently being litigated in Judicial Watch, Inc. v. Nat'l Archives

& Records Admin., Civ. No. 07-1987 (D.D.C.) (PLF).  That request alone originally sought over

three million pages of responsive records, although I understand that Judicial Watch has

indicated a willingness to narrow that request on the order of one million pages.  Nevertheless, as

a result of what we estimate to be an additional 400,000 pages still to be reviewed before the

---

[1]  The approximately 20,000 pages of telephone log books generally constitute hand annotated
message slips identifying the date and time of a call, with "to" and "from" fields filled in.

[2]  There are in addition three audio-visual queues for requests involving those media.

3

telephone log books portion of the Request arises in the queue structure, we anticipate that the Library will not be able to *begin* processing this portion of the Request for at least one to two years.

7.    The historical experience of Presidential Library staffs has been that the rate of FOIA processing increases over time, as archivists work with materials and become more familiar with the overall presidential record collections, as well as with the nature of FOIA exemptions and processing. However, given the continuing uncertainty as to how much faster we can accomplish the processing of our current backlog of FOIA requests because of resource and budget constraints, we are not in a position to provide a reasonable estimate at this time as to how long it may take to process the remaining portion of the FOIA Request.

8.    The Clinton Presidential Library and NARA take their responsibilities with regard to the administration of the Presidential Records Act and the FOIA very seriously, and all reasonable efforts are being made to comply with statutory deadlines. It is regrettable that the Library is without greater resources at its disposal, and that the processing of presidential records for opening to the public is necessarily delayed. Nevertheless, as a matter of equity, and to ensure that each requestor receives the attention he or she deserves, the Library must be able to process its pending FOIA requests based on the sound administrative policies and practices developed to date. It would simply be unfair to judicially assign plaintiff's request for processing ahead of other requests in the various queues. Each court order that requires that one request be given priority ahead of others invariably works to the detriment of other, more patient requestors, and thereby encourages other requestors to seek relief in the courts, thereby undermining the

Library's (and NARA's) attempts at managing the many FOIA requests received annually in a
fair and consistent fashion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true
and correct.

Executed this 29th day of February, 2008.

_Emily Robison_

EMILY ROBISON
Deputy Director
Clinton Presidential Library

5

# Exhibit 1 to Second Supplemental Declaration of Emily Robison

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JUDICIAL WATCH, INC.,      )
                                 )
                Plaintiff,     )
                                 )
               v.            )      Civil Action No: 1:07-cv-01267 (JR)
                                 )
U.S. NATIONAL ARCHIVES AND    )
RECORDS ADMINISTRATION,      )
                                 )
                                 )
           Defendant.    )
                                 )

**SUPPLEMENTAL DECLARATION OF EMILY ROBISON IN SUPPORT OF
DEFENDANT'S STATUS REPORT AND PROCESSING SCHEDULE**

    I, Emily Robison, declare as follows:

1.   I am the Acting Director and the Deputy Director of the William J. Clinton Presidential

Library, having served in the position of Acting Director since May 2007.  My background,

training, and experience is as an archivist, having been continuously employed at the Clinton

Presidential Library in the capacity of Supervisory Archivist from February 2002 to August

2004, and Deputy Director from September 2004 to May 2007.  In my current capacity, I

supervise the staff of the Clinton Presidential Library, which include: one Supervisory Archivist

who supervises eight archivists, one archives specialist, one archives technician, and a part-time

student; one Curator who (as of September 4, 2007) supervises 3.6 Full-Time Equivalent

("FTE") museum staff, one education specialist, 5.3 FTE audiovisual museum staff, and 3.1 FTE

admissions clerks; one IT contractor; and five administrative staff members of the Library.

2.    Pursuant to Title 44 of the U.S. Code, Chapter 21, the Clinton Presidential Library is a component of the National Archives and Records Administration (NARA), and, therefore, all staff members of the Clinton Presidential Library are also NARA staff members.

3.    Due to the nature of my official duties, I am familiar with the procedures followed by the Clinton Presidential Library in responding to requests for Presidential records from its files pursuant to the provisions of the Presidential Records Act of 1978, 44 U.S.C. § 2201, et seq. ("PRA"), the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), and Executive Order 13233.  NARA regulations direct that FOIA requests for Presidential records of the Clinton Administration be directed to the Director of the Clinton Presidential Library for processing. See 36 C.F.R. §§ 1250.22.

