# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,         )
                                        )
         Plaintiff,           )
                                        )
         v.                    )     Case No. 1:07-CV-01267 (JR)
                                        )
U.S. NATIONAL ARCHIVES AND    )
RECORDS ADMINISTRATION,     )
                                        )
         Defendant.        )
_____)

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
## FOR *OPEN AMERICA* STAY AND MOTION FOR LIMITED DISCOVERY

Plaintiff, by counsel, hereby submits this memorandum in opposition to Defendant's

Motion for *Open America* Stay of the Proceedings. For the reasons set forth below, (1)

Defendant's motion should be denied, and (2) Plaintiff's accompanying motion for limited

discovery should be granted.

## MEMORANDUM OF LAW

### I.  **Introduction**.

Defendant describes at great length the hurdles it claims to face in order to respond to

Plaintiff's Freedom of Information Act ("FOIA") request. None, however, can excuse

Defendant's tardiness in responding to Plaintiff's request.

First, more than seven years after taking possession of the records of former President

William J. Clinton, and almost two years after receiving Plaintiff's FOIA request, the Clinton

Presidential Library ("Library"), which Defendant controls, apparently is prepared to respond

only to a portion of Plaintiff's request.[1]  Moreover, Defendant cannot offer a concrete timetable under which it will begin processing the remainder of the request, let alone inform Plaintiff as when it can expect to receive a full and complete response.

Instead, Defendant asks this Court for, in effect, an indefinite stay of this case despite Defendant's admission that it wildly underestimated the public's interest in the records, was woefully unprepared when it started receiving FOIA requests, and remains understaffed and entirely unable to comply with its statutory responsibilities.

Serious questions exist concerning how Defendant is handling Plaintiff's FOIA request. Plaintiff's request apparently has been placed within the Library's byzantine seventeen-part queue structure.  At a minimum, this queue structure is violative of the "first in, first out" principle governing FOIA requests.  In addition, it appears that the Library is using allegedly scarce resources to process FOIA requests concerning subjects such as "Unidentified Flying Objects," ahead of more timely, public interest requests.  *See* Ex. 1 (Fred Lucas, "Clinton Library Answers UFO Theorist, Not USA Today," *Cybercast News Serv.* (Feb. 4, 2008); *see also* Ex. 2 (Clinton Presidential Library, "Inventory for FOIA Request 2006-492-F").  This, along with other issues, raises serious questions as to how processing decisions are in fact being made at the Library.  Accordingly, accompanying this memorandum is Plaintiff's motion to conduct limited discovery regarding the processing procedures of the Library.  Plaintiff respectfully submits that, under the circumstances, such discovery is necessary before there can be any adjudication of Defendant's motion.

---

[1] Defendant's partial response to Plaintiff's April 5, 2006 FOIA request is scheduled to be released on March 20, 2008.  *See* Second Supplemental Declaration of Emily Robison ("Robison Second Supp. Dec.") at ¶5.

In the event the Court does not authorize limited discovery at this time, Defendant's motion to stay this case should be denied. Not only for Plaintiff, but for the public interest, Defendant must not be allowed to evade its duty to timely respond to Plaintiff's FOIA request.

## II.    Factual Background.

Judicial Watch is a nonprofit, educational foundation organized under the laws of the District of Columbia. Judicial Watch seeks to promote integrity, transparency, and accountability in government and fidelity to the rule of law. In furtherance of its public interest mission, Judicial Watch regularly serves FOIA requests on Federal, state, and local government agencies, entities, and offices, and disseminates its findings to the public.

The Presidential Records Act ("PRA"), 44 U.S.C. § 2201 *et seq.*, establishes a five-year moratorium on the disclosure of presidential records after a president leaves office. After five years, presidential records become subject to FOIA requests, unless a president expressly designates a longer period of time, not to exceed twelve years.

Defendant received custody of the records of former President William J. Clinton, including records from the Office of the First Lady from the departing Clinton administration on January 20, 2001. *See* Def.'s Mem. of Points and Auth. In Support of a Stay of the Proceedings ("Def.'s Mem.") at 6. Over the course of the next five years, Defendant claims that it provided training to Library staff and otherwise prepared to receive FOIA requests under the PRA. Def. Mem. at 6-7. On January 20, 2006, the five-year moratorium on FOIA requests for the records of President Clinton expired. According to Defendant, the Library established 17 separate "access queues" for these records, 16 for FOIA requests and one for review of classified documents. *Id.* at 7. Each queue is then further subdivided based on the type of record requested and volume of

responsive records.  The Library then rotates through the "queue structure," processing one request per queue.  *Id.* at 8.  After a request is processed, that queue goes to the "end of the line." *Id.*  Defendant describes the queue structure as "continually evolving" and that the Library anticipates "continued flexibility" in how requests are assigned to various queues.  *Id.*

According to Defendant, as of February 25, 2008, the Library has processed only 72 of the 436 FOIA requests it has received since it began receiving requests more than two years ago.[2] *Id.* at 9.  This allegedly represents 230,004 pages of textual and electronic records and 31,600 audiovisual records.[3]  *Id.*  The Library has six archivists who, as only part of their job duties, process FOIA requests.  *Id.*

Plaintiff submitted its FOIA request on April 5, 2006, seeking access to "First Lady Hillary Rodham Clinton's calendar, to include but not limited to her daily office diary, schedule, day planner, telephone log book, and chronological file."  *Id.*  The Library responded by stating that approximately 188,000 records may be responsive to the request and further stated that the request was placed in the "complex electronic unclassified processing queue."  *Id.* at 10.  Of these records, approximately 62,600 were estimated to be textual records and 125,732 were estimated to be electronic records.  *Id.*  Defendant subsequently reduced the total number of

---

[2]    Plaintiff notes that in *Judicial Watch v. National Archives*, C.A. No. 07-1987 (PLF), Defendant stated that, as of January 24, 2008, of the 430 FOIA requests received, "archivists at the library have processed a total of 72 FOIA requests, representing a total of approximately 225,094 pages of textual records and 44,363 audio-visual records." See Defendant's Motion to Dismiss, or in the Alternative, for a Stay of the Proceedings at 9.  In other words, over the past month, Defendant has not lowered the number of requests to which it needs to respond.  That number has, in fact, increased.

[3]    According to a November 30, 2007 interview with an archivist employed by Defendant, the number of processed records is approximately 100,000.  *See* Exh. 3 (*National Journal*, "Inside the Clinton Archives: Q&A: Sharon Fawcett," at 9 (published Dec. 17, 2007)).

documents responsive to Plaintiff's request to 30,000 textual records only. Def. Mem. at 10, n.1. It found that *none* of the 125,732 previously identified electronic records were responsive. *Id.* Thus, it would appear that Defendant's original estimate of the number and type of records responsive to Plaintiff's request was grossly overestimated. At the moment, Plaintiff has no way of knowing whether or not, had this error be caught earlier, Plaintiff's request might have been placed in a different queue and processed more quickly.

In response to an inquiry by Plaintiff, on August 9, 2006, Defendant informed Plaintiff that 156 FOIA requests were pending before Plaintiff's request as of that date. Def. Mem at 10. It is unclear how many of these requests were submitted before or after Plaintiff's request. *Id.* Subsequently, a portion of Plaintiff's request, constituting approximately 10,000 pages of Hillary Rodham Clinton's daily schedule records, apparently was transferred from the "complex unclassified" queue to a newly-created "multi-request" queue. *Id.* at 11. The remaining 20,000 pages, consisting of telephone log books, were also transferred to the multi-request queue. *Id.* While Defendant states that the remainder of Plaintiff's FOIA request now has 30 requests in front of it for processing, it remains unclear what effect these assignments to various queues had upon Plaintiff's overall position in the queue. *Id.*

Nonetheless, Defendant has belatedly scheduled production of 10,000 of the 30,000 pages responsive to Plaintiff's FOIA request for March 20, 2008. *See* note 1, *supra.* As for the remaining 20,000 pages of Plaintiff's request, Defendant incredibly estimates that it will be "at least" 1 to 2 *years* before it will even begin processing those records. Def. Mem. at 12. No estimate is given as to when Plaintiff can expect any of those 20,000 records to actually be produced. Defendant nonetheless asserts that this action should be, in effect, indefinitely stayed,

citing *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976).

