## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 1:07-cv-01267 (JR) |
| v. | ) | |
| | ) | |
| U.S. NATIONAL ARCHIVES AND | ) | |
| RECORDS ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S RESPONSE IN SUPPORT OF MOTION FOR OPEN AMERICA STAY

### INTRODUCTION

Plaintiff Judicial Watch, Inc.'s Supplemental Opposition to Defendant's Motion for Open America Stay miscasts or ignores information disclosed at the 30(b)(6) deposition of the Clinton Presidential Library. Even a cursory reading of the deposition transcript reveals that the Clinton Presidential Library has been exercising, and continues to exercise, utmost diligence in processing FOIA requests. See Dep. Tr. of Dana Simmons ("30(b)(6) Dep.") (excerpts attached as Exhibit 1). Consistent with testimony in the previously-filed declarations of Emily Robison, the deposition transcript again unambiguously establishes that plaintiff has benefitted from the queue structure at the Clinton Presidential Library and that an Open America stay is justified in this case. Because defendant has established that a stay is appropriate under Open America[1] and has put to rest plaintiff's complaints about the queue structure, defendant respectfully requests that the Court stay these proceedings for one year (with the opportunity at that point for

---

[1] The deposition testimony also confirms the exceptional circumstances presented to the Clinton Presidential Library in the processing an unanticipated volume of FOIA requests with limited resources. In accord with the previously-filed declarations of Ms. Robison, the 30(b)(6) witness confirmed that the Library simply does not have the resources to process the hundreds of FOIA requests received by the Library within the time limits set forth in the FOIA. The six full time equivalent archivists are conducting painstaking reviews and exercising utmost diligence in processing the requests. See 30(b)(6) Dep. at 68:17-19 ("Yes, we would need more resources to respond more timely to the FOIA request backlog that we have.").

defendant to seek additional time as needed to complete processing the remaining portion of plaintiff's request).

## ARGUMENT

Plaintiff earlier insisted that "the objective of limited discovery would be to understand exactly where Plaintiff's request falls within the queue structure, how this decision was made, and the effect this has had on the timeliness of processing Plaintiff's request." Pl's Opp'n at 16. Given plaintiff's representations, it is notable that plaintiff does not detail or describe the deposition testimony it elicited about the queue structure's impact on processing the remaining telephone log books portion of plaintiff's request. As the 30(b)(6) deponent testified, Judicial Watch stands to receive records responsive to its request "much quicker now that they are in the multi-request queue." Without question, Judicial Watch "has benefitted from the queue structure that the Clinton Library has employed in order to process FOIA requests." 30(b)(6) Dep. at 91:19-92:6. Indeed, as of the date of the deposition, the queue structure has put the telephone log books portion of Judicial Watch's request behind only 27 other pending FOIA requests, though processing requests chronologically – without any queues, e.g., divided by media type and size – would require the Library to process 119 pending requests in advance of plaintiff's request. See 93:20-94:5 & Errata ("Based on the queue structure currently in place at the Clinton Presidential Library, there are 27 requests pending before the telephone log books portion of request number 2006-0886-F that must be processed. Those 27 requests remain throughout the 13 textual and electronic queues. Hypothetically, though, if the Library had only one "queue," for processing, there would be 119 FOIA requests that would have to be processed before the telephone log books portion of request number 2006-0886-F would be processed. That is because those 119 requests all pre-date Judicial Watch's April 5, 2006 request."). These statements alone reject plaintiff's stated concerns about the queue structure. The Library certainly should not be penalized for maximizing the efficiencies of its staff and processing system, through which plaintiff has benefitted. At a minimum, the Library has exhibited due diligence in processing all of its FOIA requests, including plaintiff's.

The queue system itself is a relatively unremarkable organizational structure divided by media type (textual, electronic or audiovisual) and the total amount of material responsive to a request (small, medium or large).  See 30(b)(6) Dep. at 16:7-12.  Thus, of the 17 queues making up the queue structure, one is for mandatory review of classified materials, one is the multi-request queue, three are dedicated to audiovisual records, six are for textual records (based on size and whether the request calls for classified or unclassified records), and six are for electronic records (also based on size and whether the request calls for classified or unclassified records).  See id. at 14:7-16:19.  And significantly, within each queue, requests are organized by date received.  Id. at 16:20-17:5; 65:9-11.  As archivists at the Library complete processing FOIA requests, they are assigned the first-filed FOIA request in the queue that is next in line for processing.  Id. at 19:10-20.  Under FOIA and this Circuit's instructions, the Library's queue structure supports a finding of due diligence sufficient to support an Open America stay request. See, e.g., 5 U.S.C. § 552(6)(D)(i) (permitting regulations "providing for multitrack processing of requests for records based on the amount of work or time (or both) involved in processing requests"); Open America v. Watergate Special Prosecution Force, 547 F.2d 605, 614 (D.C. Cir. 1976) ("There is no allegation by plaintiffs that the FBI procedure, treating each request on a first-in, first-out basis *after initially separating the requests into the simple and the difficult tasks for appropriate processing*, is anything but fair, orderly, and the most efficient procedure which can be adopted under the circumstances") (emphasis added); Elec. Frontier Found. v. U.S. Dep't of Justice, 517 F. Supp. 2d 111, 115 & n.6 (D.D.C. 2007) ("Requests [made to the FBI] are placed in one of three queues, based on the total amount of material responsive to the request, and are assigned to one of the Disclosure Units . . . based on the date of their arrival within the appropriate queue."); Ctr. for Public Integrity v. United States Dep't of State, No. 05-2313, 2006 WL 1073066, *4 (D.D.C. Apr. 24, 2006) ("The Department [of State] processes requests on a first-in, first-out basis, with two tracks-simple/fast and routine/complex."); Appleton v. FDA, 254 F. Supp. 2d 6, 9 (D.D.C. 2003) (finding due diligence by FDA because, *inter alia*, the