4.    Specifically, I am familiar with the treatment which has been afforded the April 5, 2006 FOIA request submitted by Judicial Watch, Inc., seeking "First Lady Hillary Rodham Clinton's calendar, to include but not limited to her daily office diary, schedule, day planner, telephone log book, and chronological file" for an eight-year time period between January 1, 1993 and January 20, 2001.  That April 5, 2006 FOIA request was assigned FOIA case number 2006-0886-F.

5.    I am also familiar with the above-captioned case, having previously filed a Declaration in this case on August 6, 2007.  The exhibits filed in support of that Declaration are incorporated herein.  This Supplemental Declaration is based on my personal knowledge, as well as on facts supplied to me by NARA staff as known to them in the course of their duties.

## PRESIDENTIAL RECORDS ACT OF 1978

6.   The PRA sets forth a scheme for the preservation and disclosure of Presidential and Vice-Presidential records.  See 44 U.S.C. §§ 2201, 2207.  "Presidential records" covered by the PRA include "documentary materials, or any reasonably segregable portion thereof, created or received by the President, his immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President."  44 U.S.C. § 2201(2).  Included among "Presidential records" are documentary materials created or received by the Office of the First Lady, when those materials meet the above definition.

7.   Documentary materials deemed Presidential records become the property of the United States, 44 U.S.C. § 2202, and may be disclosed to the public under limitations imposed by the PRA.  Id. § 2204.  The PRA imposes upon the Archivist of the United States ("Archivist") "an affirmative duty to make [Presidential] records available to the public as rapidly and completely as possible consistent" with limitations under the PRA.  Id. § 2203(f)(1).  However, there is no public access to Presidential records under FOIA for a period of five years after the President leaves office.  In addition, the President may, before leaving office, "specify durations, not to exceed 12 years, for which access shall be restricted with respect to information" within one of six enumerated categories:  (1) classified information designated by Executive order; (2) documents relating to appointments to Federal office; (3) documents specifically exempted from disclosure by statute other than FOIA; (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential; (5) confidential communications

3

requesting or submitting advice, between the President and his advisers, or between such

advisers; or (6) personnel and medical files and similar files the disclosure of which would

constitute a clearly unwarranted invasion of personal privacy.  See 44 U.S.C. §§ 2204(a)(1) –

(a)(6).  Thus Presidential records falling into one of the six categories may be withheld for up to

12 years, even if the record is the subject of a FOIA request.  The PRA provides that the

Archivist's decision to withhold a record within the 12 year period under one of the six

enumerated restrictions of the PRA "shall not be subject to judicial review."  Id. § 2204(b)(3).

8.  During his time in office, President William J. Clinton asserted his right to apply the six

enumerated restrictions in 44 U.S.C. § 2204(a)(1) – (a)(6) for the full 12 year period, and we

may withhold documents covered by the restrictions as currently defined in consultation with the

former President.

9.  In addition, the PRA incorporates the provisions of the FOIA, including the enumerated

exemptions from public access contained in 5 U.S.C. § 552(b)(5), subject to the exception that

the (b)(5) exemption, 5 U.S.C. 552(b)(5), is unavailable.  See 44 U.S.C. § 2204(c)(1).

Applicable FOIA exemptions, including but not limited to Exemption 2 for certain internal

administrative records, and Exemption 7, for law enforcement records, 5 U.S.C. §§ 552(b)(2) &

(b)(7), respectively, may apply to records not otherwise covered by one of the PRA restrictions.

Such FOIA exemptions may also be applied to Presidential records first processed beyond the 12

year PRA restriction period.  See 44 U.S.C. § 2204(c)(1).  The Archivist may therefore withhold

documents from disclosure under FOIA exemptions even when they are not subject to restriction

under the PRA.

4

10.   Once a Presidential Library intends to disclose Presidential records, NARA must notify the incumbent and former Presidents, through their designated representatives, in order to provide them an opportunity to review the records for any constitutionally-based privileges that may apply.  36 C.F.R. § 1270.46; see also Executive Order 13233, § 3; 44 U.S.C. § 2206.