Plaintiff objects to Defendant's failure to provide a concrete estimate of the date by which it will

complete, or even begin, its processing of the remaining 20,000 pages of documents responsive

to Plaintiff's April 5, 2006 FOIA request.  Plaintiff also objects to Defendant's efforts to stay this

litigation indefinitely.  Defendant has failed to satisfy its burden of demonstrating that a stay is

warranted to allow it additional time to complete its processing of responsive records.  Moreover,

substantial questions of fact have arisen that justify allowing Plaintiff to conduct limited

discovery.

**III.    Argument.**

      **A.    Defendant's Motion for an Open America Stay Should Be Denied.**

           **1.    FOIA Requires Timely Production.**

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of

a democratic society, needed to check against corruption and to hold the governors accountable

to the governed."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  FOIA also

prevents excessive government secrecy.  In enacting FOIA, "Congress sought to open agency

action to the light of public scrutiny."  *U.S. Department of Justice v. Tax Analysts*, 492 U.S. 136,

142 (1989); *see also Department of Justice v. Reporters Comm.*, 489 U.S. 749, 772 (1989);

*Department of Air Force v. Rose*, 425 U.S. 352, 372 (1976).  Records are "presumptively

disclosable unless the government can show that one of the enumerated exemptions applies."

*Consumer Federation of Am. v. Department of Agriculture*, 455 F.2d 283, 287 (D.C. Cir. 2006)

(quoting *Bureau of National Affairs, Inc. v. U.S. Dep't of Justice*, 742 F.2d 1484, 1498 (D.C. Cir.

1984)).

Equally important to effectuating the purpose of FOIA is ensuring that agency records be disclosed in a timely manner. As the legislative history of FOIA makes clear, Congress recognized that delay in releasing information can be "tantamount to denial" of access. *See* H. Rep. No. 876, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Admin. News, 6267, 6271. "The value of information is partly a function of time." *Fiduccia v. U .S. Dep't of Justice*, 185 F.3d 1035, 1041 (9th Cir. 1999). Consequently, agencies are required to determine within twenty days of the receipt of a request for records "whether to comply with such request" and "to immediately notify the person making such request of such determination and the reasons thereof." 5 U.S.C. § 552(a)(6)(A)(I). This time limit can be extended by ten working days if the agency determines that "unusual circumstances" exist. 5 U.S.C. § 552(a)(6)(B).

Although nearly two years have passed since Plaintiff submitted its FOIA request to the library on April 5, 2006, Defendant is only now responding in part to Plaintiff's request. In addition, Defendant seeks an indefinite stay for responding to a substantial majority of Plaintiff's request. Defendant's conduct demonstrates a complete disregard for the law.

> **2.    Defendant Failed to Satisfy Its Burden of Demonstrating That a Stay Is Warranted.**

FOIA's twenty day time limit may be extended if an agency makes a showing that it is facing "exceptional circumstances" and is "exercising due diligence" in responding to a  request. *See* 5 U.S.C. § 552 (a)(6)(C)(I). This "safety valve" provision was "carefully crafted to put a substantial burden on the government to justify to the courts any noncompliance with FOIA time limits." *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605, 617 (D.C. Cir. 1976). In *Open America*, the U.S. Court of Appeals for the District of Columbia Circuit ("D.C.

Circuit") found that "exceptional circumstances" exist only when an agency meets the following test:  (1) the agency is deluged with a volume of requests for information "vastly in excess" of that anticipated by Congress; (2) the agency's existing resources are inadequate to deal with the volume of such requests within the time limits set forth by FOIA; *and* (3) the agency can show that it is exercising due diligence in processing the request.  *Open America*, 547 F.2d at 616.

In 1996, Congress passed the Electronic Freedom of Information Act Amendments ("E-FOIA Amendments") to address, in part, "the single most frequent complaint about the operation of the FOIA:  agency delays in responding to FOIA requests."  *See* H. Rep. No. 795, 104th Cong., 2d Sess., *reprinted in* 1996 U.S. Code Cong. & Admin. News, 3448, 3466.  In enacting the E-FOIA Amendments, Congress declared:

> In *Open America* . . . the District of Columbia Circuit Court of Appeals held that exceptional circumstances exist when the agency can show it has inadequate resources to process FOIA requests within statutory time limits . . . Relying upon overly broad dictum in this case, agencies have employed the exceptional circumstances -- due diligence exception to obtain judicial approval for lengthy delays whenever they have a backlog.
>
> Backlogs of requests for records under the FOIA should not give agencies an automatic excuse to ignore the time limits.

*See* H. Rep. No. 795, 104th Cong., 2d Sess., *reprinted in* 1996 U.S. Code Cong. & Admin. News, 3448, 3456-57.  With the E-FOIA Amendments, Congress doubled the time allowed to agencies to respond to FOIA requests, but expressly limited those circumstances previously considered exceptional:

> For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

5 U.S.C. § 552(a)(6)(C)(ii).  Courts have denied stays where agencies have shown no more than predictable workloads or have failed to show reasonable progress in reducing the backlog of pending requests.  *Leadership Conf. on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 259 (D.D.C. 2005); *Wilderness Society v. U.S. Dep't of the Interior*, 2005 U.S. Dist. LEXIS 20042, *32-34 (D.D.C. September 12, 2005); *Hunter v. Christopher*, 923 F. Supp. 5, 8 (D.D.C. 1996).

### i.    Defendant Failed to Demonstrate the Existence of "Exceptional Circumstances" Warranting a Stay.

Defendant has failed to demonstrate that "exceptional circumstances" exist warranting a stay of this lawsuit, much less a stay of indefinite duration.

First, Defendant has not demonstrated that the volume of requests it has received is "vastly in excess" of anything contemplated by Congress or that this volume is anything more than a predictable agency workload.  Defendant must have been aware that the Library would receive a high volume of FOIA requests, especially considering that:  (1) the Clinton presidency was highly controversial and the subject of an unprecedented degree of media and public scrutiny; (2) President Clinton is one of only two presidents to be impeached in the history of the United States; (3) Mrs. Clinton played a particularly prominent role in her husband's presidency; (4) while First Lady, Mrs. Clinton ran for and was elected to the U.S. Senate and currently is a sitting U.S. Senator for the State of New York; (5) Mrs. Clinton had long been considered a likely candidate for the Presidency of the United States and formally declared her candidacy more than a year ago; and (6) if elected, Mrs. Clinton would be the first female President of the United States and the first spouse of a former president to be elected.  In short, Defendant should

have known that public interest in the records of the Clinton Library, and in particular the records

pertaining to Mrs. Clinton's calendars, would be substantial, and it also should have known that

the number of requests for records would likely exceed by a substantial margin the number of

requests received by the libraries of President Clinton's predecessors.  It simply is not credible

for Defendant to assert that it has been "burdened" with an "unprecedented" number of FOIA

requests.  A predictable workload yields nothing more than a predictable backlog.

Second, the number of records at issue here – 20,000 pages of textual records out of a

total of approximately 78 million pages – does not constitute an "exceptional circumstance"

under FOIA, nor should it excuse Defendant's delay in failing to meet FOIA's statutorily

mandated time period.  Defendant must have been fully aware, long before the five-year

moratorium on the disclosure of Clinton presidential records expired, of the volume of records

the Library would be required to review in order to process and respond to FOIA requests.  Under

the PRA, Defendant had five years time to coordinate, organize, and index the Library's records

in order to prepare for the inevitably large number of FOIA requests the Library would likely

receive.  Nonetheless, Defendant admits the Library waited until shortly before the moratorium

expired to send two of its archivists to the George H.W. Bush Presidential Library in College

Station, Texas to review the Bush Library's handling of FOIA requests.  Def.'s Mem. at 7.

Defendant's assertion that the Library's staff participated in "one or more" training exercises and

was briefed via telephone conference by Defendant's staff on "FOIA processing issues"

demonstrates a particularly lackluster effort to try to satisfy its FOIA obligations.  *Id.*

Third, "inadequate staff, insufficient funding or a great number of requests are not within

the meaning of 'exceptional circumstances' as that language is used in the statute nor were they

within the contemplation of its framers as evidenced by the legislative history." *Hamlin v. Kelley*, 433 F. Supp. 180, 182 (N.D. Ill. 1977). Defendant has had years to address this alleged deficiency, but has failed to do so. Hence, Defendant's claim that the Library's resources are insufficient to address the number of FOIA requests it receives does not justify a stay.