agency used a multi-track system where part of the requester's request was placed in the "'complex' track, which operates on a first-in, first-out basis").

That a later-filed, but simple request may be processed ahead of Judicial Watch's voluminous and complex one does not negate a finding of due diligence. See Def's Reply in Support of Open America Stay [19] at 9-10. Considering requests according to complexity and volume so that requesters with simple and quick responses do not wait for extended periods of time while complex voluminous requests are reviewed is not only contemplated by FOIA, but is eminently reasonable. See 5 U.S.C. § 552(6)(D)(i) (permitting regulations "providing for multitrack processing of requests for records based on the amount of work or time (or both) involved in processing requests"). Even then, to date, only one, single textual or electronic record request that was filed after April 5, 2006 (the date of Judicial Watch's instant request) has been reviewed (but no records released). Of the requests calling for textual or electronic records that have been processed and records released, each one pre-dated Judicial Watch's request.[2] See 30(b)(6) Dep. Tr. at 90:8-90:14. Of the 27 requests that remain to be processed before the telephone log books portion is processed, only one was received after April 5, 2006. And that "request is in one of the expedited or small queues" for requests totaling under 500 pages. Id. at 47:20-22 & Errata; 49:11-18. These facts simply confirm that the queue structure is functioning as it should.

In that context, plaintiff's complaint that "the Library has used its limited resources to process less timely FOIA requests for records relating to 'Unidentified Flying Objects,'" is immaterial for two reasons. Pl's Supp. at 2-3. First, the UFO requests were submitted before Judicial Watch's April 5, 2006 request. See Pl's Opp'n, Ex. 2. As a result, plaintiff may not complain about the processing of an earlier filed request. Second, as the 30(b)(6) deponent explained, the "UFO requests" were placed into a queue for requests seeking fewer than 50 pages of records and were processed as they arose in the line up of queues. See 30(b)(6) Dep. at

---

[2]    Because requests for audiovisual records are different in kind, they are processed within a rotation of their own three queues by date received. See 30(b)(6) Dep. at 71:7-9.

77:7-16, 78:10 & Errata.  Accordingly, that simple and quick responses were provided to earlier-filed requests does not undercut the Library's diligence in processing all of its FOIA requests. Contrary to plaintiff's suggestion, the Library does not make judgments about the relative importance of FOIA requests: "each FOIA request comes in.  It's a valid request as long as they meet the criteria that they have an address and a phone number and they request records that we can produce.  And we take those in the date that we receive them.  There aren't discussions on which topic is more relevant than another topic."  Id. at 75:7-16.

Finally, plaintiff contends that the Library's inability to fund more archivists for FOIA processing in 2006 undermines the Library's due diligence in processing FOIA requests.  Of course, if resources were unlimited so that the Library could increase "the number of archivists tasked with processing the requests," Pl's Supp. at 3, no resource-limitation would support defendant's request for an Open America stay.  Unfortunately, however, resources have not been and are not currently unlimited.  See 30(b)(6) Dep. at 68:17-19.  Indeed, in response to the Fiscal Year 2006 budget appropriated by Congress to NARA, the National Archives was compelled to institute agency-wide belt-tightening, including a hiring freeze.  See Ex. 2 (Spring 2008 article discussing, in part, recent lifting of a hiring freeze).  The Library's careful utilization of available resources supports its need for a stay, not undercuts it.

NARA and the Clinton Presidential Library are taking, and will continue to take, reasonable steps, in light of present-day resource and budget constraints, to address the important issue of expedient FOIA processing.  As amply demonstrated in the opening motion, defendant can demonstrate both exceptional circumstances and due diligence in handling plaintiff's request.  The deposition confirmed that a stay is appropriate.  Accordingly, the Court should stay the proceedings to allow the Library time to process the remaining telephone log books portion of plaintiff's request in accordance with the Presidential Records Act.

## CONCLUSION

For all of the reasons noted above, Defendant respectfully requests that the Court grant Defendant's Motion for an Open America Stay.

Respectfully submitted this 23rd day of April, 2008.

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

OF COUNSEL                                                  /s/ Helen H. Hong
JASON R. BARON                                          HELEN H. HONG
(DC Bar No. 366663)                                      Trial Attorney, Federal Programs Branch
Director of Litigation                                       U.S. Department of Justice, Civil Division
Office of the General Counsel                           Tel: (202) 514-5838
NARA                                                            Fax: (202) 616-8460
8601 Adelphi Road, Suite 3110                        helen.hong@usdoj.gov
College Park, MD 20740
Telephone: (301) 837-1499                              Courier Address:
Fax: (301) 837-0293                                        20 Massachusetts Ave., NW, Rm. 6132
jason.baron@nara.gov                                      Washington, D.C. 20530

*Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 23, 2008, a true and correct copy of the foregoing

Defendant's Response in Support of Motion for Open America Stay was served electronically by

the U.S. District Court for the District of Columbia Electronic Document Filing System (ECF)

and that the documents are available on the ECF system.