11.   In light of the constitutionally-based provisions of the PRA and Presidential Executive Order 13233, including the requirement of a Presidential notification period, NARA's regulations provide that the agency "cannot expedite requests for Presidential records."  36 C.F.R. § 1250.28(b).[1]  Plaintiff did not request that NARA expedite this FOIA request.

12.   NARA received legal custody of the Presidential records of former President Clinton, including records from the Office of the First Lady, on January 20, 2001.  The five-year moratorium on disclosure mandated by the PRA expired on January 20, 2006, and the Clinton Presidential Library began to receive FOIA requests for documents on that date.  Between January 20, 2006, and April 5, 2006 (the date of the present FOIA request, see ¶ 4), the Library received 211 FOIA requests, totaling an estimated 5,260,372 records.  A total of 397 FOIA requests have been received between January 20, 2006 and September 26, 2007.   From January 20, 2006 to September 26, 2007, archivists at the Library have processed 57 FOIA requests representing approximately 188,304 records.  We currently have 287 pending FOIA requests, which we estimate involves the processing of approximately 10,500,000 pages of Presidential records.  Any documents covered by one of the six restrictions on disclosure are not releasable until January 22, 2013, at which time those processed and restricted records that are not also subject to a FOIA exemption will be proposed for release.

---

[1] NARA's regulations at § 1250.28(b) reflect the provisions of prior Executive Order 12667.

5

## EXECUTIVE ORDER 13233

13.   Consistent with principles of executive privilege, Executive Order 13233 provides that the former and incumbent Presidents be afforded an opportunity to review all Presidential records, not otherwise restricted by operation of section 2204 of the PRA, prior to their public disclosure for purposes of determining whether to invoke any constitutionally-based privileges.  See also 44 U.S.C. § 2204(c)(2).  Executive Order 13233 further provides that the Archivist must provide notice of a request for Presidential records to the former and incumbent President and, as soon as practicable, should provide a copy of any records requested by the former or incumbent Presidents.

14.   NARA has been following the requirements of Executive Order 13233 by notifying the representatives of the former and incumbent Presidents of its intent to release non-exempt records.  An average of 237 days has been required for Presidential review of Clinton Presidential records.

## FOIA CASE LOG NUMBER 2006-0886-F

15.   After receiving Judicial Watch's April 5, 2006 FOIA request ("Request"), archivists at the Clinton Presidential Library conducted what we term a "preliminary search" to determine the approximate volume of records that could be responsive, in order to place the request in the appropriate FOIA queue.  The preliminary search for relevant calendar records to Judicial Watch's request consisted of searching a series of databases in the nature of "finding aids," which collectively provide a rough index to the holdings of the Clinton Administration at the Clinton Presidential Library, as supplemented by the institutional knowledge of our Clinton Presidential Library staff archivists.  One of the applications searched is a database known as

CDSS (the Clinton Document Search System), which allows Clinton Presidential Library

archivists to search the description of Clinton Presidential records retired and filed in the White

House Office of Records Management (WHORM) Subject Files, or folder titles of Staff Member

Office Files entered into the WHORM system. This database serves as a finding aid to millions

of pages of textual Clinton Presidential records.  Additionally, a search was conducted of an MS

Access database created by the Clinton Presidential Library staff, consisting of folder title lists as

originally supplied to NARA by WHORM, constituting a less than fully comprehensive set of

White House Box Inventory Lists.  Finally, the preliminary search also included a search of e-

mails captured by the Automated Records Management System (known as "ARMS") for

potentially responsive e-mail records.

16.   The Clinton Presidential Library conducted a preliminary search of its electronic finding

aids and databases for First Lady Hillary Rodham Clinton's calendar records for the time period

between January 1, 1993 and January 20, 2001.  This database search suggested that there were

roughly 62,600 pages of potentially responsive textual records.  This figure included daily

schedules for First Lady Hillary Rodham Clinton and telephone log books for the Office of the

First Lady that contain, as a subset, an as-yet-undetermined number of message slips for

Mrs. Clinton.   In conducting the electronic search, we located no responsive records

corresponding to a "daily office diary," a "day planner," or a "chronological file" belonging to

First Lady Hillary Rodham Clinton.