In addition to not being able to demonstrate "exceptional circumstances," Defendant has failed to show that the Library is making reasonable progress in reducing its backlog of pending requests. Instead, it appears that the backlog of requests is multiplying at an ever-increasing rate. Defendant asserts that the Library received 211 FOIA requests in the first three months following the expiration of the PRA moratorium, totaling an estimated 5,260,000 pages. Def.'s Mem. at 9. Of these 210 FOIA requests, it has taken the Library more than two years to process only 72 requests. *Id.* Since the first three months, however, the Library received an additional 225 requests, totaling approximately 10,500,000 pages. *Id.* Clearly, the Library has not gained any ground. Rather, it appears to be falling further behind as its backlog is increasing.[4] Defendant's request for a stay should be denied for the additional reason that the Library has failed to demonstrate reasonable progress in reducing its backlog of pending requests.

ii.    **Defendant Failed to Demonstrate That it Exercised "Due Diligence" in Responding to Plaintiff's Request.**

Defendant's effort to show "due diligence" in responding to Plaintiff's request also is lacking. Defendant appears to try to make this showing by citing budgetary proposals for possible future increases in personnel for Fiscal Year 2009 and a 2007 in-house study conducted

---

[4]    According to a published interview, the Library anticipates processing only 200,000 pages in 2008. *See* Exhibit 3.

by the Office of Presidential Libraries and Defendant's Presidential Materials Staff discussing

ways to achieve faster processing. Def.'s Mem. at 9. Neither of these points demonstrate that

Defendant has acted with due diligence in processing *Plaintiff's* request. Instead, the possibility

of added personnel and "streamlining" of the FOIA request process only demonstrates how the

Library *might* treat *future* FOIA requests with greater diligence. Moreover, Defendant has not

demonstrated that it exercised "due diligence" *from the outset* in order to qualify for the relief

Defendant seeks here. *Oglesby v. Department of the Army*, 920 F.2d 57, 62 n.3 (D.C. Cir. 1990)

("The court [has] authority to allow the agency additional time to examine requested records in

exceptional circumstances where the agency was exercising due diligence in responding to the

request *and had been since the request was received*.") (quoting H.R. Conf. Rep. No. 1380, 93

Cong., 2d Sess. 11 (1974)) (emphasis added).

The Library has not, in fact, treated Plaintiff's request with due diligence. Defendant

admits that its original estimate of the number and type of records responsive to Plaintiff's

request was wildly inaccurate. It originally estimated that there were approximately 188,000

records responsive to the request, of which 125,732 were electronic records and 62,600 were

textual. It now asserts that none of the 125,732 records are responsive and only 30,000 of its

original estimate of 62,600 textual records are responsive. Defendant fails to explain how this

huge overestimate of the number and type of records responsive to Plaintiff's request has affected

the processing of the request. It also appears that the request originally was placed – erroneously

– in the "complex electronic unclassified" queue even though *none* of the responses to the

request are electronic. Defendant does not even attempt to explain how such clear error could

constitute "due diligence."

In addition, Defendant admits that, after almost two years, it still cannot state with certainly when it can even begin processing the majority of Plaintiff's FOIA request. Def.'s Mem. at 12. Such treatment simply cannot amount to due diligence. This is particularly true when the Library apparently has been using its alleged scarce resources to process less newsworthy FOIA requests. According to one published news account and the Library's own website, the Library has responded to requests on UFOs, "Roswell New Mexico," Area 51, and even a surprise birthday party for President Clinton, featuring the music group "Greasy Greens." *See* Exhibits 1, 2. Not only does this fail to demonstrate due diligence, but it raises factual issues concerning how, in fact, FOIA requests are being selected for processing.

Defendant also claims that it is entitled to a due diligence finding because its queue structure allegedly is part of a "larger, complex first-in first-out" queue system. Def.'s Mem. at 19. While an agency may establish due diligence by assigning all requests on a "first in/first out basis" (*Open America*, 547 F.2d at 615), that is not simply not what Defendant has created here. The queue structure created by Defendant is a byzantine and opaque system by which some or all parts of a FOIA request may end up in any one of 17 separate "access queues." Def.'s Mem. at 7-8. Each of these 17 queues apparently is then subdivided into five subgroups, based on the type of record requested and the volume of responsive records. *Id.* at 8 After assigning a FOIA request to one of these queues, the Library then "rotates" through the "queue structure," processing one request per queue. *Id.* After a request is processed, that queue goes to the "end of the line." *Id.* Adding to the uncertainty, Defendant states that the queue structure is "continually evolving" and the Library anticipates "continued flexibility" in how requests are assigned to various queues. *Id.*

13

Such a system cannot be said to constitute a "first-in first-out" system. As described by Defendant, a request is placed in a particular queue based on the type of records requested, not based on when it was received. Processing of a particular request must wait while the queue system "rotates" back to the particular queue in which the request was placed. As a result, if a request goes into a queue already containing an unusual number of other requests, by the time the system rotates back to that queue, other later-in-time requests will inevitably have been processed. As a result, it appears that a particular request could actually lose substantial ground in the overall queue structure, as other queues fill up with requests and are processed. It is clear, however, that this queue structure is not based on the first-in first out principle, and therefore cannot demonstrate due diligence by Defendant.

In sum, Defendant has failed to carry its burden of demonstrating that "exceptional circumstances" exist or that it has exercised "due diligence" in responding to Plaintiff's request. As a result, Defendant has failed to show that any stay, much less a stay of indefinite duration, is warranted.

**B.    Plaintiff Should Be Allowed to Conduct Limited Discovery.**

Defendant's failure to properly respond to Plaintiff's FOIA request raises significant questions of fact that are directly related to Defendant's request for a stay. A full and complete understanding of the Library's "queue" system, and Plaintiff's position in the queue, is necessary before any request for a stay can be adjudicated by the Court. Plaintiff respectfully suggests that the answers to these questions, if Plaintiff is permitted to obtain them through limited discovery, would be in the public interest as well as its own.

14

Limited discovery regarding certain factual matters is permitted in a FOIA case, and is liberally granted when jurisdiction is at issue. *See, e.g., CREW v. Office of Admin.*, No. 07-964 (D.D.C. Feb. 11, 2008) (CKK) (order authorizing jurisdictional discovery in FOIA/PRA case); *Public Citizen v. FDA*, 997 F. Supp. 56, 72 (D.D.C. 1998) (permitting discovery for "investigating the scope of the agency search for responsive documents, the agency's indexing procedures, and the like"). In this case, significant questions exist as to how the queue system functions, whether Plaintiff's request was properly placed in the queue, whether Plaintiff's request will be processed on a "first-in first-out" basis, and how the Library's resources are being utilized. The limited discovery proposed by Plaintiff would seek answers to these questions. Only after these questions are answered can Defendant's request for a stay be adjudicated properly. Questions to be answered in discovery would include:

- Have less timely FOIA requests been processed ahead of Plaintiff's request and, if so, how many?

- What input did Defendant's original, grossly erroneous estimate of the number and type of records responsive to Plaintiff's request have on the placement of the request in the queue structure?

- When Plaintiff's request was transferred from the "unclassified complex" queue to the "multi-request" queue, what effect did this have on the request's "place in line"?

- Of the 156 requests allegedly pending before Plaintiff's request as of August 9, 2006, how many were submitted before and how many were submitted after Plaintiff's request?

15

- Of the 30 requests allegedly currently pending before Plaintiff's request, how many were submitted before and how may were submitted after Plaintiff's request?

- How many FOIA requests involving "Unidentified Flying Objects" have been received, when were they received, and what is their status in queue structure?

In short, the objective of limited discovery would be to understand exactly where Plaintiff's request falls within the queue structure, how this decision was made, and the effect this has had on the timeliness of the processing of Plaintiff's request.

Plaintiff, and the public, are entitled to understand why Plaintiff's and other FOIA requests are not being processed. Limited discovery regarding Plaintiff's request will help answer these questions prior to any stay being entered.