/s/ Helen H. Hong
HELEN H. HONG

EXHIBIT 1

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF COLUMBIA

3        ----------------------------- X

4        JUDICIAL WATCH, INC.,            )

5               Plaintiff,               ) Case No.

6           vs.                          ) 1:07-CV-01267(JR)

7        U.S. NATIONAL ARCHIVES AND      )

8        RECORDS ADMINISTRATION,         )

9               Defendant.               ) Pages 1-100

10       ----------------------------- X

11

12

13                    DEPOSITION OF DANA SIMMONS

14                    Monday, April 7, 2008

15                    Washington, D.C.

16

17

18

19

20       Reported by:  Sara A. Watt

21       Job No. 186570

22

```
 1

 2

 3

 4                          April 7, 2008

 5                          12:58 p.m.

 6

 7    Deposition of DANA SIMMONS, held at the offices of:

 8

 9         Judicial Watch, Inc.

10         501 School Street, Northwest

11         Suite 500

12         Washington, D.C.  20024

13

14    Pursuant to notice, before Sara A. Watt, Registered

15    Merit Reporter and Notary Public in and for the

16    District of Columbia.

17

18

19

20

21

22
```

1    ON BEHALF OF THE PLAINTIFF:

2        James F. Peterson, Esquire

3        Judicial Watch, Inc.

4        501 School Street, Northwest, Suite 500

5        Washington, D.C.  20024

6        (202) 646-5172

7

8    ON BEHALF OF THE DEFENDANT:

9        Helen H. Hong, Esquire

10        Varu Chilakamarri, Esquire

11        U.S. Department of Justice

12        20 Massachusetts Avenue, Northwest, Room 6132

13        Washington, D.C.  20006

14        (202) 514-5838

15

16        Jason R. Baron, Esquire

17        National Archives and Records Administration

18        8601 Adelphi Road, Room 3110, NGC

19        College Park, Maryland  20740-6001

20        (301) 837-1750

21

22    ALSO PRESENT: Christopher J. Farrell, Jason Aldrich

1                              I N D E X

2

3        EXAMINATION OF DANA SIMMONS:                    PAGE

4            MR. PETERSON                                   5

5            MS. HONG                                      88

6            MR. PETERSON                                  93

7                              - - -

8

9                         E X H I B I T S

10

11       SIMMONS DEPOSITION EXHIBITS                     PAGE

12            None.

13                             - - -

14

15

16

17

18

19

20

21

22

```
 1                    P R O C E E D I N G S

 2        Thereupon,

 3                      DANA SIMMONS

 4   A witness, called for examination by counsel for

 5   the Plaintiff, and, after having been sworn by the

 6   notary, was examined and testified as follows:

 7            THE WITNESS:  I do.

 8            EXAMINATION BY COUNSEL FOR PLAINTIFF

 9   BY MR. PETERSON:

10        Q.   Good afternoon.  Please state your name

11   for the record.

12        A.   Dana Simmons.

13        Q.   Good afternoon, Dana.  I'm James Peterson

14   for Plaintiff Judicial Watch in this matter.  I

15   will be asking you questions during this

16   deposition.  The purpose of this deposition is to

17   obtain your full and complete answers to my

18   questions.

19            Do you understand that?

20        A.   Yes, I do.

21        Q.   If you do not hear my questions, please

22   inform me and I will repeat it or have the court
```

1    coordinator and being a processing archivist, I

2    understand the queue structure and where it lies

3    inside our current queue structure.

4    BY MR. PETERSON:

5         Q.    Okay.  Let's move on to the queue

6    structure itself then, please.

7              Can you just begin by describing in your

8    own words as much as possible the queue structure?

9    I understand it has 17 access queues, 16 of which

10   are FOIA, the other for classified documents; is

11   that correct?

12        A.    Yes.

13        Q.    What specifically are the 16 queues?  Can

14   you tell me that?

15        A.    Okay.  The queue structure is divided

16   into basically, as you said, 17.  You take out the

17   one for the mandatory review, which is not part of

18   the FOIA.  And then you have three audiovisual

19   queues which is completely dedicated to the

20   audiovisual records.  And so that leaves 13 queues.

21             Do you want me to list them?

22        Q.    Please.

1        A.    Okay.  May I have a pen?  It's easier for

2    me to write them so I don't -- and then I can speak

3    them as I write them.

4            Okay.  We have a complex electronic

5    classified queue.  We have a complex textual

6    classified queue.  We have a complex electronic

7    unclassified queue, and a complex textual

8    unclassified queue.  So those are our four complex,

9    or large, as we like to describe them, because they

10    have the most records requested.

11            Then we have a simple electronic

12    classified queue, a simple textual classified

13    queue, a simple electronic unclassified queue, and

14    a simple textual unclassified queue.