17.   By letter dated April 13, 2006, the Clinton Presidential Library's Supervisory Archivist

notified Judicial Watch that its Request had been received and assigned case number 2006-0886-

F.  As indicated above, our initial letter provided Judicial Watch with notice that a preliminary

7

search had found 62,600 pages of textual records.  The letter also indicated that an additional

125,732 pages of electronic records could be responsive to the Request; however, our letter also

indicated that the "page total is an estimate and that all pages processed might not be relevant to

[the] specific topic."

18.  Since then, the Clinton Presidential Library determined that the 125,732 pages of electronic

records -- which consist entirely of e-mail records not of the First Lady, but rather of two of the

First Lady's appointed schedulers on staff -- are not responsive to Judicial Watch's Request.  In

addition, we have since conducted a more accurate physical search of the potentially responsive

textual records and determined that these documents total approximately 30,000 pages, not

62,600 pages.  The approximately 30,000 pages of textual records include 10,000 pages of daily

schedules and 20,000 pages of telephone log books for the Office of First Lady.  Accordingly, as

set out above, we believe there to be a maximum of approximately 30,000 pages of textual

records that may be responsive to the Request.

19.  We further corresponded with Judicial Watch in letters dated July 25, 2006, August 9, 2006,

January 16, 2007 and February 9, 2007.   In the correspondence, Judicial Watch requested an

estimated completion date for the Request.  The Supervisory Archivist responded that the

Request had been placed into a processing queue and that approximately 156 requests preceded

the Request, requiring processing and review of over 2,000,000 pages of records pursuant to the

PRA, FOIA and Executive Order 13233.  She also noted that "[b]ecause the Clinton Library has

only been processing records in response to FOIA requests for less than seven months, we do not

yet have a sense of how long it will take us to process the [pending requests] . . . nor how long it

will take us to process [the Request] once they reach the front of our queue."  Upon receipt of

further inquiries, similar responses from the Clinton Presidential Library were provided in subsequent correspondence.

20.    The Clinton Presidential Library has 17 separate access queues, 16 for FOIA and one for mandatory review of classified documents.  The queues are divided by the type of records requested (e.g., textual, electronic, audio-visual); whether the requests are deemed complex, simple, or capable of immediate processing (which correspond to our preliminary search resulting in an estimate of the request being over 5000 pages, 501-5000 pages, or under 501 pages, respectively).  Within each queue, the FOIA cases are organized by date received.  A matrix format is used to rotate through each of the queues; as the next-in-line FOIA request is selected from each queue, the queue from which the FOIA request is selected for processing will then go to the end of the queue line.  The Clinton Presidential Library queue structure has been evolving since we began FOIA processing.  In an attempt to better serve our requestors, we have added additional queues and adjusted queue requirements.  Our current queue structure is the result of experience gained by conducting many FOIA request searches as well as discussions between staff at the Clinton Presidential Library, the Office of General Counsel, and the Presidential Materials Staff in Washington, D.C.

21.    We have recently added an additional queue for records that are the subject of multiple FOIA requests.  Because we received requests involving records relating to Mrs. Clinton's schedule prior to receipt of the original request from plaintiff Judicial Watch, and because we subsequently received two or more additional requests for similar records, we made a determination earlier in 2007 to initiate processing of a portion of the instant Request – constituting an estimated 10,000 pages – as part of our "multi-request" queue, and had thus

begun to process these records as of June 14, 2007, shortly before the filing of the Complaint in

this action. The remainder of the present Request (constituting the telephone log books from the

Office of First Lady) is still pending in the multi-request queue. There are currently five FOIA

requests in this multi-request queue ahead of this portion of the Judicial Watch Request. Under

the matrix process described in ¶ 20, in which we rotate through each of the 16 queues, however,

there are 80 FOIA requests ahead of the remainder portion of the Request. Seven FOIA

requests totaling approximately 165,200 pages are currently being processed by Clinton

Presidential Library archival staff. As each of these FOIA requests is completed, archival staff

will pull the next FOIA request to be processed from its respective queue.