## IV.    Conclusion.

For the foregoing reasons, Defendant's request for an indefinite stay of this lawsuit pursuant to *Open America* should be denied. At a minimum, Plaintiff should be allowed to conduct limited discovery on the factual issues discussed above before any stay is entered.

Date: March 17, 2008

Respectfully submitted,

JUDICIAL WATCH, INC.

/s/ Paul J. Orfanedes
D.C. Bar No. 429716
/s/ Jason B. Aldrich
D.C. Bar No. 495488
501 School Street, S.W., Suite 500
Washington, DC 20024
Tel: (202) 646-5172
Fax: (202) 646-5199

Attorneys for Plaintiff

## <u>LOCAL RULE 7.1(m) CERTIFICATE OF COUNSEL</u>

On March 17, 2008, I contacted Helen H. Hong, Esq., counsel for Defendant, by telephone, to confer, and to inquire whether her client would consent to Plaintiff's Motion for Limited Discovery. Ms. Hong stated that her client will oppose Plaintiff's motion.


<u>/s/ Jason B. Aldrich</u>

EXHIBIT 1

# CNSNEWS.COM™
## Cybercast News Service

# Politics

## Clinton Library Answers UFO Theorist, Not USA Today
By Fred Lucas
CNSNews.com Staff Writer
February 04, 2008

**(CNSNews.com)** - Even though it says it processes Freedom of Information Act (FOIA) requests on a first-come-first-serve basis, the William Jefferson Clinton Presidential Library has answered multiple requests related to Unidentified Flying Objects made in late February 2006 but not any of the requests made a month earlier by *USA Today*. The so-far unanswered FOIA requests focus on issues such as the 1993 health care task force headed by then-first lady Hillary Clinton, the Marc Rich pardon, and the Clinton administration's tracking of Osama bin Laden.

The Clinton library first began accepting FOIA requests on Jan. 20, 2006. Five days later, it received eight requests from *USA Today* reporter Susan Page. Page told **Cybercast News Service** Monday that so far the Clinton library has not provided her with any documents in response to any of her requests.

On Feb. 23, more than four weeks after it received the requests from USA Today, the Clinton library received more than 50 FOIA requests from Grant Cameron, who runs PresidentialUFO.com. Cameron's biography says he is "working on a detailed paper detailing the '64 Reasons the Government is Covering Up the ET Presence.'"

Cameron's Web site boasts that he has made about 100 requests to the Clinton library and that so far the library has provided him with responses to 12 of those requests.

The receipt dates for *USA Today*'s and Cameron's FOIA requests are recorded in a chronological log of FOIA requests to the Clinton library provided to **Cybercast News Service** by the National Archives and Records Administration.

Under the Presidential Records Act, the records in the Clinton library are open to the public, subject to certain exemptions for national security and privacy concerns.

Politicians, public interest groups and the media have been complaining, however, about the Little Rock, Ark.-based Clinton library's lack of progress in making records available.

The library opened in 2004, and the records became subject to the Freedom of Information Act in January 2006. Currently, the National Archives has processed just 30 requests of the more than 300 made.

All FOIA requests are handled on a first-come-first serve basis, National Archives spokeswoman Susan Cooper told **Cybercast News Service** last month. The Clinton library has just six people working on more than 10 million pages of documents.

"Who is to say what is the most important? We don't feel we can make that kind of judgment," Cooper said last year.

In an interview with **Cybercast News Service** Monday, however, Cooper qualified her prior assertion. "It is

first come first serve," she said. "However ... we set up different queues for FOIA requests. The queues can consist of, but are not limited to, the classified queue, the complex queue, the simple queue, the multiple-request queue, among others, the audio visual queue.

"So just because something is the 300th request that is received, it doesn't mean it's going to be processed as number 300," Cooper said. "It might go into a queue, which is a shorter queue than some of the others so that an archivist might get to that request sooner than they would if we only had one queue."

Nicholas Cull, a professor of public diplomacy at the University of Southern California, filed the first group of FOIA requests on Jan. 20, 2006.

"At the (George H.W.) Bush library, I had records in three months," Cull told **Cybercast News Service**. "With the Clinton library, it's been well over a year since I submitted my request in 2006 - about a year and a half really."

Cull, researching for two book projects on U.S. diplomacy and the United States Information Agency, wanted to make it clear that he did not blame the librarians whom he said were very apologetic for the delays.

He blames the delays on stricter regulations imposed on the release of presidential documents by the Bush administration. So far, he says, he has gotten about half the material he requested.

Cull said that he does not anticipate that any of the information he is seeking would be negative to Sen. Clinton.

That may not be the case, however, with other record requests made to the library in January and February 2006. (So far, the library has not responded to any FOIA request received after February 2006.)

The chronological log provided to **Cybercast News Service** shows that in January and February 2006, several news organizations, including USA Today and the Associated Press, requested documents from the Clinton library.

Page is listed on the log for eight separate FOIA requests received by the library on Jan. 25, 2006.

Page's requests involved White House discussion of Mrs. Clinton's potential 2000 Senate bid, the Clinton administration's discussion of Osama bin Laden as a potential threat, the development of a new policy on gays in the military, White House communications about the 1993 health care task force, records related to President Clinton's appointment of first lady Hillary Clinton to lead that task force, records relating to President Clinton's pardon of fugitive Marc Rich, discussion of Vice President Al Gore's 2000 campaign, and the White House's involvement in the 2000 Florida recount.

"It is accurate that on behalf of USA Today I filed Freedom of Information requests with the Clinton library and that I haven't received any documents from those requests to date," Page told **Cybercast News Service**.

A page on the Clinton library Web site lists those FOIA requests to which the library has already responded. Page's requests are not listed there. Nor are the seven requests the library received on Feb. 4, 2006, from Andrew DeMillo, an Associated Press reporter based in Arkansas.

DeMillo filed requests seeking documents regarding Gen. Wesley Clark, the Oklahoma City bombing, the bombing at the 1996 Atlanta Olympics, Monica Lewinsky, the Whitewater scandal, current Arkansas Gov. Mike Beebe, and former Arkansas Gov. and current Republican presidential candidate Mike Huckabee.

DeMillo told **Cybercast News Service** on Monday he was uncertain if he should answer any questions on potential stories he is working on.

However, the Clinton library has completed a request for photographs of President Clinton's 53rd birthday party that it received on Feb. 13, 2006 - nine days after it received DeMillo's requests.

The archivists at the library seemed most generous with Grant Cameron of PresidentialUFO.com.

On Feb. 23, 2006, he made 59 separate requests - many of them repetitive - regarding UFOs, aliens, the TV series "X-Files" and other matters.

The library released records to Cameron showing that Camp David received the Sci-Fi Channel; information in the Clinton White House about the controversy of Roswell, N.M., in 1947; a photo of President Clinton and former Central Intelligence Director James Woolsey; a response to his questions on flying saucers; and an audio recording of an interview Bill Clinton had with former NBC News anchor Tom Brokaw.

Cameron could not be reached for comment Friday or Monday for this story, but his Web site says, "At present Cameron is awaiting almost 100 FOIA requests from the Clinton Presidential Library in Little Rock, Arkansas, related to the UFO related actions and policies inside the two presidential terms of Bill Clinton. So far 12 UFO related requests have been released."

Neither Hillary Clinton's presidential campaign office, nor her Senate office would respond to questions on the matter Friday or Monday as to why documents apparently related to Clinton controversies of the 1990s were not released.

"I suspect it's just not very difficult to clear those documents," Cull said of the UFO-related documents requested by Cameron.

Nearly 2 million pages of documents about Sen. Clinton's time as first lady are in the custody of archivists who don't anticipate that they will release them until after the 2008 presidential race, according to the Los Angeles Times.

*Newsweek* has reported that former President Clinton instructed the National Archives to tightly control the disclosure of communications directly between him and his wife.

The Clinton White House records are also the subject of a lawsuit filed against the National Archives by the conservative public interest group Judicial Watch, which is seeking access to Mrs. Clinton's daily schedules and calendars from the White House years.

Judicial Watch announced Friday that the Department of Justice confirmed the National Archives is on schedule to process about 10,000 pages of the New York senator's daily schedules from her time as first lady. The archives have authority to release the documents within 30 days after notifying former President Clinton.