15            Then what we have, we have the smallest

16    of the queues, because the simple is like our

17    middle queue.  Then we have what we call our

18    expedited queue or the quickie queue.  So we have

19    the expedited electronic classified queue,

20    expedited textual classified queue, expedited

21    electronic unclassified queue, and the expedited

22    textual unclassified queue.

1          And in addition, we have a new queue

2     called the multi-request queue.  So that makes up

3     the 13.  With the other three AV and the one

4     mandatory review queue, that makes up the 17.

5          Q.   Now, are these queues -- are these queues

6     then further subdivided?

7          A.   The queues are based on quantity of

8     records.  That's how we get the small, medium and

9     large.  And then they're based on basically the

10    four divisions of unclassified, classified,

11    textual, or electronic.  And then you have the AV

12    separate.  But there is no further subdivision.

13         Q.   What is the cutoff for small, medium,

14    large?

15         A.   Okay.  The small, which was what we call

16    expedited, would be basically anything less than

17    500 pages.  The simple, which is the medium, would

18    be anything between 500 and 5,000.  And the complex

19    is above 5,000.

20         Q.   How does the date of receipt of a FOIA

21    affect its placement in these queues?

22         A.   The queues -- the queues are -- the FOIA

1    cases are placed in each queue by date received.

2    So the first FOIA case that we receive that goes

3    into this queue is at the front of the line of that

4    queue, and everything goes in sequence by date

5    received.

6         Q.   Can you tell me how many requests are

7    currently in each of these queues?

8         A.   Not off the top of my head, I cannot.

9         Q.   Can you give me some approximation?

10        A.   I cannot.

11             MS. HONG:  You're asking total pending

12   requests in each of the 13 queues?

13   BY MR. PETERSON:

14        Q.   Yes.

15        A.   I can't.  I don't have the ability to

16   pull that information out right now.

17        Q.   Can you discuss the multi-request queue?

18   When was it created?

19        A.   The multi-request queue was put into

20   effect in June of 2007.

21        Q.   Why was it -- why was it created?

22        A.   The multi-request queue was part of a

1      study.   The Presidential Records Act libraries,

2      Reagan, Bush and Clinton, were charged with trying

3      to be more efficient and process FOIAs faster.   And

4      so part of the study was to try to implement a new

5      queue that we could pull FOIA requests that request

6      similar series or subseries of records that overlap

7      FOIA requests, so we could batch them and then

8      systematically process those series or subseries,

9      in turn would satisfy all or parts of multiple FOIA

10     cases.

11          Q.   Can you tell me how many are in it now?

12              MS. HONG:  I'm sorry, "it," the

13     multi-request queue?

14     BY MR. PETERSON:

15          Q.   The multi-request queue.

16          A.   Let me count.

17              MS. HONG:  And I'm just going to do a

18     general objection.   To the extent that you seek

19     those types of specific figures from a 30(b)(6)

20     deponent witness, it's improper and imposes undue

21     burdens on the witness.

22              But she can -- to the extent that you

1    know and have the numbers or can provide

2    approximations, certainly you can do that.

3                 THE WITNESS:  Okay.  I'm going to try to

4    count.

5                 Approximately ten, approximately ten.

6    BY MR. PETERSON:

7        Q.    And what -- how would you explain the

8    matrix format?  Can you describe to me what that

9    means?

10        A.    Okay.  The matrix -- and I like to

11    describe it more as just a lineup of the queues.

12    And I can describe it basically as that on my desk

13    I have the 13 queues that I described earlier in a

14    list of which one's up next, and they're in a line.

15                 And right now when the next archivist

16    comes to me and says I'm finished with this FOIA

17    request, I can look at this list and say this FOIA

18    queue is up next.  And so I know that I can send

19    that archivist to the case file and they'll pull

20    that case.

21                 And then I print out a new list which

22    that FOIA queue goes to the bottom of the list and

1          We have one FOIA queue up.  The next up

2     in line is I think expedited textual unclassified.

3     The next one is multi-track again, because we're

4     back to the multi-track.  That will be a health

5     care task force FOIA request.  That was the first

6     one that we received.

7          Then we'll move through the other queues

8     and we'll come back.  When we get back to the

9     multi-track we'll pick up a segment of Northern

10    Ireland.  And then the next time we circle back to

11    the multi-track, 886 is up again.  And at that

12    point the phone logs will be processed.  It's a

13    total of 27 FOIA cases that would have to be picked

14    up.

15         Q.   How many of these 27 FOIA cases were

16    submitted prior to Judicial Watch's?

17         A.   That we anticipate -- the 27 that we

18    anticipate processing?

19         Q.   Right.

20         A.   I believe one, and it's in one of the

21    expedited -- it's in one of our expedited, our

22    small.

```
 1            MS. HONG:  Wait, I'm sorry.  Can we

 2    clarify that?

 3            The question was how many were submitted

 4    prior to Judicial Watch's request?

 5            MR. PETERSON:  Correct.

 6            MS. HONG:  So chronologically, of the 27

 7    requests --

 8            THE WITNESS:  How many did we receive?

 9            MS. HONG:  -- were predated April 5th,

10    2006?

11            THE WITNESS:  One.

12            MS. HONG:  No, I'm sorry.  I'm not sure

13    that the question is clear.

14            Of the 27 FOIA requests that need to be

15    processed before you reach Judicial Watch's, did

16    those come in before Judicial Watch filed its April

17    5th, 2006?

18            THE WITNESS:  One.  It's in one of the --

19    it's in our small queue.

20            MS. HONG:  Does that mean -- well --

21            MR. BARON:  We need to take a break.

22            MS. HONG:  Yeah, can we take a quick
```

1    break?