22.   Once processing of the first portion of the Request is completed, pursuant to the terms of

the PRA and Executive Order 13233, NARA will notify the representatives of the former and

incumbent President of the Clinton Presidential Library's proposed release of these records

under Executive Order 13233. Notwithstanding all of the constraints the Library is operating

under (see ¶¶ 24-33), consistent with the estimate given in my first declaration of a processing

time of five to six months from that date, we estimate that it will take through January 2008 to

complete processing of the 10,000 pages of records representing the first portion of plaintiff's

request. We presently intend to process the remainder portion as it arises under the current

matrix system. However, given continuing uncertainty as to how much faster we can accomplish

the processing of our current backlog of FOIA requests given resource and budget constraints,

we are not in a position to provide a reasonable estimate at this time as to how long it may take

to process the remaining portion of the FOIA request.

23.   Once our review of the first portion of the request is complete as expected in January 2008,

we will promptly follow the notification procedures set forth above.  However, we are not in a

position to expedite the privilege review by the former and incumbent Presidents under the terms

of PRA, NARA's regulations and Executive Order 13233.  Once the review process has been

completed, NARA will inform Judicial Watch of the Clinton Presidential records that are

available and whether any records are being withheld.

### FOIA PROCESSING AT THE CLINTON PRESIDENTIAL LIBRARY

24.  The Clinton Presidential Library can allocate no more than six archivists for processing all

of its pending FOIA requests for textual and electronic records.  Counting each archivist as a

"Full Time Equivalent" or "FTE" position in government, we estimate that from January 20,

2006 until September 2007, only 51.5% of total archival FTE time was available to process

FOIA requests.  This processing requires not only a page-by-page, line-by-line review to ensure

that all exempt information is properly identified and redacted but also the time-consuming tasks

of searching for, arranging, describing, and performing basic preservation on the responsive

records.  Also included in this time is time required to conduct re-reviews of records as needed in

response to ongoing negotiations with representatives of the former President.

25.  Since January 2006, the remaining 48.5% portion of cumulative FTE time has been spent

on reference services, including answering all incoming general reference requests from the

public, as well as requests received from places such as the White House, the Clinton

Foundation, the former President, government agencies, and others.  Archivists staff the

Library's textual and audio-visual research rooms when researchers are present.  Archivists also

spend time responding to what are called "special access" requests under 44 U.S.C. § 2205,

including since January 20, 2006, four significant special access requests from the incumbent

President, and one from a federal court.  Additionally, archivists spend time improving the functionality of access to electronic records, including working with contractors on upgrades to the Presidential Electronic Record Library known as "PERL."  Finally, archivists spend time working on museum exhibit issues, assisting the Curator with writing text, and dealing with a variety of administrative issues as they arise.

26.  In anticipation of the opening of Clinton Presidential Library records to FOIA processing on January 20, 2006, two archivists on my staff traveled in 2005 to the George H.W. Bush Presidential Library in College Station, Texas, to review the Bush Presidential Library's handling of FOIA requests under the Presidential Records Act.  Clinton Presidential Library staff also participated in one or more training exercises held in person and via phone conferencing with NARA headquarters staff familiar with FOIA processing issues in general, including being briefed by the Director of NARA's Presidential Materials Staff and her staff, as well as by various other NARA FOIA officials.

27.  Notwithstanding all of these attempts at due diligence, the sheer total volume of records held at the Clinton Presidential Library has contributed to unanticipated delays in the Clinton Library's ability to process FOIA requests after January 2006.  For example, the Clinton Presidential Library holds an estimated 78 million pages of Presidential textual records, whereas in contrast the Reagan Presidential and Bush Presidential Libraries hold 43.8 million and 33.7 million pages of textual records governed by the PRA, respectively.  The Clinton Presidential Library also legally holds an estimated 20 million presidential electronic mail records, 2 million electronic cables, and 60 other electronic systems, which is orders of magnitude greater than similar electronic records holdings elsewhere in these other Libraries and, if printed in a textual

12

format, would rival in size the entire volume of Presidential records generated during the eight

years of the Reagan Administration.   This increase in the volume of holdings and variety of

formats necessarily requires more complex and time-consuming searching and pulling of

records, as well as demanding greater efforts to maintain intellectual control over this vast

collection of records through traditional hard copy finding aids and electronic indices of various

kinds.