In an interview with C-SPAN late last year, the former president said, "The public has to know they're not my records. They belong to and are under the jurisdiction of the archives."
No one has an interest in blocking the release of these documents unless the former president asks them to, said Judicial Watch President Tom Fitton.

"Bill and Hillary Clinton do not need to review these schedules unless they seek to hide something embarrassing," Fitton said in a statement.

"Bill Clinton has publicly stated his desire to have all of Hillary's records released as soon as possible, and he blamed the National Archives for the delays. Now the ball is in his court. All Bill Clinton has to do is say the word and Hillary's schedules will be released to the American people immediately. The clock is ticking," he added.

<u>Make media inquiries or request an interview with Fred Lucas.</u>

**Subscribe to the free CNSNews.com daily E-brief.**

**E-mail a comment or news tip to Fred Lucas.**

**Send a Letter to the Editor about this article.**

Copyright 1998-2006 Cybercast News Service

EXHIBIT 2



# Clinton Presidential Library

*1200 President Clinton Avenue*
*Little Rock, AR 72201*

### Inventory for FOIA Request 2006-0492-F

**All files on UFOs, Roswell New Mexico, flying saucers, Area 51 or the TV show X-Files in the files of John Podesta**

## Extent
3 folders, approximately 27 pages

## Access
Collection is open to all researchers. Access to Clinton Presidential Records is governed by the Freedom of Information Act (FOIA) (5 USC 552 as amended) and the Presidential Records Act (PRA) (44 USC 22) and therefore records may be restricted in whole or in part in accordance with legal exemptions.

## Copyright
Documents in this collection that were prepared by officials of the United States government as part of their official duties are in the public domain. Researchers are advised to consult the copyright law of the United States (Title 17, USC) which governs the making of photocopies or other reproductions of copyrighted material.

## Provenance
Official records of William Jefferson Clinton's presidency are housed at the Clinton Presidential Library and administered by the National Archives and Records Administration (NARA) under the provisions of the Presidential Records Act (PRA).

## Processed by
Staff Archivist, 2006. Previously restricted materials are added as they are released.

## Scope and Content
The materials in FOIA 2006-0492-F are a selective, not necessarily all inclusive, body of documents responsive to the topic of the FOIA. Researchers should consult the archivist about related materials.

FOIA request 2006-0492-F consists of emails to and from John Podesta, containing the words either, X-Files or Area 51. John Podesta was a renowned fan of the "X-Files" television show. Automated Records Management System (ARMS) contains emails with many passing remarks about the "X-Files" during 1998 and 1999. Additionally, there are several emails that contain articles regarding the "X-Files" television show.

## System of Arrangement
Records that were responsive to this FOIA request were found in one collection area—Clinton Presidential Records: Automated Records Management System (ARMS).

The following is a list of documents and folders processed in response to FOIA 2006-0492-F:

**Clinton Presidential Records:  ARMS Emails**
WHO 1998/01-1998/11
      [X-Files; Podesta]
          [01/08/1998 – 11/30/1998] [OA/ID 600000]

WHO 1998/12-1999/06
      [X-Files; Podesta]
          [12/08/1998 - 03/25/1999] [OA/ID 650000]

WHO 1999/07-1999/11
      [X-Files; Podesta]
          [07/20/1999] [OA/ID 700000]


Last modified:  03/24/2006

EXHIBIT 3

━━━━━━━━━━ ADVERTISEMENT ━━━━━━━━━━



━━━━━━━━━━ ADVERTISEMENT ━━━━━━━━━━

National Journal.com Home • National Journal Magazine • The Hotline • CongressDaily • Technology Daily

## News Features

**Feb. 25, 2008**

**National Journal Group**
Learn more about our publications and sign up for a free trial.

**E-Mail Alerts**
Get notified the moment your favorite features are updated.

**Need A Reprint?**
Click here for details on reprints, permissions and back issues.

**Advertise With Us**
Details on advertising with National Journal Group -- both online and in print -- can be found in our online media kit.

**Go Wireless**
Get daily political updates on your handheld computer.

GOVERNMENT
**EXECUTIVE**.com

Q&A: SHARON FAWCETT

# Inside The Clinton Archives

© National Journal Group Inc.
Monday, Dec. 17, 2007

> "These are the most important records... of the government. And yet we can't provide sufficient staff to process presidential records in as timely a manner as everyone would like."
>
> — *Sharon Fawcett*



Ad Spotlight
Almanac
Buzz Columns
Campaigns
Daybook
Earlybird
Markup Reports
News Features
Poll Track

Search

Are **Bill** and **Hillary Rodham Clinton** locking away records from their years in the White House while Sen. Clinton seeks the presidency, or are they eager for speedy release of materials from the William J. Clinton Presidential Library in Little Rock, Ark. -- as they have argued in recent weeks?

*National Journal*'s Alexis Simendinger asked expert **Sharon Fawcett**, assistant archivist for presidential libraries at the National Archives and Records Administration. The following is a complete transcript of the Nov. 30 interview about President Clinton's instructions to the Archives, how the former first lady's records are handled, and how presidential records have been treated under the law ever since **President Nixon** left office. For previous Insider Interviews, click here.

**Q: There are journalists, bloggers and political commentators -- even Karl Rove, President Bush's former White House political adviser -- who recently have suggested that President Clinton's actions tied to his records and those of his wife have been secretive or unusual. Right or wrong?**

Fawcett: This matter has provoked a lot of questioning, but the National Archives believes there has been some misunderstanding about where we are in processing the Clinton records. No one is doing anything extraordinary or outside of the realm of what their statutory rights are. And another thing to

remember is that executive privilege is a constitutional right, and not just a statutory right. The Presidential Records Act is a statutory right, but executive privilege is a constitutional right.

It's really been useful to have this discussion about the opening of presidential records and to call attention to the major issues, and the complexity of reviewing and opening these files. These are the most important records, the highest policy records of the government. And yet we can't provide sufficient staff to process presidential records in as timely a manner as everyone would like to see them processed. I'm hoping that through all of this discussion, we are able to raise the awareness of the need for more resources for the National Archives in order to open these and other very important historical materials.

The statute, the Presidential Records Act, allows the president to impose certain restrictions on his records during the first 12 years after he leaves office.

Interestingly, he has to impose that restriction while he is still in office. If he neglects to send the Archivist a letter saying, "I wish to exercise my rights under the Presidential Records Act to impose these six categories of restrictions on my records for the first 12 years I'm out of office," he doesn't have the right. He has to do it while he's in office. So, normally presidents, usually in their first couple of months they're in office, will send a letter to the Archivist so designating that, and naming his or her representative.

**Q: And the National Archives seeks that letter [PDF] from the president?**

**Fawcett:** We meet with the incoming administration, with their general counsel's office, and we brief them on the Presidential Records Act, and we do let them know that this is something they need to pay attention to.

**Q: By law enacted after the clash over President Nixon's papers, who owns the records created by a president and his White House?**

**Fawcett:** The records that represent the constitutional and statutory roles of the president belong to the government, and the Archivist of the United States takes legal custody of those records at 12 noon on January 20 of the inaugural year.

**Q: President Clinton left office in early 2001, and by early 2005, it appears that he began to release some of his documents to the public, as the law allows. Is that right?**

**Fawcett:** In November 2002, President Clinton sent a second letter [PDF] to the Archivist which provided guidance to the NARA staff on the processing of his records -- a letter we requested -- specifically outlining what "easing of the restrictions" categories the president would be interested in applying to his records. I mean, they came to us and they were fairly open about what they wanted to open, and he listed

several categories in the letter.

And those categories have widely been interpreted to mean he was closing everything, for example, related to Mrs. Clinton, his communications with Mrs. Clinton. What he really said was that he would want to consider some material for withholding, but he wanted to see it first. It didn't mean he was closing it outright. But he did not want us to open anything regarding his communications with Mrs. Clinton -- and several other categories of information, including, for example, communications with former presidents -- without first being aware of it, seeing it, and giving it a pass. He encouraged NARA staff to consult with his designated representative on questions and concerns with respect to these categories.

**Q: When you say "easing of the confidential advice category," that is under President Clinton's own say-so, right?**

Fawcett: That's under his own say-so.

**Q: Whom did President Clinton designate as his representative?**

Fawcett: He designated the first lady and attorney **Bruce Lindsey** as his representatives.