2              MR. PETERSON:  Sure.

3              (Recess taken at 2:03 p.m.)

4              (Deposition resumed at 2:04 p.m.)

5              MS. HONG:  Thank you for allowing us

6    to --

7              MR. PETERSON:  Ready to go back on?

8              MS. HONG:  I think -- is a question

9    pending?

10             (The reporter read back as requested.)

11             THE WITNESS:  Okay.  All of the 27, with

12   the exception of one, predate Judicial Watch.

13   That's what I was trying to say.  So 26 predate

14   Judicial Watch.  They came in before April 5th.

15             One was received after April 5th.  It is

16   in one of our small queues, what we call our

17   expedited queues, and it will come up within that

18   27 FOIA cases to be processed.

19   BY MR. PETERSON:

20        Q.   So do you know which one it is that did

21   not predate Judicial Watch's request?

22        A.   I don't have a specific case number.  I

1    Q.    Is it fair to say that then the way the

2    queue structure is set up in terms of the type, the

3    type of the record requested, the size, size of the

4    request, that it's the nature of the request, not

5    when it was received, that is the most important

6    factor as to when a request will be processed?

7              MS. HONG:  Objection.  Argumentative and

8    misstates the facts.

9              THE WITNESS:  FOIA cases are placed in

10   each queue based on date received.  Date received

11   is always important in the FOIA case.

12   BY MR. PETERSON:

13   Q.    I understand you have nine bodies,

14   archivists, representing six full-time equivalent;

15   is that correct?

16   A.    Yes.

17             MS. HONG:  I'm sorry, archivists.

18   BY MR. PETERSON:

19   Q.    Archivists, right.  How does this number

20   compare to the number of archivists employed at

21   other libraries, other presidential libraries?

22   A.    I'm not -- I don't know the staffing at

1      received an unexpected number of FOIA requests once

2      the library started accepting FOIA requests.

3                  Are you aware of this?

4      A.    Yes, I've read that in the declaration.

5      Q.    Ms. Robison has also stated that the

6      library has had insufficient resources to respond

7      to the number of FOIA requests it was receiving.

8                  Is this correct to your knowledge?

9      A.    Is this my opinion?

10     Q.    Yes, to your knowledge.

11                 MS. HONG:  And I'm not sure, I'm not sure

12     what paragraph or which declaration you're

13     referring to.  I think that it was to respond

14     timely to the FOIA requests.

15     BY MR. PETERSON:

16     Q.    Correct.  Okay, I'll --

17     A.    Yes, we would need more resources to

18     respond more timely to the FOIA request backlog

19     that we have.

20     Q.    Has the library taken any steps to

21     increase the resources that it devotes to

22     responding to FOIA requests?

1    she was moved up and she assumed his position, and

2    where she has remained.

3        Q.    Is there any reason that you're aware of

4    that other employees like that could not be

5    detailed to assist with the processing of FOIA

6    requests now?

7        A.    Well, we only have one audiovisual

8    archivist who handles all audiovisual general

9    reference requests, as well as all FOIA requests.

10       Q.    Let's go back to the 2007 study you

11   mentioned.

12            Who was responsible for conducting that

13   study?

14       A.    Basically all three Presidential Records

15   Act libraries, Reagan, Bush, and Clinton, were

16   charged -- the supervisory archivists were to

17   submit basically ideas of how we could improve

18   processing.  And so in collaboration with the other

19   two Presidential Records Act libraries and NLMS,

20   which is the Materials Project in Washington, they

21   collaborated on this study for one year.

22       Q.    Can you describe to me kind of how it was

1     Clinton-related materials?

2              MS. HONG:  Objection.  Vague.

3              And are you asking about whether the

4     records were processed because of the nature of the

5     requests?

6     BY MR. PETERSON:

7        Q.   I'm asking whether the library ever gave

8     any consideration as to the nature of the subject

9     matter of requests in general.

10       A.   No.  We basically -- each FOIA request

11    comes in.  It's a valid request as long as they

12    meet the criteria that they have an address and a

13    phone number and they request records that we can

14    produce.  And we take those in the date that we

15    receive them.  There aren't discussions on which

16    topic is more relevant than another topic.

17       Q.   You've never heard of any discussions

18    concerning that, which topic is more relevant,

19    which is greater immediate interest?

20             MS. HONG:  Asked and answered.

21    BY MR. PETERSON:

22       Q.   You can answer again.

1      A.   No, not to my knowledge, there have been

2   no discussions on what topic is more relevant than

3   another topic.

4      Q.   Just for the sake of picking a particular

5   topic, how many requests regarding -- regarding or

6   relating to UFOs have been received?

7      A.   In February of 2006 we received 77 FOIA

8   requests from one requester.  However, he is

9   interested in extra-terrestrial, UFOs, Area 51, and

10   that subject matter.