28.   As the first Presidential Library to have a significant volume of born-electronic records, the

Clinton Presidential Library has received FOIA requests for more than one million emails in the

twenty months since Clinton Presidential records became subject to FOIA.  While NARA is

expending significant resources to address the explosion in volume of electronic records through

its Electronic Records Archive project, and while upgrades in functionality have been made to

the PERL system that currently holds Clinton Presidential electronic records, the Clinton

Presidential Library must print electronic records to paper prior to arranging, reviewing, and

describing them as textual records.  Additionally, the Clinton Presidential Library archival staff

has spent large amounts of staff time on an unanticipated process known as "de-hexification,"

i.e., converting attachments to individual email records that cannot be read due to an unknown or

unreadable file into something approaching readable form.

29.   Additionally, in the first year of FOIA processing since January 2006, the Library has

experienced an unexpected jump in the volume and complexity of the incoming FOIA requests

themselves.  In contrast to what transpired at the Reagan and Bush Presidential Libraries, we

received 336 FOIA requests in the first calendar year of FOIA processing, between January 20,

2006 and December 31, 2006 – a three-fold increase over the approximately 100 FOIA requests

received during the first year of FOIA processing at the Reagan and Bush Presidential Libraries. Also, in contrast to the experience of NARA staff at those libraries, and despite the best efforts of Clinton Presidential Library staff, we have not been particularly successful in convincing FOIA requestors at our Library to work with us in substantially narrowing what often have been extremely far-ranging requests for "all" records on a number of topics, either by date, content, or by some other reasonable means.

30.   NARA is aware of the unprecedented number and volume of FOIA requests received by the Clinton Presidential Library to date and has been working to address this issue.  Most significantly, the Office of Presidential Libraries has submitted to the Archivist of the United States a budget request for Fiscal Year 2009 that includes funding for 15 new archivists for processing Presidential records.  If funded, the Clinton Presidential Library would receive the largest number of these archival resources, and this staff would be dedicated to reducing the FOIA backlog at the library.

31.   Apart from seeking additional funding for positions, we also have taken concrete steps to address our FOIA backlog.  For example, as part of a government-wide effort undertaken in response to Executive Order 13392 to improve the disclosure of government information, NARA's PRA libraries created "multi-request FOIA queues."  As referenced in ¶ 21, FOIA requests are moved to this queue when a library receives multiple requests for significant portions of the same series or sub-series of records.  Once the requests are transferred to the frequently requested queue, the library will begin systematically processing the entire file or collection as opposed to individual folders.  Because systematic processing is faster than FOIA processing, this assists in responding more rapidly to FOIA requesters who wish to gain access

because in lieu of making individual folders available, researchers can gain access to entire series or sub-series of records. By opening an entire series or sub-series, we will enable access to these records to future researchers without the necessity of filing a FOIA request, which would ultimately add to the existing FOIA backlog.

32.  Additionally, NARA's Office of Presidential Libraries and Presidential Materials Staff, after discussions with the Supervisory Archivists of the three PRA libraries decided to undertake an in-house study in the spring of 2007 to review ways to achieve faster processing of Presidential records. As a result of this study, a one-year pilot project was initiated to implement the most promising proposals. Such proposals include halting what has been a time-consuming process of routinely referring to the originating and/or equity agencies those classified items processed in response to FOIA requests.

33.  In sum, NARA and the Clinton Presidential Library are taking, and will continue to take, reasonable steps, in light of present-day resource and budget constraints, to address the important issue of improving FOIA request processing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this  2  day of October, 2007.

*Emily Robison*
EMILY ROBISON
Acting Director
Clinton Presidential Library

15

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 1:07-cv-01267 (JR) |
| | ) | |
| U.S. NATIONAL ARCHIVES AND | ) | |
| RECORDS ADMINISTRATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**[PROPOSED] ORDER GRANTING DEFENDANT'S OPEN AMERICA**
**<u>MOTION FOR A STAY OF THE PROCEEDINGS</u>**

Upon consideration of Defendant's Open America Motion for a Stay of the Proceedings

and opposition briefing, and the arguments made therein, it is hereby

ORDERED that Defendant's Open America Motion for a Stay of the Proceedings be, and

hereby is, GRANTED.  This case shall be stayed for a period of one year from the date of the

issuance of this Order, and administratively closed until the expiration of the stay.

Signed this _____ day of _____, 2008.


_____
JUDGE JAMES ROBERTSON
United States District Judge