**Q: Do people misunderstand the law that the president is following?**

Fawcett: The restriction category [to close some records] specifically at issue in this case is from the Presidential Records Act, is a category that we at the National Archives call "P5 confidential advice." It allows for the restriction of confidential advice between the president and his advisers, or between his advisers, for a period of time not to exceed 12 years after the president leaves office.

One of the reasons why President Bush revised and issued a new executive order [in 2001] on presidential records, is that at the end of the 12-year period of the [Ronald] Reagan records -- Reagan is the first president to have completed a 12-year period -- there was no longer an applicable FoIA exemption. Because once presidential records move out of the 12-year-Presidential-Records-Act restriction period, they can be restricted under the FoIA exemptions, and those apply to all executive agency governmental records, except for the FoIA exemption on the "deliberative process." Congress, in the Presidential Records Act, specifically exempted the presidential records from that provision of the FoIA. So, that provision could no longer apply to presidential records, which means that the only way a president can withhold material of a confidential nature -- not security classified, but of a confidential-advice nature -- is to claim executive privilege. And that's the whole heart of why the executive order was revised by President Bush.

Now, there are provisions in the executive order that made other changes that many groups found objectionable, but the major reason for issuing the executive order was because of the

loss of that confidential-advice exemption, and the need to expand the time in order to review for privilege claims.

**Q: Has President Clinton indicated to the archivists that there are any requests received at his library that he is particularly sensitive about?**

Fawcett: Only what's in his [1994] letter. That is the only communication we have regarding that.

**Q: The only other communications on this topic that you know about are the ones President Clinton has made publicly?**

Fawcett: Right.

**Q: During Senator Clinton's presidential campaign, have either President Clinton or Mrs. Clinton tried to contact the Archives, or through anyone else, to clarify anything having to do with the records, or to issue new instructions?**

Fawcett: Well, one of the things that President Clinton noted is that sometimes the Archives may be issuing notice [for records clearance]. This is a hypothetical example: 25,000 pages and the [Clinton] representative has finished reviewing 20,000 pages. And they've wanted to go forward with the pages that have been completed: "Let's notice those 20,000 pages, let's get that out there. And we'll continue to work on the remaining pages."

That put a little bit of an administrative burden on NARA to separate that out, but we understood the need to get the material out there, and we immediately changed our processes so that we could notify incrementally, as records came through the formal review processes. That's been in the last few months.

**Q: When President Clinton told the Archives he wanted to see the communications with Mrs. Clinton before he considered releasing them, was he going the extra mile? In other words, are all communications between a president and his or her spouse considered personal?**

Fawcett: In the National Archives, while many family communications are personal, the first lady [or first spouse] has a role. And when a first lady is representing the government in that role, we would consider the communications between her and the president to be governmental.

Now, if there are communication exchanges between the president and first lady about whether she should consider running for the Senate, those would be personal. If they talked about a health-care task force, she was playing a governmental role and representing the president in that role and those communications would be official.

**Q: What other records of a president are considered personal?**

Fawcett: The personal records are materials that are personal to the president's private life -- financial information; information about his family, his children; also, political information --

information about his role as head of the political party. Information about his campaign is considered political, and therefore personal, and not governmental.

**Q: Did President Clinton and Mrs. Clinton issue any special instructions to release political records, since political records can be held back as personal?**

Fawcett: The Presidential Records Act suggests that those records should be separated. In reality, it's very difficult to separate the records because events are complex. For example, a presidential trip to a disaster area is partly constitutional and statutory, because the president is inspecting a disaster, but perhaps on the way to or from he went to a fundraising dinner, and that part of the trip was political.

So it is very hard to keep the files completely separate. That ends up being a responsibility of the Archives to work through with the president's representative when we start reviewing. And, in fact, if there is a document and it includes both political and presidential material, that document is in fact presidential, although the political material may be closed under the privacy restriction. That's when we would redact. But we would consider that [as a whole] to be a governmental record. We are not going to start cutting up records and say, "Here, you get page one, and we get page two."

**Q: Is there anything the Clintons have done of note to expand the open holdings of the Clinton library?**

Fawcett: I would say this: In the five-year period before the records were open to FoIA, certainly the president was interested in what the Archives could do about systematic review, and even requested that we review materials. And we agreed together that we should try to systematic-review many of the domestic policy files. So the Clinton library has done some systematic review of the domestic policy files because the president, through his representative, requested that we consider doing that. They were very interested in processing and opening the domestic policy files.

**Q: When President Clinton says, as he has in several interviews recently, that he wants to get more records out as soon as possible about Senator Clinton and her contributions as first lady, can he wave a wand and tell the Archives to dump the information out?**

Fawcett: To an extent. He could waive all of his interests in reviewing the records, if he chose, but it would not automatically result in the dumping of this information out there for everyone to see. The Archives still has to conduct a review for other restrictive categories: for national security, for third-party privacy information. These records will be highly sought after when they come out, so we need to go through and redact phone numbers and Social Security numbers, and other information that could be damaging to a person's personal privacy, so those are the kinds of things that slow down the

process.

[For example,] we are in the current process of reviewing Mrs. Clinton's schedules [as first lady]. If her schedules indicate information about the Secret Service, we redact that information because it's critical and substantive to the protection of president. So that's the kind of information that we go through page by page and look at.

It would make the process slightly faster to not be concerned about a [presidential] representative's review of this material, however, it doesn't mean that he can wave the wand and automatically, the National Archives will open all this material. And you have to remember, too, that he [President Clinton] has a statutory right to review this material.

**Q: Some people believe that because there has been increased interest in Senator Clinton's records as first lady, prompted by her presidential campaign, those document requests should leap to the head of the line for expedited processing and release by the Archives. Is there a specified way in which the Archives must process requests for presidential records?**

**Fawcett:** The law specifies that people can file a <u>Freedom of Information Act</u> request for presidential records. And in the administration of FoIA, it's "first in and first out."

However, we have been permitted through court actions over the litigation about FoIA requests in general, not just FoIAs involving presidential records, to make the process more efficient. And one of the efficiencies in the process is to develop different queues. So you might have a complex queue, where the records come from many sources. You have a simple queue, where the record is one file; it's a few pages.

If you just had one long queue, if somebody had a request for 3 million pages, and you had a request for five pages, and you were behind the 3-million-page requester, it would be a long time before you would get your request. So, by having different queues, and the [Archives] staff rotating across the queues when they picked the next case to process, they are able to answer more of these simple requests and can turn some of them around fairly quickly.

We have several different queues at the [Clinton] library. There's a queue for classified records. There's a queue for audio-visual records. There's a complex queue where there's more than 10,000 pages.

**Q: Where are Mrs. Clinton's health care task force records, and have any of those records been processed and released?**

**Fawcett:** The records are at the Clinton presidential library in Little Rock, Ark. About 500,000 pages were processed and released while the president was still in office -- I think they were released in 1994 -- in response to litigation in the early

part of the Administration. These are records that directly related to the task force. There are many other records at the presidential library that relate to health care reform, that are outside of the purview of that task force, and those are not open, but there are FoIA requests pending for those records.

**Q: If the Little Rock library gets a request for documents that the archivists know were released while the president was in office, but the researcher is not aware of that, what does the library do?**

Fawcett: We just let the researcher know that. They would have to go to the library in Little Rock to review those records or order copies at their expense.

**Q: To clarify, a former first lady does not have executive privilege rights?**

Fawcett: No, that's right. Some people think it is Senator Clinton who is claiming executive privilege. She has no claim of executive privilege over these records. It is her husband who would have the claim of executive privilege over any of these records. And actually, since we are within the 12-year period, he wouldn't need to assert executive privilege. He would just close them as confidential advice, if he chose.

**Q: Has President Clinton done that?**

Fawcett: We have many things closed in library in that category. As of last February there were about 28,000 pages closed in all categories of restrictions, including confidential advice.

**Q: President Clinton has total control over that, within the 12-year window under the law?**

Fawcett: Right, although I would say sometimes the Archives makes the first cut of that and then provides the material to them to look at.

**Q: Have there been occasions when the Archives made the first cut and thought it was "confidential advice," and the president reviewed it and said, "Oh, no, put this out"?**

Fawcett: Oh, that happens with all the presidents. It goes both ways. You know, reviewing is not a science, it's an art form. And one day an archivist may feel a lot more conservative than on another day. You have to use your judgment, and you have different archivists.