11         However, not all of his 77 requests have

12   to do with UFOs.  He's asked for other things

13   regarding speeches and correspondence between

14   certain individuals.

15      Q.   How many requests relating to UFOs have

16   been responded to, have been processed?

17      A.   I'm trying to think of the number.

18   Including audio -- well, no, audiovisual wouldn't.

19         I think seven.  I'm not sure about the

20   number, but seven seems correct.

21      Q.   As a result of their placement within the

22   queue structure have any of these requests been

1    processed ahead of less timely requests?

2         A.   No.

3         Q.   Excuse me, let me start over.

4              As a result of the placement in the queue

5    structure have any of these requests been processed

6    ahead of more timely requests?

7         A.   The UFO requests that were processed were

8    the first FOIA cases that we had received that met

9    the threshold of being less than 50 pages.  So

10   therefore they were at the beginning of those

11   queues.  And that's why so many of those at the

12   very beginning were processed, because at the time

13   they were the only ones that met that threshold,

14   because it was less than 50 pages.  And most of

15   these requests were for 5 pages or 16 pages or 2

16   pages.

17        Q.   So the answer to the question would be

18   yes?

19        A.   Can you ask the question again?  I'm

20   sorry.

21        Q.   Have any requests for UFO-related

22   information been processed ahead of more timely,

1    other more timely requests?

2              MS. HONG:  Objection.  Vague.

3              Do you mean have any been processed

4    before requests that came in before the UFO

5    requests came in?

6    BY MR. PETERSON:

7        Q.    Correct.

8        A.    Not in those queues.

9        Q.    What about overall?

10       A.    Possibly.

11             MR. PETERSON:  Go off the record, take a

12   very short break.  And then we'll finish up.

13             (Recess taken at 2:49 p.m.)

14             (Deposition resumed at 2:57 p.m.)

15   BY MR. PETERSON:

16       Q.    Okay.  Let's go back on the record,

17   please.  Just a few follow-up questions and then

18   we'll send you back to Little Rock.

19             Do you or the archival staff file reports

20   regarding, like, the progress of processing FOIA

21   requests with the Archives national headquarters?

22       A.    When asked for.  It's not a regular

1      the Judicial Watch.  I do not have a number.

2           Q.   For the FOIA, the 13 FOIA queues that are

3      used in order to process textual and electronic

4      records, though, all of those that have been

5      processed came before Judicial Watch filed its

6      request; is that right?

7           A.   Can you ask that again?

8           Q.   Yes.  Of the 72 requests that have been

9      processed, the textual and electronic records

10     requests, those that have been processed have all

11     predated -- the requests that initiated the

12     processing all predated April 5th, 2006; is that

13     right?

14          A.   Yes.

15          Q.   Okay.  And of the 27 requests that are

16     pending before Judicial Watch's, aside from that

17     one expedited, meaning the less than 500-page

18     request, so 26 of the requests, all of those

19     predate Judicial Watch's April 5th, 2006, request;

20     is that right?

21          A.   Yes.

22          Q.   If the library had one queue, sort of a

1    chronological queue, chronological log of a queue,

2    excepting the AVs of course, but for textual and

3    electronic records requests, if there was only one

4    queue how many FOIA requests would be required to

5    be processed before Judicial Watch's April 5th,

6    2006, request would be processed?

7        A.   Like as of now?

8        Q.   As of now.

9        A.   I believe it's 119 FOIA cases.

10       Q.   How has the queue structure, including

11   the multi-request queue, affected the processing of

12   Judicial Watch's April 5th, 2006, request, if at

13   all?

14       A.   Well, they have received 11,000 pages of

15   their request because of the multi-request queue,

16   which would be much -- which is much sooner than

17   they would have received any records if they had

18   remained in their queue, their previous queue.

19       Q.   And the remainder of the request, the

20   telephone log book portion of the request, what

21   about that?

22       A.   They will receive those much quicker now

```
 1     that they are in the multi-request queue as well.

 2          Q.   Is it accurate to state then that

 3     Judicial Watch has benefitted from the queue

 4     structure that the Clinton Library has employed in

 5     order to process FOIA requests?

 6          A.   Yes.

 7               MS. HONG:  Can I take a quick break?

 8     Just one minute or two minutes and then I'll be

 9     right back.

10               (Recess taken at 3:14 p.m.)

11               (Deposition resumed at 3:16 p.m.)

12     BY MS. HONG:

13          Q.   One last follow-up question, Ms. Simmons.

14               Did the placement of the April 5th, 2006,

15     Judicial Watch FOIA request in the complex

16     unclassified electronic queue affect Judicial

17     Watch's request, the processing of its request, in

18     any way to detriment it?

19          A.   The initial placement of that?

20          Q.   Uh-huh.

21          A.   No.

22          Q.   If it had been placed into a different
```

1    queue initially, would that have impacted the

2    processing of Judicial Watch's request, given that

3    it has been transferred to the multi-request queue?

4        A.    Like another specific queue?

5        Q.    Right.

6        A.    Like we determined the electronic records

7    were not -- if it just got transferred to a textual

8    complex queue, it would have been further down in

9    the queue because we had received more complex

10    textual unclassified FOIA cases than we had

11    electronic FOIA cases at that time.