**Q: How do the archivists treat first lady's records?**

Fawcett: It's interesting because of how that has evolved, because there is no constitutional role for the first lady, or any governmental role -- but we all know that the first lady travels and represents the president, performs at official functions, plans official social events. And all those functions have come to be regarded as official governmental records.

Case 1:07-cv-01267-JR    Document 16-4    Filed 03/17/2008    Page 9 of 16

It is interesting that we have a FoIA for her schedules [at the Clinton library]. Her schedules will be, in part, her representation of the government as the first lady, her travel with president in an official capacity, but other parts of her schedule will be completely personal, being a mom, a wife. She might have lunch with her daughter on her schedule. She could be getting her hair done, or she could be attending a school concert for her daughter -- that sort of thing. Those are not presidential events. I doubt that those [schedule] materials [of a personal nature] will be open.

Eventually, and it's too soon after President Clinton left office for this to have happened yet, but eventually presidents are usually willing to deed over to the National Archives those personal records that we've had to redact. So, many of them may eventually be opened under guidelines set for review of personal records.

It's very much like the records found in libraries where presidents deeded all their materials to us, that is, presidents before Reagan.

**Q: Can you describe the FoIA requests pending at the library related to Mrs. Clinton?**

Fawcett: There are about 30 or so pending requests for records related to Hillary Clinton. Some of them are for one or two pages, or one document, or a photograph. Others are requests for extensive numbers of materials, including several requests for records related to health care.

**Q: How long do you think it will take for archivists there to complete the process of reviewing those records and have President Clinton review them, etc.?**

Fawcett: I think we are talking about 3 million or more pages, a substantial number of pages, so undoubtedly those will not be completed before the Democratic convention [next August]. There may be some that are done. We will process incrementally to open as much as we can. I'm not sure what's next in the queue to come up; I do not know that.

I know what's being processed now at the library are her schedules, about 10,000 pages of her schedules. That was in response to a FoIA request, and it is anticipated that the Archives will complete our part of the process in January.

**Q: When did the FoIA request for Mrs. Clinton's schedules come in, to give everyone an idea how long the Archives process takes?**

Fawcett: The records at the Clinton library became available to FoIA on January 20, 2006. And I think early on in the process there were FoIA requests submitted for her schedules. It was fairly early, in the first few months [of 2006]. Since the archivists are processing it now, I must say, it must be one of the early ones to come in.

Q: How long will it take to process and release a majority of the Clinton materials?

Fawcett: We have approximately 70 million pages of textual material.

Q: And e-mails?

Fawcett: We're guessing 48 million pages, and we're basing that on an average of three pages per message, because of attachments. So, that leaves us with 118 million pages.

We are working on ways to make our process for processing these records at the Clinton library a little more efficient, and next year, we hope to process 200,000 pages.

Q: And how many pages have you processed so far?

Fawcett: About 100,000 pages under FoIA [Freedom of Information Act]. Now, there's more than that open. I think we have around a million pages open in the Clinton library.

So, just doing the math on it, you'll see there's a huge time lag. Now, as the records age, the process becomes a little more efficient. At the Reagan library, NARA archivists are now processing about a million pages a year. But not all of those are presidential records; some of them are other donated collections. So, the process does get more efficient, especially as you emerge from the periods of time that are covered by the Presidential Records Act of 1978 -- that 12-year period after a president leaves office, when certain restrictions apply.

Q: And why does the processing move faster after that time?

Fawcett: Some of the categories [exceptions for certain documents included in the 1978 law] -- the "confidential advice" category -- no longer applies. In the case of President Clinton, while there has been considerable easing of the confidential advice category, it still requires consultation with the president or his representative to clear documents for public release.

Q: If President Clinton says, "This is what I want out," does the sitting president, President Bush, have the authority to review the materials?

Fawcett: He can apply his own level of scrutiny. The [Bush] White House has indicated that any request that has gone through the former president's review -- I think they are immediately passing on it. But they certainly have the right by law to review it. That is part of the statute and the [2001 Bush] executive order. There certainly hasn't been a claim of executive privilege by the White House over any Clinton records.

Q: President Bush's 2001 executive order, which Congress is now considering revoking with legislation, permits sitting presidents and

previous presidents or their heirs to weigh in on records release. Can you explain what President Bush ordered?

**Fawcett:** What the new executive order did that was different than the previous [Reagan-era] executive order is that it removed the discretion of the Archivist to make a call when there was a difference between the former president's view and the incumbent president on opening records.

[Previously], if the former president wanted to close something -- wanted to claim executive privilege -- and the current president did not uphold the claim of executive privilege, it would be the Archivist's call to make a decision. This meant that if the former president wanted to dispute that call, he would have to litigate it.

What the new executive order did was remove that discretion from the Archivist. And essentially Bush said in that executive order that, barring the most unusual of circumstances, he would uphold a former president's claim of privilege, which put the litigation responsibility onto the researcher, or the requester. That meant that if someone wanted to dispute the claim of executive privilege and take it to court, it would be the responsibility of the requester. And the Archivist was removed from that equation.

Now, just to close the loop, if the former president wanted to open something, and the incumbent president claimed privilege -- this is under both executive orders -- it would remain closed, because the incumbent's claim of privilege trumps everyone else's claim. Now, we never put any of that to the test because at the end of 12-year period [in the Presidential Records Act] there was a hiatus on the opening of records, as the Bush administration held up everything until they issued the new executive order.

**Q: Congress is trying to legislate away that Bush executive order?**

**Fawcett:** Right, but that has been ongoing for several years now. There is legislation before Congress that would basically terminate the requirements of the Bush executive order and go back to the requirements of the first one.

**Q: Under existing law and practice, when the 12-year clock to open President Clinton's records tolls -- and if his wife is elected president in 2008 and then re-elected -- his records would be opened in the first year of her second term in 2013, and both the former president and the incumbent president, related by marriage, could hold sway over release of some materials. Does this system really work?**

**Fawcett:** [Laughs.] It's very similar to the situation in which President Bush became responsible for the records of the end of his father's 12-year term. The Presidential Records Act sets this up, and as it turns out, I don't think the Presidential Records Act ever anticipated that relatives would be responsible. But certainly, either a member of the same party or a member of the

opposite party could be in power. As I said, I doubt that the framers of the Presidential Records Act anticipated that there would be sons and spouses running for president.

We just follow the law.

**Q: Has the Archives recommended any changes related to the fact that it has encountered this situation, with relatives responsible for presidential records?**

Fawcett: In terms of checks and balances? If we restored the first executive order and gave the Archivist back his discretionary authority to mitigate between the incumbent and the former presidents on claims of executive privilege, that [change] would certainly assist. There has been a lot of concern about Bush's executive order, which gave the continuing right of executive privilege to family members of deceased presidents. That's also been a major point of concern.

The issue of executive privilege was litigated in regard to the Nixon papers, and the Supreme Court found that former presidents had a right of executive privilege. But the Supreme Court recognized that the privilege diminished over time.

You look at the Presidential Records Act, and this one modification to consider in the future is, how long is it necessary to continue noticing a White House? We still notice [notify for records review] the White House when we want to open records that go beyond the 12-year period. So we're noticing on Reagan records. Will we still be noticing on Reagan records in the year 2030, in the year 2050, in the year 2080? That's a question that needs to be addressed.

**Q: When would you have the clock stop on notification?**

Fawcett: There's always a tension in that. And I think if you have the clock stop too soon, it's difficult for people to let go. I think you have to come up with a time where you can really have the clock stop. It's like the executive order on declassification -- 25 years is really not enough time. The fact is that 25 years ago, some of the same leaders were in power that are still in power, and that makes declassification difficult.

So if you put a long enough time frame on it, then you can get out of questioning this. So maybe you could say 50 years is enough time, or maybe 40 years is enough time. It's unlikely that people who were prominent in an administration 40 years ago, or 50 years would still be prominent today, so there's no reason to keep noticing and worrying about executive privilege claims.