12        MS. HONG:  Okay.  I have no further

13    questions.

14        EXAMINATION BY COUNSEL FOR PLAINTIFF

15    BY MR. PETERSON:

16        Q.    Can you just explain very briefly how, if

17    there are currently 27 FOIAs pending in front, you

18    reached the 119?  It was based on counsel's

19    question.

20        A.    Basically the 119 is basically just a

21    list by date received.  And so it involves, you

22    know, all kinds of queues.  But if it was just a

1    first-in/first-out by date received, then that

2    would be 119 pending processing before we would get

3    to yours received on the 5th.  But the way the

4    queue goes around, it's processing from different

5    queues.

6        Q.   And it's your testimony that of all -- of

7    the 72 that have been processed, only -- how many

8    exactly have been -- how many did not predate

9    Judicial Watch's request?

10       A.   Can you ask the question again?

11       Q.   72 requests have been processed by the

12   library; is that correct?

13       A.   Yes.

14       Q.   How many of those again, would you tell

15   me again how many of those were less timely than

16   Judicial Watch's request?

17           MS. HONG:  Objection.  Vague.

18   BY MR. PETERSON:

19       Q.   How many of those were received after

20   Judicial Watch's request was received?

21       A.   No textual or electronic FOIA case was

22   received after Judicial Watch within that 72.  The

```
 1    only potential FOIA cases that are within that 72

 2    would be audiovisual requests.

 3         Q.   So you're certain about the textual

 4    electronic, but you're not certain about the

 5    audiovisual?

 6         A.   Yes, because --

 7         Q.   Why is that?

 8         A.   Because we had a lot of audiovisual

 9    requests that were processed and finished and they

10    actually predated Judicial Watch.  And so I know

11    that those are in that 72.

12              However, we've notified

13    audiovisual/photograph requests that came after

14    Judicial Watch, but I'm not certain how many are in

15    that notification.  So we consider that processed,

16    but I'm uncertain of the number.

17              MR. PETERSON:  Okay.  I don't have any

18    more questions.  This concludes the deposition.

19              MS. HONG:  And just to put on the record,

20    typically we get 30 days to review the transcript.

21    Maybe we can go off the record to talk about this.

22              We do reserve our right to review and
```

```
1    sign the transcript.

2                          - - -

3              (Deposition concluded at 3:20 p.m.)

4                          - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

## ACKNOWLEDGMENT OF DEPONENT

I, DANA SIMMONS, do hereby acknowledge that I have read and examined the foregoing ninety-seven (97) pages of testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any changes and/or corrections appear on the attached errata sheet signed by me.


4/17/08
_____
(Date)

_____
DANA SIMMONS

ESQUIRE DEPOSITION SERVICES
1020 19th Street, Northwest
Suite 620
Washington, D.C. 20036

Case Name: Judicial Watch v. National Archives
Witness Name: DANA SIMMONS
Deposition Date: April 7, 2007
Job No.: 186570

## ERRATA SHEET

| PAGE:LINE | CURRENTLY READS | CORRECTION | REASON |
|---|---|---|---|
| 10:9 | 2006-886 | 2006-0886 | Transcription Error |
| 12:7 | 886 | 0886 | Transcription Error |
| 12:9 | 2006-886-F | 2006-0886-F | Transcription Error |
| 12:13 | 2006-886-F | 2006-0886-F | Transcription Error |
| 27:3-6 | "I did not process the FOIA case. I know it was limited, very small amount of records. It was all classified, and therefore nothing could be released." | I did not process the FOIA case. I know the potentially responsive records were limited and were a very small amount of records. It was all classified, and therefore nothing could be released or produced to the requesting party." | Clarification |
| 36:12 | "former and the incumbent" | "former and the incumbent Presidential representatives" | Clarification |
| 44:22 | 2006-886-F | 2006-0886-F | Transcription Error |
| 45:13 | "first lady's phone logs" | "First Lady's Daily Schedules" | Misspoke |
| 47:20-22 | "I believe one, and it's in one of the expedited – it's in one of our expedited, our small." | "I believe that 26 of the 27 FOIA requests currently pending before Judicial Watch's telephone log books portion of request number 2006-0886-F were submitted before Judicial Watch submitted request 2006-0886-F. Only one of the 27 was submitted after April 5, 2006 and that request is in one of the "expedited" or "small" queues." | Misunderstood the question and misspoke. |
| 48:11 | "One" | "Twenty-six" | Misunderstood the question and misspoke. |
| 48:18-19 | "One. It's in one of the -- it's in our small queue." | "Twenty six." | Misunderstood the question and misspoke. |
| 63:20 | "Materials Project" | "Materials Staff" | Misspoke |
| 71:20 | "Materials Project" | "Materials Staff" | Misspoke |
| 78:10 | "Possibly." | "Yes. Because the UFO | Clarification |

| PAGE:LINE | CURRENTLY READS | CORRECTION | REASON |
|---|---|---|---|
| | | requests were placed into a queue for requests seeking fewer than 50 pages of records, those requests were processed as they arose in the line up of queues. Some requests that were submitted before the UFO requests were submitted remained in other queues for larger requests and were processed or remain to be processed after the "UFO" requests." Although the UFO requests were processed within the small or expedited queue by date received, those requests were processed before some larger requests could be processed. | |
| 81:9 | "processed paged" | "processed pages" | Transcription Error |
| 86:13 | "Because it's the only one." | "Because it's the only one submitted after Request No. 2006-0886-F that was processed before the daily schedules portion of 2006-0886-F was processed. | Clarification |