**Q: What kind of manpower and resources does the National Archives have at the Clinton library?**

Fawcett: We have 10 archivists there. Sixty-five percent of their time is spent processing FoIAs. Somebody might say, "What's the other 35 percent spent on?" There are

Case 1:07-cv-01267-JR          Document 16-4          Filed 03/17/2008          Page 13 of 16

special-access requests, there's reference -- there are other
duties that archivists have. There's preparing catalog entries.
But 65 percent of their time is spent processing the actual FoIA
requests. That's the searching, pulling the records, administering
the queues, and reviewing the records.

**Q: Would it speed things up if President Clinton broadened the
manpower his designated representative has available to review records
processed by the Archives?**

Fawcett: If there were more people on President Clinton's staff
looking at what we're proposing to open, it would be of
incremental help. The big delay is really how long it takes the
Archives to process this material.

We get a request; it's for a broad subject, like health care
reform. That requires going through thousands of files to pluck
out those files from 36,000 boxes that relate to health care. And
then arranging those files, and reviewing them, and removing
the personal information and the other restricted information,
preparing withdrawal sheets, preparing notifications and
submitting them for review.

In addition, there's the search of the electronic mail, and the
electronic mail system is not a system that we can review
online. We have to do searches, using [advanced] search terms
just like people do when they search the Internet, and we get
many, many hits on these things. You have to look at your hits
and figure out how you narrow the search terms to get to the
specifics you want. And then, if there are attachments, there is a
process. In order for the archivists to read the attachments, they
have to put them through a very complex process called
dehexification -- don't ask me to explain it, I just know it's
complicated and takes time -- in order for the archivists to even
view the attachment on the screen. Then they have to print all
that to paper, put it in a file, and prepare that for processing.
There was e-mail in previous administrations, but not to the
extent of this e-mail. President Clinton took office in 1993 and
it helps to understand the magnitude of the e-mail if people
think about when they first started using e-mail.

**Q: Do all the presidential libraries have similar Archives staffing, or do
you put more archivists on the new libraries?**

Fawcett: From about President Johnson on, they all have about
the same number. Some of them have one or two more; some
have one or two less, and it's between eight to 10 archivists at
each of these presidential libraries.

**Q: Considering demand, what would ideal staffing look like to be as
rapidly responsive to requests as some people might like?**

Fawcett: Well, in an ideal world, I would probably look at
having five or six more archivists in a presidential library
processing records under the Presidential Records Act. And one
of the things that we would attempt to do is far more systematic

processing. Systematic processing is much more efficient than FoIA. If we can identify those areas where there is the most research interest, we could put a portion of our staff to systematically reviewing those files. In other words, they pull a box off a shelf and start processing that box. They're not pulling individual files from all over the library.

I would try to do the processing more comprehensively. If you think of an intersecting line, the FoIA requests would eventually start to intersect with the records that have already been systematically processed, so they would be open and available. That would mean there would be a continuing decline in what people would have to FoIA, and the staff could get the records out in a more timely fashion.

We are making some modifications to our system in that we take a look at our FoIA requests, and we attempt to bundle them, so that if we have a number of FoIA requests on a specific related subject, we will bring them together.

For example, say we had a lot of requests on Afghanistan, but they cover different aspects of Afghanistan, we'd probably try to identify the majority of files that would cover that subject and let researchers know that we're processing that systematically, and then process it that way and notify all the FoIA requesters at the same time when the material is done. They are likely to get the material much more quickly that way. But again, it depends on the subject interest of the FoIAs, and FoIAs really come in based on what's happening. You know, Hillary Clinton is running for president, so we have FoIA requests asking for her records.

**Q: To clarify, the reason the Archives processes material based on FoIA requests is because the process is specified in the law that way?**

**Fawcett:** Right. We have to be responsive to FoIAs.

It will be very hard to ever peddle back against doing FoIA, and I wouldn't even advocate that we not have FoIA for presidential records, because that enables people to request what is of most interest.

It's a resource question. And it's really more about a meeting of minds among the media, the historians and the others who request these records to say, "Let's let the Archives process records in this area, or this area. Let's advise the Archives about the most important records to process." And then, if we have sufficient resources and we could still meet our FoIA obligations, we could do more of the systematic processing. I think we could make a lot of people much happier about the situation in the libraries.

We should do both, and I think that's what we have to be able to do, and if we do both, then the idea is that we are addressing systematically the records of most concern without turning off the ability of people to file individual FoIA requests.

I think what would then happen is that new FoIA requests would be very specific. They would be requests for a specific document or a specific file, as opposed to these massive requests for great quantities of information.

**Q: Has the Archives finished cataloging the records in the Clinton library to know what's there?**

Fawcett: We have a pretty good idea of what we have. Most of the boxes have a folder-title list. Sometimes they're a little general, like "correspondence," and you wonder what the correspondence is about. But if you know who the aide is -- that this was the legislative affairs person -- you have a pretty good idea of the type of thing that might be in that box. There are always finer levels of control that we can give to the records, but we have a fairly good knowledge of where to go and look for material.

And because archivists are treasure hunters, once you find a file, it often leads you to other files. So, you might not know everything when you begin the search, but after you examine some files, you recognize, "Oh, you know, so-and-so was also working on this area. I should go check and see what's in his boxes," and then look at that folder-title list and see if anything jumps out at you that might have been too general in your initial search. But now that you know for sure he was working in that area, you decide to go and check.

**Q: Do you discover that some White House officials are particularly efficient record-keepers and others are spottier?**

Fawcett: If they sent the records to the White House Office of Records Management, we really have fairly good control over those. It's the records that they might have kept in their office, strewn across the top of their desk or in their file drawers that may be more problematic for us to sort through. But the ones they box up and send to the White House Office of Records Management have been inventoried. And you know what is a real controlling factor for doing that? The offices in the White House are extraordinarily small. The officials can't keep much in their offices. So they tend to send their records to WHORM, and then the records management people make lists, and those are the lists we inherit.

**Q: What about the other libraries covered by the Presidential Records Act? What's open so far?**

Fawcett: At the Reagan library, we have 8 million pages open, out of the 43 million pages. And at the George H.W. Bush library, we have about 5.5 million open, out of not quite 34 million pages of records. At the deed-of-gift libraries, some of the older ones, it is nearly 100 percent. Mainly at Ford, Eisenhower, Kennedy, and Johnson, we're completing the review of classified files that we're working on releasing. The Ford library is about 70 percent open. Carter is somewhat less.

[ **Insider Interview Archives** ]

**Need A Reprint Of This Article?**
National Journal Group offers both print and electronic reprint services, as
well as permissions for academic use, photocopying and republication.
Click here to order, or call us at 877-394-7350.

[ E-mail NationalJournal.com ]
[ Site Index | Staff | Privacy Policy | E-Mail Alerts ]
[ Reprints And Back Issues | Content Licensing ]
[ Make NationalJournal.com Your Homepage ]
[ About National Journal Group Inc. ]
[ Employment Opportunities ]

Copyright 2008 by National Journal Group Inc.
The Watergate · 600 New Hampshire Ave., NW
Washington, DC 20037
202-739-8400 · fax 202-833-8069
NationalJournal.com is an Atlantic Media publication.

2/25/2008 6:37 PM

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,        )
                              )
        Plaintiff,        )
                              )
        v.                )     Case No. 1:07-CV-01267 (JR)
                              )
U.S. NATIONAL ARCHIVES AND    )
RECORDS ADMINISTRATION,    )
                              )
        Defendant.     )
_____)

## [PROPOSED] ORDER

Upon consideration of Plaintiff's Opposition to Defendant's Motion for *Open America*

Stay and the entire record herein, it is hereby:

ORDERED, that

       1.     Defendant's Motion for *Open America* Stay is Denied.


DATE_____            _____
                                   Judge James Robertson
                                   United States District Judge for
                                   The District of Columbia

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JUDICIAL WATCH, INC., )
)
Plaintiff, )
)
v. )    Case No. 1:07-CV-01267 (JR)
)
U.S. NATIONAL ARCHIVES AND )
RECORDS ADMINISTRATION, )
)
Defendant. )
_____)

**[PROPOSED] ORDER**

Upon consideration of Plaintiff's Motion for Limited Discovery, and opposition thereto,

and the entire record herein, it is hereby:

ORDERED, that

1.    Plaintiff's motion is granted.


DATE_____                    _____
                                        Judge James Robertson
                                        United States District Judge for
                                        The District of Columbia