| 89:11-13 | "I don't recall – I don't think we had responsive records, though, because I don't remember anything being processed." | "I believe the request called for fewer than 3000 records. " | Clarification |
| 93:20-23 | "Basically, the 119 is basically just a list by date received." | Based on the queue structure currently in place at the Clinton Presidential Library, there are 27 requests pending before the telephone log books portion of request number 2006-0886-F will be processed. Those 27 requests remain throughout the 13 textual and electronic queues. Hypothetically, though, if the Library had only one "queue" for processing, there would be 119 FOIA requests that would have to be processed before the telephone log books portion of request number 2006-0886-F would be processed. That is because those 119 requests all pre-date Judicial Watch's April 5, 2006 request. | Clarification |

_____          4/17/08
Signature                                             Date

3

# EXHIBIT 2

## THE U.S. NATIONAL ARCHIVES & RECORDS ADMINISTRATION

| www.archives.gov | Wednesday, April 23, 2008 |
|---|---|

Spring 2008, Vol. 40, No. 1

**A Word About the Archives' Budget**
**—And the Quality of Our Staff**
*By Allen Weinstein*

As many of you know, I offer a column in each issue of *Prologue.* Most columns, given my interests and background, deal with historical or archival issues related to my broader responsibilities at the National Archives and Records Administration (NARA).

For this issue, however, I decided to provide readers with a brief glimpse of the budget and expenditures at the Archives—a look at the day-to-day operations of this complex institution.

One of the things I have admired in my three years as Archivist of the United States is the professionalism and dedication of its staff. Some 3,000 employees work with our customers every day to assist them with research of various kinds or providing a guided tour through an exhibit.

Their work, as part of NARA's special mission, was recognized recently by Congress and the President in the form of a generous appropriation for fiscal year 2008—$411.1 million. This level of funding represents an increase of 20.5 percent over fiscal year 2007 appropriations.

This is very good news because for the past several years, NARA has done its job with limited resources—requiring a hiring freeze, a reduction in hours of operation, agency-wide belt-tightening, and a general slowdown in the processing of records.

In response to the new budget, Archives staff have developed innovative ways to broaden access to records and have expanded public programs to inform and educate the public about the mission of the Archives and the importance of the records we preserve.

This new appropriation is allowing us to restore regular research hours effective April 16. Hours had been reduced earlier because of a shortage of funds needed to cover the energy, security, and staff costs involved in keeping the research rooms open evenings and on Saturdays. The once-a-month extended hours created a challenging work environment for our talented reference and research room staff who faced frustrated customers and a high volume of requests on those days. The hiring freeze has been lifted, and we're now in the process of bringing on additional professional archival staff.

\* \* \*

The good news of a budget increase, however, must be tempered by the fact that many necessary costs have risen significantly. The lion's share of our budget—$315 million—will be spent on rapidly rising operating expenses: salaries and recently enacted pay raises for nearly all employees; contractor services, such as maintenance and security; and costs of energy at all our facilities except the self-funding federal records centers.

We have received full funding of $58 million to continue the development of the Electronic Records Archives (ERA), which is being built by the Archives to preserve and make accessible all the electronic records being produced by the federal government now and in the future. It will allow access to these records, as well as records of the past as they are moved to electronic

format, to anyone, anywhere at any time.

The new budget also includes funds ($28.6 million) for construction projects at the presidential libraries. Among those projects is the construction of an archival addition to the Richard M. Nixon Presidential Library in Yorba Linda, California. Once the addition is completed to NARA specifications, Nixon presidential records will be moved from College Park to Yorba Linda so that all the records of Richard Nixon's career in public life will be under one roof.

Also included are funds to complete the repairs and restoration of the plaza at the Lyndon B. Johnson Presidential Library in Austin, Texas; $8 million for the first steps of acquiring land for and building a new addition to the John F. Kennedy Presidential Library in Boston; and money for design work on renovations at the Franklin D. Roosevelt Library at Hyde Park, New York.

The National Historical Publications and Records Commission is receiving $7.5 million for grants to entities to preserve and provide access to important and significant nonfederal historical records at various repositories around the country.

* * *

Despite ongoing fiscal limitations, the National Archives has the resources to meet the needs of our customers, the citizens of the United States—in the form of generous appropriations provided by Congress and the President, but equally important, through the talent, ingenuity, and commitment of our staff nationwide.

**Allen Weinstein** is Archivist of the United States.

Articles published in *Prologue* do not necessarily represent the views of NARA or of any other agency of the United States Government.

**Purchase This Issue** | **Subscribe to Prologue**

Page URL: http://www.archives.gov/publications/prologue/2008/spring/archivist.html

The U.S. National Archives and Records Administration
8601 Adelphi Road, College Park, MD 20740-6001 • Telephone: 1-86-NARA-NARA or 1-866-272-6272